UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES

REPORT AND RECOMMENDATION OF SPECIAL MASTER

---------------------------------------------------------------- x

1:24-MC-03415-BMC-JAM

IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTE CONFLICT ID NUMBERS:

1:26-MC-02719-BMC-JAM

185684 (WINGS-UP OF BOARDWALK, LLC)
185685 (WINGS-UP OF WEST MONROE, LLC)
185764 (WINGS-UP OF SIEGEN, LLC)
185825 (WINGS-UP OF HOUMA, LLC)
186032 (WINGS-UP OF DENHAM, LLC)
186307 (WINGS-UP OF BATON ROUGE, LLC)
186424 (WINGS-UP OF SLIDELL, LLC)
186543 (WINGS-UP ON THE WESTBANK, LLC)
186544 (WINGS-UP OF LAFAYETTE, LLC)
186547 (BLUE SKY MANAGEMENT CO., LLC)

---------------------------------------------------------------- x

**Parties**:

CC Advocacy LLC (“CCA”)

Optium Capital, LLC (“Optium”)

**Representatives**:

Jatin Zalawadia, Managing Director
CC Advocacy LLC
4069 Roaring Fork Lane
Frisco, TX 75033
310-846-7678
info@ccadvocacy.com
Representative of CCA

Hugh Alexander, General Counsel
Optium Capital, LLC
620 Newport Center Drive, Suite 670
Newport Beach, CA 92660
415-805-8137
claim@optiumcapital.com
Representative of Optium

I. <u>Background</u>

The parties to the conflicts listed in the caption have both registered with the Class Administrator claims for a share of the proceeds of the settlement fund in *In re Payment Card Interchange Fee Merchant Discount Antitrust Litigation*, Dkt. no. 05-MD-1720 (E.D.N.Y.) ("*MDL 1720*")) arising out of the payment card transactions of the following ten merchants, each of which is a member of the *MDL 1720* damages settlement class and owned by Hooters of Louisiana LLC ("HOL"). The ten merchants, identified by name and the last four digits of its Taxpayer Identification Number ("TIN") are: Wings Up of Boardwalk, LLC (4392); Wings Up of West Monroe, LLC (4529); Wings Up of Siegen, LLC (6666); Wings Up of Houma, LLC (4492); Wings Up of Denham, LLC (8819); Wings Up of Baton Rouge, LLC (8160); Wings Up of Slidell, LLC (6646); Wings Up On The Westbank, LLC (5780); Wings Up of Lafayette, LLC (6085); Blue Sky Management, LLC (7462) (collectively, the "HOL Merchants").

On July 30, 2019. *See* Memorandum from CCA dated August 19, 2025 ("CCA Memo"), Ex. A ("CCA Service Agreement"). Under that agreement, HOL engaged CCA "to act as an *exclusive recovery agent* to assist in recovering" settlement funds and "undertook *not* to engage any other company for the same services in the future." CCA Memo at 2 (citing CCA Service Agreement ¶¶ 1, 3) (emphasis in original). CCA agreed to provide that service and "earn a fee as a percentage of the recovery." Letter from CCA dated April 29, 2024 at 1 (citing CCA Service Agreement ¶ 4); *see also* CCA Memo at 2 (CCA "enter[ed] into a contingent fee arrangement where we do all the work at no upfront cost to the class member and only get paid years later after the class member gets paid from claims recovery."). CCA contends that "[t]his fee structure has resulted in CCA now having a 25% interest in all the [HOL Merchants'] claims from July 30, 2019 onwards." CCA Memo at 3. On September 20, 2019, after entering into the CCA Service

Agreement, HOL's President executed and sent to the Class Administrator a notice of its agreement with CCA and asked all future communications regarding the *MDL 1720* claims of the HOL Merchants to be sent to CCA. *See* CCA Memo., Ex. B.

After HOL agreed to appoint CCA as its agent, on July 17, 2020, HOL sold the HOL Merchants' *MDL 1720* damages claims to Optium. *See* Letter from Optium dated August 28, 2025 ("Optium 8/28/25") at 1 & Ex. A (Claim Purchase Agreement dated Jul. 17, 2020 ("Optium CPA"). In doing so, HOL represented and warranted that it had "good, valid and marketable title" to those claims and sold them "free and clear of any mortgage, pledge, lien, security interest, claim, set-off or encumbrance of any kind or nature." Optium CPA § 3.3. On the same date, HOL executed a Notice of Transfer and Assignment of Right addressed to the Class Administrator stating that it had "absolutely, unconditionally and irrevocably transferred and assigned to [Optium] all of [HOL's] rights, title and interest in and to or associated with, or connected in any manner to, any claim against and settlement, judgment or recovery of funds or other consideration … arising from the class action litigation of [*MDL 1720*]." *Id*. Ex. B. The Notice referred to an exhibit to the CPA listing the ten HOL Merchants whose claims HOL had transferred to Optium. *Id*. Ex. D.

## II. Analysis

CCA asserts that the instant conflict presents two issues for resolution:

> 1. Should [the] Special Master void a binding agreement between parties with a contingent interest in favor of a subsequent agreement signed in violation of the terms of the original agreement?"
>
> 2. Should a purchase agreement be given precedence over an existing exclusive and binding representation agreement without any compensation for our interest in the claims?

CCA Memo at 1. CCA answers "no" to both questions. *See id*. I respectfully disagree with CCA's framing. As discussed below, I have no power even to consider those contractual issues,

let alone decide them or recommend a resolution. Instead, I do no more than identify who owns some or all of the HOL Merchants' *MDL 1720* claims and who is authorized to file those claims with the Class Administrator.

A. CCA's Agreement With HOL Does Not Convey Ownership

The CCA Service Agreement prescribes what CCA must do for HOL and how HOL must compensate CCA for doing it. CCA "agrees to make all reasonable efforts to provide assistance with respect to filing claim(s) and to secure payment of the claim(s) *on behalf of the Client* in all the remaining payouts under the ongoing settlement." CCA Service Agreement ¶ 2 (emphasis added). In return, "[HOL] agrees to pay the Company twenty-five percent (25%) of ALL proceeds received as payment in the Settlement on or after the date of this Agreement (the 'Fee')." *Id.* ¶ 4. However, under that same provision, CCA "*is NOT entitled to any compensation unless it is successful in recovering a refund for the Client.*" *Id.* ¶ 4 (emphasis in original).

The Service Agreement is explicitly a contract for CCA to provide a specified service to HOL in exchange for a fee. Nothing in the agreement states, or even suggests, that HOL is conveying ownership of any of the HOL Merchants' *MDL 1720* damages claims. Moreover, several provisions are inconsistent with such an interpretation. The following list is not exhaustive.

First, unlike the Optium CPA, which explicitly describes itself as a "Claim Purchase Agreement," the parties to the CCA Service Agreement explicitly agreed to an "Engagement of Services." *Id.*, ¶ 1. Second, CCA's duty under the agreement is "to fil[e] claim(s) and to secure payment of the claim(s) *on behalf of the Client*" – there is no mention of any filing or claim to be made on CCA's behalf – which suggests that CCA owns no claims that can be filed. *Id.*, ¶ 2 (emphasis added). Third, the agreement explicitly describes CCA's role as an "agent" – not a

purchaser or owner. *Id.*, ¶ 3. Fourth, the agreement's compensation provision is inconsistent with the proposition that CCA now owns any part of the HOL Merchants' claims. Most obviously, it describes CCA's compensation as a "fee" that CCA will "earn" in the future by rendering the prescribed service to HOL – not as an ownership interest that the agreement created at the time the parties entered into it. *Id.*, ¶ 4. The provision's disclaimer is also inconsistent with CCA's position here. It provides that CCA will get no compensation unless it secures a recovery for HOL. *Id*. But if CCA currently owns some part of the HOL Merchants' claims, then – by virtue of the Court's order approving the settlement – it is entitled to receive the corresponding share of the settlement funds regardless of whether it provides any service to HOL. A failure to provide such service might expose it to civil liability, but it would not divest CCA of any specific property it now owns or vitiate its rights as the HOL Merchants' successor in interest under the settlement agreement.

Thus, whatever benefit the CCA Service Agreement conferred on CCA, it was not partial ownership of the HOL merchants' claims. CCA appears to tacitly acknowledge that reality in its most recent submission, which contends only that "[t]he contingent-fee structure and CCA's performance created a property-like interest in the proceeds." Letter from CCA dated Sept. 4, 2025, at 2. CCA provides no legal authority for that proposition, nor does it go so far as to assert that its claimed "property-like interest" is sufficiently equivalent to ownership as to give it control of some portion of the HOL Merchants' claims.

The evidentiary record easily establishes that Optium is the owner of whatever *MDL 1720* damages claims HOL owned as of July 17, 2020 (the date of the Optium CPA). CCA does not appear to contest that point. Instead, CCA argues that what HOL owned and Optium purchased in 2020 was only 75 percent of the claims HOL originally owned, and that CCA

acquired the remaining 25 percent in 2019. The record does not support that assertion. I therefore respectfully recommend that the Court find that Optium, as HOL's successor in interest, is the sole owner of the *MDL 1720* damages claims at issue in this conflict.

B. <u>The Claims' Owner Has the Power to Decide Who May File Its Claims</u>

It is blackletter law that a principal generally has the power to revoke an agent's authority, regardless of the existence of any contract between the two under which that revocation may constitute a breach. *See*, *e.g.*, *United Ins. Co. v. World Wide Web*, 2011 WL 1870599, at *2-3 (E.D.N.Y. Apr. 27, 2011) ("a principal has an inviolate right to revoke its agency at any time[;]" if "in doing so, the principal violates its obligations to the agent under their contract, the agent retains the legal recourse of bringing a breach of contract claim") (citing cases), *report and recommendation adopted* 2011 WL 1843280 (E.D.N.Y. May 16, 2011); Restatement (Third) Of Agency § 3.06 (2006).[1]

Accordingly, as the owner of the relevant claims, Optium has the authority to choose an agent to register those claims on its behalf with the Class Administrator or to do so itself. Regardless of any contractual rights CCA may have as a result of its service agreement with HOL, it has no power to override Optium's choice of agent. I therefore respectfully recommend that the Court permit Optium, and not CCA, to file the claims at issue here.

[1] The general rule does not apply when the authority granted to the agent is a "power given as a security." *See*, *e.g.*, *Gov't Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 95 F.3d 291, 300 (3d Cir. 1996). However, a third-party filer's agreement to file a claim on behalf of a merchant in exchange for a portion of the merchant's eventual recovery does not create a power given as a security; it creates no more than a revocable agency relationship. *See* Restatement (Third) Of Agency § 3.12, illus. 4 (2006) ("P develops a mechanical invention and engages A to patent the invention…. P authorizes A to file patent documents on P's behalf…. P agrees … to pay A half of P's profits. Even if A's authority is stated to be irrevocable, A does not hold a power given as security.")

C. The Court Should Decline to Review CCA's Potential Contract Claims

As noted above, the resolution I recommend does not resolve any potential contract-based claim CCA may have against Optium or HOL. I conclude that I have no authority as Special Master to determine whether CCA has any such enforceable right and I therefore respectfully recommend that the Court likewise decline to review that question.

In its order approving the damages class settlement, the Court retained jurisdiction over three specified groups of parties: "the members of the Rule 23(b)(3) Settlement Class Plaintiffs, the members of the Rule 23(b)(3) Settlement Class, and the Defendants." *MDL 1720*, Doc. 7818 (the "Final Judgment") ¶ 18. Moreover, it did so only for a specific purpose: "to implement, administer, consummate, and enforce the [Settlement], including any disputes relating to, or arising out of, the release and covenant not to sue of the Rule 23(b)(3) Settlement Class or any claim for payment from the Class Settlement Cash Escrow Account." *Id.*

CCA is not a plaintiff, class member, or defendant in *MDL 1720*.[2] And while both HOL and Optium have at different times qualified as class members for present purposes (by virtue of owning the HOL Merchants' damages claims), that alone does not mean that the Court reserved jurisdiction over non-party CCA's potential claims against either of them. If the Court adopts the recommendation to resolve the instant conflicts in Optium's favor, resolving CCA's potential contract-based claims against Optium or HOL will not in any way promote the Court's ability to "implement, administer, consummate, and enforce" the settlement agreement. On the other hand, if the Court rejects that recommendation and finds that CCA owns 25 percent of the HOL

[2] While CCA may itself be a member of the plaintiff class in *MDL 1720* on the basis of having accepted payments for its services from clients using Visa or MasterCard payment cards, its potential claims against HOL or Optium would be unrelated to that status.

Merchants' damages claims, that will moot any contract-based claims CCA might assert against Optium or HOL.

Either way, the Court will have no reason to review the merits of those claims. Regardless of whether Optium or HOL is deemed liable to CCA for breach of the CCA Service Agreement or under quasi-contract theories, Optium will still be entitled to receive a pro-rata share of the settlement funds. A court resolving CCA's potential contract-based claims would merely decide whether some other party (presumably Optium or HOL) must pay CCA an amount calculated with reference to the recovery at issue here as a contingency fee under the terms of the CCA Service Agreement. That determination will turn on an issue of contract interpretation under Delaware law. *See* CCA Service Agreement, ¶ 17. It will not hinge on an interpretation of either the legal issues in *MDL 1720* or the terms of the damages class settlement agreement and it therefore will have no impact on this Court's ability to implement, administer, consummate, or enforce that agreement. *See MDL 1720*, 348 F.R.D. 151, 172 (E.D.N.Y. 2024) (adopting identical reasoning by Judge Marutollo).[3] Accordingly, the Court's reservation of jurisdiction does not apply to CCA's potential contract-based claims against Optium or HOL.

III. <u>Recommendation</u>

For the reasons set forth above, I respectfully recommend that the Court permit Optium, and not CCA, to file claims on behalf of the merchants listed in the caption. I further respectfully recommend that the Court decline to review any potential claims arising from CCA's agreement to file claims on behalf of HOL.

---

[3] In the cited decision, the Court also adopted Magistrate Judge Marutollo's explanation of why the All Writs Act did not give the Court jurisdiction over a contract dispute between two third-party filers. *Id*. at 168-173. The same reasoning applies with equal force here.

IV. Objections

This Report and Recommendation will be served on all registrants who are parties to the instant conflict via the Court's ECF system, and the Class Administrator will also promptly provide a copy to all such registrants. Any interested party shall have 21 days from today's date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-02719-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this Report and Recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket.[4] Such evidence may be filed under seal to protect confidentiality and the identities of claimants, as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMA-JAM, Doc. 3, ¶ 4.

Dated: June 29, 2026

*/s/ James Orenstein*
Special Master

[4] In preparing this Report and Recommendation, I have considered the following submissions, including their exhibits: (1) letters from Optium dated August 28, 2025; September 12, 2025; and September 17, 2025; and (2) letters from CCA dated April 29, 2024; and September 4, 2025; and (3) a memorandum by CCA dated August 19, 2025.