UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

IN RE MDL 1720 DAMAGES CLASS
SETTLEMENT DISPUTES

REPORT AND
RECOMMENDATION
OF SPECIAL MASTER

-------------------------------------------------------------------- x     1:24-MC-03415-BMC-JAM

IN RE MDL 1720 DAMAGES CLASS
SETTLEMENT DISPUTE                                  1:26-MC-02391-BMC-JAM
CONFLICT ID NUMBERS:

261129 (BUFFETS LEASING CO. LLC),
261130 (HOMETOWN LEASING CO. LLC),
261136 (HOMETOWN BUFFET, INC.),
261137 (OCB LEASING CO. LLC),
261139 (BUFFETS FRANCHISE HOLDINGS, LLC),
261141 (RYAN'S REST. MGMT. GRP., LLC),
261143 (OCB PURCHASING CO.),
261144 (DISTINCTIVE DINING, INC.),
261147 (FIRE MTN. LEASING CO., LLC),
261148 (FIRE MTN. MGMT. GRP., LLC),
261149 (BUFFETS HOLDINGS, INC.),
261150 (TAHOE JOE'S LEASING CO. INC.),
261151 (BIG R PROCUREMENT CO., LLC),
261152 (BUFFETS REST. HOLDINGS, INC.),
261153 (RYAN'S REST. LEASING CO. LLC),
261199 (RYAN'S REST. GRP., LLC),
261263 (TAHOE JOE'S, INC.),
261290 (OCB REST. CO., INC.),
261307 (FIRE MTN. RESTAURANTS LLC), and
261449 (BUFFETS, INC.).

-------------------------------------------------------------------- x


**Parties**:

Blue Sturgeon Holdings LLC
Claims Compensation Bureau
National Recovery Services, Inc.
Oak Point Partners, LLC

**Representatives**:

Blair Will
Clark Hill LLP
505 Montgomery Street, 13th Floor
San Francisco, CA 94111
bwill@clarkhill.com
415-984-8520
Counsel for Blue Sturgeon Holdings LLC

Karmella M. R. Aiken, Assistant Vice President of Operations
Claims Compensation Bureau
130 Corporate Boulevard
Norfolk, VA 23502
757-431-7908
karmella.aiken@claimscompensation.com
Representative of Claims Compensation Bureau

Janice A. Alwin, Chief Legal Officer
Oak Point Partners, LLC
5215 Old Orchard Road, Suite 1000
Skokie, IL, 60077
janice@oakpointpartners.com
847-577-1374
Counsel for Oak Point Partners, LLC

William D. Gardner
Von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
William.gardner@vonbriesen.com
414-287-1283
Counsel for National Recovery Services, Inc.

Timothy D. Babcock
Hamilton, Houck, & Babcock
5520 37th Street South
Wisconsin Rapids, WI 54494
tim@nrsgroup.com
920-989-1519
Counsel for National Recovery Services, Inc.

I.      Background

The parties to the conflicts listed in the caption have all registered with the Class Administrator claims for a share of the proceeds of the settlement fund in *In re Payment Card Interchange Fee Merchant Discount Antitrust Litigation*, Dkt. no. 05-MD-1720 (E.D.N.Y.) ("*MDL 1720*")) arising out of the payment card transactions of Buffets, Inc. ("Buffets") and a number of its related entities (collectively with Buffets, the "Buffets Entities").[1] Four parties remain in conflict and have submitted arguments to me: Blue Sturgeon Holdings LLC ("BSH"); Claims Compensation Bureau ("CCB") in its capacity as the representative of Park Interchange, LLC ("Park"); National Recovery Services, Inc. ("NRS"); and Oak Point Partners, LLC ("OPP").[2] Four other entities withdrew their claims after registering them: Cascade Settlement Services LLC ("Cascade"), Buffets, LLC; Crowell & Moring, and Spectrum Settlement Recovery. Fire Mountain Restaurants LLC has not withdrawn the claim it registered on its own behalf but also has not responded to notices soliciting submissions about the conflict either to the Class Administrator or to me, and I therefore deem its claim abandoned.

There are two main categories of disputes. The first arises from a pair of written agreements between Buffets and NRS executed in 2011. Under those agreements, Buffets appointed NRS as its agent for filing its claim for a share of the proceeds of any recovery in

---

[1] To help differentiate among entities with similar names, I refer to the various Buffets Entities with the entity's name and, in parentheses, the last four digits of the its Taxpayer Identification Number ("TIN"). In addition, to reduce the need for explanatory notes, I refer to a merchant associated with a given TIN by the name the Class Administrator has used in its record of conflicts, notwithstanding the parties' occasional use of slightly different names (such as substituting "LLC" for "Inc.") or alternate names under which a merchant with a specific TIN has done business.

[2] I will use "[party abbreviation] [submission date]" to cite the parties' submissions. Those submissions are listed in the Appendix, along with a table showing which of the remaining parties has registered claims for each of the Buffets Entities.

*MDL 1720.* In exchange, Buffets agreed to pay NRS twenty percent of its recovery. NRS asserts that the 2011 agreements bound not just Buffets but also other Buffets Entities. It further asserts that the agreement gave it a direct stake in the *MDL 1720* settlement rather than merely the right to collect a fee from Buffets (or Buffets' successor in interest) for serving as the latter's agent. BSH, CCB, and OPP all disagree with the latter assertion and instead contend that NRS may do no more than seek relief from whichever entity has succeeded to Buffets' contractual obligations under the agreements.

The second category of disputes arises from a series of bankruptcy proceedings that different subsets of the Buffets Entities initiated from 2012 to 2021. Those proceedings resulted in a series of reorganization plans as well as multiple transfers of the various debtors' assets – although the parties disagree as to whether the Buffets Entities' damages claims in *MDL 1720* were included in those asset transfers. At various times after the start of those bankruptcy proceedings, Cascade, BSH, OPP, and Portfolio Recovery Associates, LLC ("PRA") each purchased some of those assets.[3] NRS contends that none of those transactions involved the Buffets Entities' *MDL 1720* damages claims. BSH, OPP, and CCB all disagree with NRS on that point but also disagree with one another about who owns which bundle of claims as the result of post-bankruptcy transactions.

To explain my recommendations about how to resolve these intertwined disputes, I describe in greater detail below the relevant agreements and proceedings.

---

[3] PRA and CCB are both subsidiaries of PRA Group, Inc. (formerly known as Portfolio Recovery Services, Inc.). As CCB explains in its submission, PRA bought a bundle of Buffets Entities' claims from OPP and later resold them to Park, which in turn retained CCB as its claim servicer and authorized representative. Thus, the interests held by PRA and then Park are represented in these proceedings by CCB. *See* CCB 4/30/26 at 1.

A.      June 15, 2011: Agreements Between NRS and Buffets

NRS relies primarily on two documents, each of which is attached as an exhibit to the declaration of Timothy Babcock ("Babcock") dated May 14, 2026 ("Babcock Decl.") submitted with NRS's letter of the same date. The first is an undated document titled "Amended Recovery Services Agreement." Babcock Decl., Ex. A at 1-2 ("NRS Service Agreement").[4] The second is an "Agency Appointment and Authorization" dated June 15, 2011. Babcock Decl., Ex. A at 3 ("NRS Agency Appointment" or, collectively with the NRS Service Agreement, the "NRS Agreements").[5] The NRS Service Agreement recites that it is "made and entered into by and between National Recovery Services, Inc. ('NRS') and Buffets, Inc. ('Client')." It is signed by Babcock on behalf of NRS and on Buffets' behalf by Scott Irwin, who is identified as "EVP and General Counsel [of] Buffets, Inc." The same two individuals signed the NRS Agency Appointment, which identifies "Buffets, Inc." (with a TIN ending in 2294) as the "Client" and recites that the agency appointment is "Accepted by National Recovery Services, Inc." Neither document makes any direct or indirect reference to any of the other Buffets Entities or has any language stating that it applies to anyone other than NRS and Buffets.

The NRS Service Agreement provides that "[w]ithin ten (10) days of any payment to Client relating to the Case [*i.e. MDL 1720*] (the 'Recovery'), Client agrees that it shall pay to NRS twenty percent (20%) of the total Recovery ('Service Fee)." NRS Service Agreement at 1. NRS contends that it is therefore "owns 20% of all interests in any Buffet Recovery originally

---

[4] To the extent the word "Amended" suggests the existence of a pre-amendment version of the NRS Service Agreement, I can find no such document in the record.

[5] Although the NRS Service Agreement is undated, it appears to be roughly contemporaneous with the NRS Agency appointment. No party has suggested otherwise, and I assume for purposes of analysis that both agreements were in effect at all relevant times.

held by the Buffet Entities." NRS 5/14/26 at 2. BSH, CCB, and OPP contend that the NRS

Agreements did no more than establish an agency relationship and thus did not transfer to NRS

any ownership interest in any of the Buffets Entities' *MDL 1720* damages claims. See BSH-

CCB-OPP 5/14/26 at 1. As discussed below, I agree and therefore respectfully recommend that

the Court find that NRS has no direct claim against the settlement fund.[6]

B.       The 2012 Bankruptcy[7]

On January 18, 2012, Buffets and 15 related entities (collectively, the "2012 Debtors")

filed for chapter 11 relief in the Bankruptcy Court for the District of Delaware. *See In re Buffets*

*Restaurants Holdings, Inc. et al.*, Dkt. No. 12-10237-MFW (Bankr. D. Del.) ("*2012 Bankr.*").[8]

At that point, the 2012 Debtors' assets – including ownership of their *MDL 1720* claims –

became the property of the bankruptcy estate. *See* 11 U.S.C. § 541. The Bankruptcy Court

approved a reorganization plan on June 27, 2012, effective as of July 18, 2012. *See* 2012 Order;

2012 Order Ex. A ("2012 Plan") (reproduced in OPP 4/30/26 Ex. 6 at 55-130); OPP 4/30/26 Ex.

7 (*2012 Bankr.*, Doc. 806) (notice of effective date of 2012 Plan).

---

[6] BSH, CCB, and OPP also argue that the NRS Agreements bound only Buffets, and not any other of the Buffets Entities. *See id*. As discussed below, I respectfully recommend that the Court decline to resolve that issue.

[7] Before the bankruptcy proceedings discussed below, on January 22, 2008, Buffets and 18 related entities sought relief in the Bankruptcy Court for the District of Delaware. *See In re Buffets Holdings, Inc., et al*., Dkt. No. 08-BK-10141-MFW (Bankr. D. Del.). Because the results of that bankruptcy case do not affect the instant conflicts I do not address them further.

[8] The 2012 Debtors were: Buffets Restaurants Holdings, Inc. (9569); Buffets Holdings, Inc. (4018); Buffets, Inc. (2294); HomeTown Buffet, Inc. (3002); OCB Purchasing Co. (7610); OCB Restaurant Company, LLC (7607); Buffets Franchise Holdings, LLC (8749); Buffets Leasing Company, LLC (8138); Ryan's Restaurant Group, LLC (7895); Ryan's Restaurant Leasing Company, LLC (7405); HomeTown Leasing Company, LLC (8142); OCB Leasing Company, LLC (8147); Fire Mountain Restaurants, LLC (8003); Fire Mountain Leasing Company, LLC (7452); Tahoe Joe's, Inc. (7129); and Tahoe Joe's Leasing Company, LLC (8145). *See* OPP 4/30/26 Ex. 6 (*2012 Bankr.*, Doc. 743) (the "2012 Order"), at 1 n.1.

Neither the 2012 Plan nor the order adopting it refers explicitly to *MDL 1720*, and the parties disagree as to how the terms of those documents affect ownership of the Buffets Entities' *MDL 1720* damages claims. NRS contends that once the 2012 Plan took effect, ownership of those claims reverted from the bankruptcy estate to the reorganized debtors that originally owned them. *See* NRS 5/14/26 at 2-5. BSH does not explicitly address the issue, but as explained below, its position (namely, that it purchased the Buffets Entities' *MDL 1720* damages claims from Cascade in 2013) necessarily assumes the same. CCB and OPP disagree, and assert that in approving the 2012 Plan, the Bankruptcy Court established a Litigation Trust and vested it with, among other things, the debtors' *MDL 1720* damages claims to the extent that they had accrued by the time the 2012 Debtors filed their petitions. *See* OPP 2/27/25 at 2-3; OPP 5/14/26 at 1-2; CCB 4/30/26 at 1-2. As explained below, I agree with NRS and therefore respectfully recommend that the Court find that the 2012 Plan and 2012 Order did not vest any of the Buffets Entities' *MDL 1720* damages claims in the Litigation Trust.

C.      July 2-3, 2013: Conveyances to Cascade and BSH

On July 2, 2013, Cascade entered into an Asset Purchase and Sale Agreement ("APA") with Buffets. *See* OPP 4/30/26 Ex. 11 (the "Buffets-Cascade APA").[9] Cascade then entered into another agreement on July 3, 2013, that conveyed to BSH the asset it had purchased from Buffets the day before. *See* BSH 5/14/26 Ex. A (the "Cascade-BSH OSA").

1.      July 2, 2013: The Buffets-Cascade APA

The Buffets-Cascade APA conveyed from Buffets to Cascade an "Asset" defined as the monetary recovery in *MDL 1720* (if any) to which Buffets would be entitled in the event (1) a

---

[9] As explained below, the cited document omits the agreement's Exhibit B. BSH supplied the latter exhibit in a supplemental submission. *See* BSH 5/15/26 Attachment.

7

class was certified in the case, (2) Buffets was included in the class, and (3) either the class prevailed in the litigation or secured a settlement. *See* Buffets-Cascade APA at 1 (preamble and Recital A). As part of the agreement, Buffets represented that it had "the requisite power and authority" to sell the Asset. *Id*. § 3.2.

Like the 2011 NRS Agreements, the Buffets-Cascade APA identified Buffets as a party to the agreement and did not so identify any other Buffets Entity. However, unlike the NRS Agreements, the Buffets-Cascade APA explicitly identified by name the Buffets Entities whose *MDL 1720* damages claims were included in the "Asset" sold to Cascade. Unfortunately, explaining how it does so requires reading different parts of the document in context. Further complicating the task, no party has submitted a single exhibit that contains all of the pages of the Buffets-Cascade APA.

An explanation of how the Buffets-Cascade APA identifies the Buffets Entities whose *MDL 1720* damages claims Cascade purchased starts with Section 2.2(b) of the agreement. That provision required Buffets to provide Cascade a Notice of Assignment and Authorization to Obtain Transactional Data in the forms attached as exhibits A and B to the APA. The copy of the APA supplied by OPP (like the copies submitted as exhibits by other parties) does not include pages designated as those exhibits.[10] However, it does include two pages after the signature pages. *See* OPP Ex. 11 at 9-12.

The first of these plainly appears to be Exhibit A to the Buffets-Cascade APA, although it lacks any explicit marking as such. It is a "Notice of Assignment" addressed to the "Claims Administrator for Any Recovery Arising from [*MDL 1720*]." *Id*. at 11. Like the main portion of the Buffets-Cascade APA, that Notice is dated July, 2, 2013, and signed by Buffets' Vice

---

[10] I do not infer or suggest that OPP or any other party has deliberately omitted any documents.

President of Finance Paul Holovnia ("Holovnia") and Cascade's Chief Executive Officer Bryan Waters ("Waters"). The Notice recites that it "transfers and assigns to [Cascade] all of **BUFFETS, INC.'s** ('Company')" interest in any recovery from *MDL 1720*. *Id*. (capitalization and bolding in original). *Id*.

The last page of OPP's exhibit bears a November 2023 date and therefore cannot be Exhibit B to the Buffets-Cascade APA. However, in a supplemental email dated May 15, 2026, BSH submitted a three page document inadvertently omitted from its submission the day before that appears to be the missing exhibit and to which I will refer as such. *See* BSH 5/15/26 Attachment ("Buffets-Cascade APA Ex. B"). The first page is an "Authorization to Obtain Transactional Data" Like the main APA and the Notice of Assignment, the Authorization to Obtain Transactional Data is dated July 2, 2013, and signed by both Holovnia and Waters. *See id*. at 1. The second page bears the caption "Schedule B" beneath which appear the following instruction: "List all affiliated corporate names, subsidiaries f/k/a names and tax IDs (EINs) *that comprise the company listed in the Notice of Assignment*." *Id*. at 2 (emphasis added). Beneath that is a table listing the names and TINs of each of the 20 Buffets Entities involved in the instant disputes. *Id*. The third page lists the "DBA names for the corporation and its subsidiaries listed in the Notice of Assignment." *Id*. at 3.

### 2.    July 3, 2013: The Cascade-BSH OSA

On July 3, 2013, the day after purchasing the Buffets Entities' *MDL 1720* damages claims, Cascade resold them to BSH pursuant to entered into an Origination and Service Agreement with BSH (the "Cascade-BSH OSA"). Under that agreement, Cascade transferred to BSH the Asset it had just purchased from Buffets, Inc. *See* Cascade-BSH OSA, Recital A & § 2.1. While the parties dispute precisely what bundle of rights included in the "Asset" that

Buffets sold to Cascade, there appears to be no disagreement that Cascade sold that same Asset to BSH.

### 3.    Disposition of Buffets' Agency Relationship with NRS

The Buffets-Cascade APA explicitly acknowledged that the Asset's transfer was "subject to" the NRS Service Agreement, which was attached as an exhibit to the agreement. *Id*. at Recital F; *see also id*., Recital C (acknowledging that Buffets, Inc. had retained the law firm of Hamilton, Houck, & Babcock, a division of NRS, to assist it in filing a settlement claim in *MDL 1720*) & Ex. C (copy of the NRS Service Agreement).[11] However, unlike the Buffets-Cascade APA, the Cascade-BSH OSA made no mention of the NRS Service Agreement. Instead, BSH "irrevocably appoint[ed] Cascade as [BSH's] exclusive agent … to take all steps reasonable and necessary to obtain for [BSH] any claim recovery to which [BSH] may be entitled … in the event a settlement [of *MDL 1720*] results in a monetary benefit to [BSH]." *Id*., § 2.4. As part of that agency appointment, BSH explicitly authorized Cascade to communicate with the Class Administrator and submit claim forms and all other documents incidental to the claim. *Id*., § 2.5. As discussed below, NRS nevertheless contends that BSH assumed the obligations that the NRS Agreements had originally imposed on Buffets.

### D.    2016-2022: Further Bankruptcy Proceedings and Agreements

NRS and BSH base their respective positions in the instant conflicts on the assertion that all of the Buffets Entities' *MDL 1720* damages claims reverted to those entities when they were reorganized under 2012 Order and were later conveyed to Cascade and then BSH via the transactions described above. CCB and OPP predicate their respective positions on a different

---

[11] BSH has submitted a copy of the Buffets-Cascade APA that includes the NRS Agreements (Exhibit C to the APA) but omits the other exhibits identifying the Buffets Entities whose *MDL 1720* damages claims the agreement conveyed. *See* BSH 1/8/26 Ex. 2.

theory. They posit that the 2012 Order created, and vested ownership of the Buffets Entities' *MDL 1720* damages claims in, the Litigation Trust. Under this theory, the MDL 1720 damages claims transferred to the Litigation Trust included only those that had accrued by the date of the 2012 Order – meaning claims based on payment card transactions from the start of the class period in 2004 to the July 18, 2012, effective date of the 2012 Order (the "2004-2012 Transactions"). *See* OPP 2/27/25 at 3. To the extent such claims accrued after that effective date, CCB and OPP contend that they initially belonged to the reorganized Buffets Entities but were then transferred through a series of bankruptcy proceedings and APAs as described below.

       1.      <u>The 2016 Bankruptcy</u>

On March 16, 2016, Buffets and six related debtor entities (collectively, the "2016 Debtors") sought chapter 11 relief in the Bankruptcy Court for the Western District of Texas, and the debtors' assets became property of the bankruptcy estate. *In re Buffets, LLC, et al.*, Dkt. No. 16-BK-50557-RBK (W.D. Tex.) ("*2016 Bankr.*"); *see* 11 U.S.C. § 541.[12] The Bankruptcy Court approved a reorganization plan on April 27, 2017, effective as of May 18, 2017. *See* OPP 4/30/26 Ex. 13 (*2016 Bankr.*, Doc. 2576) (the "2017 Order," approving the 2016 Debtors' proposed reorganization plan (the "2017 Plan") (attached as Ex. A to the 2017 Order)); *2016 Bankr.*, Doc. 2630 (notice of effective date of 2017 Plan). In doing so, the court established an Unsecured Creditors' Trust to which was transferred, with exceptions not relevant here, all of the 2016 Debtors' rights to payment, claims, and causes of action. *See* 2017 Plan, Art. VII.D.

---

[12] The 2016 Debtors were: Buffets, LLC fka Buffets, Inc. (2294); HomeTown Buffet, Inc. (3002); OCB Restaurant Company, LLC (7607); OCB Purchasing Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); and Tahoe Joe's, Inc. (7129). *See* OPP 4/30/26 Ex. 13 at 1 n.1.

CCB and OPP contend that as a result of the 2017 Order, the Unsecured Creditors' Trust came into possession of a portion of the Buffets Entities' *MDL 1720* damages claims. Specifically, they say that the Unsecured Creditors' Trust obtained claims that had accrued as the result of payment card transactions from the effective date of the 2012 Order (July 18, 2012) through the effective date of the 2017 Order (May 18, 2017) (the "2012-2017 Transactions"). *See* OPP 2/27/25 at 4.[13]

### 2.    The 2021 Bankruptcy

On April 20, 2021, Buffets, LLC and 14 related debtor entities (collectively, the "2021 Debtors"), sought chapter 11 relief in the Bankruptcy Court for the Northern District of Texas. *In re Fresh Acquisitions, LLC, et al*., Dkt. No. 21-BK-30721-SGJ (N.D. Tex.) ("*2021 Bankr.*").[14] The Bankruptcy Court approved a liquidation plan on December 20, 2021 and established a Liquidating Trust which was vested with all of the 2021 Debtors' assets. *See* OPP 4/30 Ex. 16 ("2021 Plan") § 15.a.iv; OPP 4/30/26 Ex. 17 (the "2021 Order") (approving the 2021 Plan).

CCB and OPP contend that as a result of the 2021 Order, the Liquidating Trust came into possession of the Buffets Entities' *MDL 1720* damages claims to the extent they accrued as the

---

[13] OPP acknowledges that the Unsecured Creditors' Trust did not obtain claims that the Buffets Entities may have transferred between the effective date of the 2012 Order and the start of the 2016 bankruptcy proceedings – a period that OPP calls the "2012-2016 Gap Period." *Id*. OPP acknowledges that to the extent any of the Buffets Entities sold some of their *MDL 1720* claims during that gap period, the Unsecured Creditors' Trust did not obtain them in 2017. *See id*. If the Court adopts the recommendations below, it need not inquire as what *MDL 1720* damages claims, if any, were transferred during the 2012-2016 Gap Period.

[14] The 2021 Debtors were: Alamo Fresh Payroll, LLC (1590); Fresh Acquisitions, LLC (2795); Alamo Ovation, LLC (9002); Buffets LLC (2294); HomeTown Buffet, Inc. (3002); Tahoe Joe's Inc. (7129); OCB Restaurant Company, LLC (7607); OCB Purchasing, Co. (7610); Ryan's Restaurant Group, LLC (7895); Fire Mountain Restaurants, LLC (8003); Food Management Partners, Inc. (7374); FMP SA Management Group, LLC (3031); FMP-Fresh Payroll, LLC (8962); FMP-Ovation Payroll, LLC (1728); and Alamo Buffets Payroll, LLC (0998). *See* OPP 4/30/26 Ex. 16 at 1 n.1.

result of payment card transactions from the effective date of the 2017 Order (May 18, 2017) through the end of the *MDL 1720* class period on January 25, 2019 (the "2017-2019 Transactions"). *See* OPP 2/27/25 at 4.

   3.  The First OPP APA and the OPP-PRA APA (2004-2012 Transactions)

On September 30, 2016, OPP entered into an APA with the Litigation Trust that the 2012 Order had created. *See* OPP 4/30/26 Ex. 10 ("OPP APA 1"). The agreement recited that the Litigation Trust had been vested with all of the "Transferred Avoidance Actions" previously held by the bankruptcy estate, except for specifically identified "Excluded Avoidance Actions." *Id*. at 1. It described "Remnant Assets" as Litigation Trust property that had not yet been transferred and noted that those Remnant Assets included claims "against American Express or any of its affiliates (collectively, 'AmEx Claims')." *Id*. Pursuant to the agreement, OPP purchased those Remnant Assets, including the AmEx claims, from the Litigation Trust. *See id*. The agreement made no mention of or allude in any way to *MDL 1720*. OPP nevertheless contends that it secured ownership of the 2004-2012 Transactions as a result of the fact that the list of Excluded Avoidance Actions did not name any of the *MDL 1720* defendants. *See* OPP 2/27/25 at 5.

On November 29, 2018, OPP entered into an APA under which it sold its ownership interest in *MDL 1720* damages claims based on the 2004-2012 Transactions to PRA. *See* OPP 2/27/25 at 6; OPP 4/30/26 Ex. 12 (the "OPP-PRA APA"); CCB 4/30/26 at 1-2. The agreement referred to CCB as PRA's affiliate and noted that it provided claim-filing services in, among other things, antitrust-related class action litigation. *Id*., Recital F.

   4.  The Second OPP APA (2017-2019 Transactions)

On March 22, 2022, OPA entered into an APA with the Liquidating Trust that the 2021 Order had established. *See* OPP 4/30/26 Ex. 19 (OPP APA 1). The APA defined a class of

"Residual Assets" that the Liquidating Trust sold to OPP. Those Residual Assets included, among other things, the 2021 Debtors' "claims or proceeds of claims in settlement of class action or antitrust matters." *Id*. at 1. The APA made no specific mention of *MDL 1720*. OPP claims that as a result of this APA, it secured an ownership interest in *MDL 1720* damages claims based on the 2017-2019 Transactions. *See* OPP 2/27/25 at 5.

5.       The Third OPP APA (2012-2017 Transactions)

On March 29, 2022, OPA entered into an APA with the Unsecured Creditors' Trust that the 2017 Order had created. *See* OPP 4/30/26 Ex. 15 (OPP APA 3). The APA defined a class of "Remnant Assets" that the Unsecured Creditors' Trust sold to OPP. Those Remnant Assets consisted of the 2016 Debtors' "known or unknown assets or claims which have not been previously sold, assigned, or transferred." *Id*. at 1. Like its predecessors, this APA made no specific mention of *MDL 1720*. OPP claims that as a result of this APA, it secured an ownership interest in *MDL 1720* damages claims based on the 2012-2017 Transactions with the exception of such claims that the 2016 Debtors had transferred during the 2012-2016 Gap Period. *See* OPP 2/27/25 at 5.

II.    Analysis

Based on my review of all of the parties submissions to me, as listed in the Appendix, I conclude, and respectfully recommend the Court find, as follows:

(1) the 2011 NRS Agreements did not convey an ownership interest in any of the Buffets Entities' *MDL 1720* damages claim, but instead conferred on NRS a contractual right to collect a service fee from NRS's counterparty (or its successor) in exchange for performing claim-filing services;

(2) the Court should decline to resolve any contract or quasi-contract claim that NRS may assert against any of the parties to secure a service fee;

(3) the 2012 Order did not convey any of the Buffets Entities' *MDL 1720* damages claims to the Litigation Trust, and therefore

14

(a) ownership of those claims vested in the reorganized 2012 Debtors when that Order took effect on July 18, 2012, and

(b) the Litigation Trust never owned any such claims or conveyed them to OPP under OPP APA 1, and

(c) OPP never conveyed any such claims to PRA under the OPP-PRA APA;

(4) the Buffets-Cascade APA transferred ownership of all of the Buffets' Entities *MDL 1720* damages claims to Cascade on July 2, 2013;

(5) the Cascade-BSH APA transferred ownership of all of the Buffets' Entities *MDL 1720* damages claims to BSH on July 3, 2013;

(6) the Buffets Entities no longer owned any *MDL 1720* damages claims when the 2016 Debtors sought bankruptcy relief on March 16, 2016, and therefore the Unsecured Creditors' Trust never owned such claims or conveyed them to OPP under OPP APA 3;

(7) the Buffets Entities no longer owned any *MDL 1720* damages claims when the 2021 Debtors sought bankruptcy relief on April 20, 2021, and therefore the Liquidating Trust never owned such claims or conveyed them to OPP under OPP APA 2.

A.      NRS's Claims

1.      The NRS Agreements Do Not Convey Ownership

NRS now asserts that it "owns 20% of all interests in any Buffet Recovery originally held by the Buffets Entities[.]" NRS 5/14/26 at 2.[15] The other parties all disagree. *See* BSH-CCB-OPP

---

[15] In its first submission to me, NRS described itself as "the appropriate *3rd Party claim filing entity* in regards to Buffets, Inc." NRS 1/9/26 at 1 (emphasis added); *see also id.* ("[NRS] is the appropriate *3rd Party Filer* to file all claims regarding Buffets in this case") (emphasis added). It did not then assert any ownership of the underlying claim. Instead, it stated that once it "had received all funds from the settlement, it [would] withhold its *contingency fee* and forward the remaining funds" to Cascade pursuant to the Buffets-Cascade APA. *Id.* Similarly, in its second submission to me, NRS wrote that its "Client" had "retained NRS to serve as its agent with respect to [*MDL 1720*]." NRS 1/26/26 at 2. At a remote conference on April 23, 2026, NRS explicitly professed to own a portion of the underlying damages claims as such. Whatever tension there may be between NRS's earlier statements and its current position, I do not consider whether NRS forfeited that position by making those earlier statements. Instead, I analyze the issue on the merits.

5/14/26 at 1. I agree with the latter that "NRS was engaged as a service provider and nothing more." *Id*. The text of each of the NRS Agreements plainly undermines NRS's position, beginning with the title of the first, which is not an "Asset Purchase Agreement," but instead an "Amended Recovery Services Agreement." That agreement requires NRS to notify Buffets of certain developments in *MDL 1720* and to assist Buffets with "completing and filing the required claims forms." NRS Service Agreement at 1. In return, Buffets must promptly pay NRS an amount that the parties describe as a "Service Fee." *Id*. The NRS Agency Appointment is similarly explicit in describing NRS's role as Buffets' "agent" for gathering information and filing claims. NRS Agency Agreement at 1.

Nothing in either of the NRS Agreements states or even suggests that they conferred on NRS any ownership of Buffets' *MDL 1720* damages claim. To the contrary, both documents explicitly create an agency relationship between Buffets and NRS. Thus, whatever claim NRS may be able to assert against Buffets or its successors in interest, the record provides no basis for finding that NRS has standing to claim anything directly from the settlement fund.

B.    The Court Should Decline to Review NRS's Contract-Based Claims

NRS identifies a variety of potential claims it could assert against any other party that holding an interest in the Buffets Entities' *MDL 1720* damages claims. It argues that BSH (which it asserts is the owner of 80 percent of the Buffets claims) must pay NRS 20 percent of its recovery as Buffets' successor interest under the NRS Service Agreement. NRS 1/26/26 at 3-4. It further argues that if it does not have a contractual remedy against BSH, it should receive its claimed 20 percent share of the recovery via the remedies of a constructive trust, an equitable lien, or "quasi-contract" based on claims of unjust enrichment and quantum meruit. *See id.* at 4-6; NRS 5/14/26 at 11-14. I respectfully recommend that the Court decline to review such claims under the aegis of the *MDL 1720* litigation.

16

I do not discount the possibility that NRS may be able to assert jurisdiction and venue for its potential claims against BSH by filing a new action filed in this district.[16] But if NRS seeks to assert its potential claims in *MDL 1720*, it would have to rely on this Court's jurisdiction over the *MDL 1720* damages class settlement. However, those potential claims are not within the scope of that jurisdiction.

In its order approving the damages class settlement, the Court retained jurisdiction over three specified groups of parties: "the members of the Rule 23(b)(3) Settlement Class Plaintiffs, the members of the Rule 23(b)(3) Settlement Class, and the Defendants." *MDL 1720*, Doc. 7818 (the "Final Judgment") ¶ 18. Moreover, it did so only for a specific purpose: "to implement, administer, consummate, and enforce the [Settlement], including any disputes relating to, or arising out of, the release and covenant not to sue of the Rule 23(b)(3) Settlement Class or any claim for payment from the Class Settlement Cash Escrow Account." *Id*.

NRS is not a plaintiff, class member,[17] or defendant in *MDL 1720*. Neither is BSH, CCB (or its affiliates Park and PRA), or OPP. If the Court adopts the recommendation to find that NRS Agreements did not convey to NRS ownership of any portion of the Buffets Entities' *MDL 1720* damages claims, resolving NRS's potential claims will not in any way promote the Court's ability to "implement, administer, consummate, and enforce" the settlement agreement. On the other hand, if the Court rejects that recommendation, NRS's ownership of a portion of the Buffets Entities' damages claims will render its potential claims moot.

---

[16] The NRS and BSH appear to be of diverse citizenship, the latter is a New York limited liability company, and the amount in controversy likely exceeds $75,000. *See* Cascade-BSH OSA at 1; 28 U.S.C. §§ 1332; 1391.

[17] While NRS may itself be a member of the plaintiff class in *MDL 1720*, its potential claims against the parties to the instant conflicts would be unrelated to that status.

17

Either way, the Court will have no reason to review the merits of those claims. Regardless of whether BSH (or Cascade) is deemed liable to NRS for breach of the NRS Agreements or under quasi-contract theories, BSH (or some combination of BSH, PRA, and OPP) will still be entitled to receive a pro-rata share of the settlement funds. A court resolving NRS's contract-based claims would merely decide whether some other party must give a portion of the settlement proceeds to NRS as a contingency under the terms of the NRS Service Agreement. That determination, which turns on an issue of contract interpretation under Illinois law, will have no impact on this Court's ability to implement, administer, consummate, or enforce *MDL 1720* damages class settlement. *See MDL 1720,* 348 F.R.D. 151, 172 (E.D.N.Y. 2024) (adopting identical reasoning by Judge Marutollo).[18] Accordingly, the Court's reservation of jurisdiction does not apply to NRS's potential claims against other non-parties.

B.     Ownership of the Buffets Entities' *MDL 1720* Damages Claims

The parties' remaining disputes turn on how the 2012 Order disposed of the Buffets Entities' *MDL 1720* damages claims. The parties all appear to agree that upon the filing of the 2012 Debtors' petitions in *2012 Bankr.*, ownership of those claims vested in the bankruptcy estate. They further appear to agree that the 2012 Order resolving those bankruptcy proceedings divested the bankruptcy estate of those claims and vested them elsewhere. BSH and NRS contend that those claims vested in the reorganized 2012 Debtors, who in turn sold them to Cascade in 2013, and that Cascade then sold them to BSH. CCB and OPP assert that the 2012 Order vested those claims in the Litigation Trust and that they were later divided into discrete bundles of assets that ended up in the hands of OPP and CCB's client. I respectfully recommend

---

[18] In the cited decision, the Court also adopted Magistrate Judge Marutollo's explanation of why the All Writs Act did not give the Court jurisdiction over a contract dispute between two third-party filers. *Id*. at 168-173. The same reasoning applies with equal force here.

that the Court find that the 2012 Plan, as approved in the 2012 Order, vested the claims in the reorganized 2012 Debtors and therefore now belong to BSH.

The parties' competing positions turn on the definition of the term "Transferred Avoidance Actions." The 2012 Plan provided that on its effective date, the debtors would transfer to the Litigation Trust "all right, title, and interest in the Transferred Avoidance Actions[.]" 2012 Plan, § VII.D.2. It further provided that "[t]he property of the Debtors' estates shall be revested in the Reorganized Debtors on the Effective Date." *Id*. § VIII.D. Thus, if the Buffets Entities' *MDL 1720* damages claims were within the scope of the Transferred Avoidance Actions, the Litigation Trust owned them as of the 2012 Plan's effective date; otherwise, those claims belonged to the reorganized debtors. *See* NRS 5/14/26 at 4; OPP 2/27/25 at 3.

The 2012 Plan's definition of "Transferred Avoidance Actions" in turn rests on the definition of two related terms: "Avoidance Actions" and "Excluded Avoidance Actions." The parties agree that the Buffets Entities' *MDL 1720* damages claims were not Excluded Avoidance Actions. The 2012 Plan defines the other two terms as follows:

> Transferred Avoidance Actions means all Avoidance Actions, other than the Excluded Avoidance Actions, that will be transferred to the Litigation Trust on the Effective Date pursuant to section 1123 of the Bankruptcy Code."

2012 Plan, § I.A.

> Avoidance Actions means those certain claims or causes of action of the Estates arising out of or maintainable pursuant to sections 510, 542, 543, 544, 545, 547, 548, 550, or 551 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

*Id*.

Those definitions thus raise the question of whether the Buffets Entities' *MDL 1720* damages claims "ar[ose] out of or [were] maintainable pursuant to sections 510, 542, 543, 544, 545, 547, 548, 550, or 551 of the Bankruptcy Code or under any other similar applicable law."

19

OPP tacitly assumes that they did but does not explain the basis for that assumption and CCB does not address the question at all. *See* OPP 2/27/25 at 3; CCB 4/30/26; CCB 5/14/26. On the other hand, NRS persuasively explains why the Buffets Entities' *MDL 1720* damages claims were not Avoidance Actions – and therefore were not among the Transferred Avoidance Actions that the 2012 Plan vested in the Litigation Trust:

> "Avoidance Actions" are claims, causes of action, and remedies available to trustees and debtors-in-possession under the Bankruptcy Code, including equitable subordination of claims against a bankruptcy estate (Bankruptcy Code § 510), turnover of estate property (Bankruptcy Code §§ 542, 543), strong-arm avoidance powers (Bankruptcy Code § 544), avoidance of liens, preferences, and fraudulent transfers (Bankruptcy Code §§ 545, 547 and 548), and related recovery and preservation for the estate of amounts avoided under other provisions of the Bankruptcy Code (Bankruptcy Code §§ 550, 551). These are quintessential bankruptcy claims, causes of action, and remedies, and are categorically distinct from the claims and causes of action arising under federal anti-trust law that were originally held by the Buffet Entities with respect to the [*MDL 1720*] Litigation.

NRS 5/14/26 at 4-5.

Because the Buffets Entities' *MDL 1720* damages claims were not Avoidance Actions for the reasons NRS articulates, they were not Transferred Avoidance Actions. As a result, they did not become the property of the Litigation Trust on the 2012 Plan's effective date and therefore were not among the remnant assets that the Litigation Trust sold to OPP and that OPP later sold to CCB's client PRA. Instead, they were sold to Cascade on July 2, 2013, and Cascade sold them to BSH the next day. Having been sold in 2013, those claims were not among the assets transferred to the bankruptcy estates in the 2016 and 2021 bankruptcy proceedings and therefore were not among the assets OPP sold to the Unsecured Creditors Trust and to the Liquidating Trust.[19]

---

[19] As noted above, the post-2013 transaction agreements (the four APA's to which OPP was a party) made no explicit reference to *MDL 1720*. Nothing in any of those agreements implies that

III.    Recommendation

For the reasons set forth above, I respectfully recommend the Court find as follows:

(1) the 2011 NRS Agreements did not convey an ownership interest in any of the Buffets Entities' *MDL 1720* damages claim, but instead conferred on NRS a contractual right to collect a service fee from NRS's counterparty (or its successor) in exchange for performing claim-filing services;

(2) the Court should decline to resolve any contract or quasi-contract claim that NRS may assert against any of the parties to secure a service fee;

(3) the 2012 Order did not convey any of the Buffets Entities' *MDL 1720* damages claims to the Litigation Trust, and therefore

(a) ownership of those claims vested in the reorganized 2012 Debtors when that Order took effect on July 18, 2012, and

(b) the Litigation Trust never owned any such claims or conveyed them to OPP under OPP APA 1, and

(c) OPP never conveyed any such claims to PRA under the OPP-PRA APA;

(4) the Buffets-Cascade APA transferred ownership of all of the Buffets' Entities *MDL 1720* damages claims to Cascade on July 2, 2013;

(5) the Cascade-BSH APA transferred ownership of all of the Buffets' Entities *MDL 1720* damages claims to BSH on July 3, 2013;

(6) the Buffets Entities no longer owned any *MDL 1720* damages claims when the 2016 Debtors sought bankruptcy relief on March 16, 2016, and therefore the Unsecured Creditors' Trust never owned such claims or conveyed them to OPP under OPP APA 3;

(7) the Buffets Entities no longer owned any *MDL 1720* damages claims when the 2021 Debtors sought bankruptcy relief on April 20, 2021, and therefore the Liquidating Trust never owned such claims or conveyed them to OPP under OPP APA 2.

---

the assets they conveyed had anything to do with *MDL 1720*, nor would reading those agreements to exclude the Buffets Entities' *MDL 1720* damages claims produce an absurd result.

21

IV.    Objections

This Report and Recommendation will be served on all registrants who are active parties to the instant conflicts via the Court's ECF system, and the Class Administrator will also promptly provide a copy to all registrants regardless of their participation in the Special Master review process. Any interested party shall have 21 days from today's date to file objections to this Report and Recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-02391-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this Report and Recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect confidentiality and the identities of claimants, as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMA-JAM, Doc. 3, ¶ 4.


Dated: June 10, 2026

                                         */s/ James Orenstein*
                                         Special Master

**APPENDIX**

A.    <u>Conflict ID Numbers, Merchant Names and Registrants Seeking Review</u>

| Conflict ID | Merchant Name | Last 4 Digits of TIN | Registrants seeking Special Master Review | | | |
|---|---|---|---|---|---|---|
| 261129 | Buffets Leasing Co. LLC | 8138 | CCB | NRS | BSH | |
| 261130 | HomeTown Leasing Co. LLC | 8142 | CCB | NRS | BSH | |
| 261136 | HomeTown Buffet, Inc. | 3002 | CCB | NRS | BSH | OPP |
| 261137 | OCB Leasing Co. LLC | 8147 | CCB | NRS | BSH | |
| 261139 | Buffets Franchise Holding, LLC | 8749 | CCB | NRS | BSH | |
| 261141 | Ryan's Restaurant Mgmt. Grp. | 6739 | CCB | NRS | BSH | |
| 261143 | OCB Purchasing Co. | 7610 | CCB | NRS | BSH | OPP |
| 261144 | Distinctive Dining, Inc. | 3069 | CCB | NRS | BSH | |
| 261147 | Fire Mountain Leasing Co. LLC | 7452 | CCB | NRS | BSH | |
| 261148 | Fire Mountain Mgmt. Grp., LLC | 7299 | CCB | | BSH | |
| 261149 | Buffets Holdings, Inc. | 4018 | CCB | NRS | BSH | |
| 261150 | Tahoe Joe's Leasing Co., LLC | 8145 | CCB | NRS | BSH | |
| 261151 | Big R Procurement Co., LLC | 5198 | CCB | NRS | BSH | |
| 261152 | Ryan's Restaurant Grp., LLC | 9569 | CCB | NRS | BSH | |
| 261153 | Ryan's Restaurant Leasing Co., LLC | 7405 | CCB | NRS | BSH | |
| 261199 | Ryan's Restaurant Grp., LLC | 7895 | CCB | NRS | BSH | OPP |
| 261263 | Tahoe Joe's, Inc. | 7129 | CCB | NRS | BSH | OPP |
| 261290 | OCB Restaurant Co., LLC | 7607 | CCB | NRS | BSH | OPP |
| 261307 | Fire Mountain Restaurants LLC | 8003 | CCB | NRS | BSH | OPP |
| 261449 | Buffets, Inc. | 2294 | CCB | NRS | BSH | OPP |

B.        Submissions to the Special Master

In preparing this Report and Recommendation, I have considered the submissions listed below, including their exhibits. If any party objects to this Report and Recommendation, those submissions shall be filed on the dispute-specific docket under seal (unless otherwise specified below) to protect confidentiality and the identities of claimants. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMA-JAM, ECF 1, ¶ 4.

1.    Submissions from BSH: Letters dated January 8, 2026; January 23, 2026; January 30, 2026; and May 14, 2026; email providing missing exhibit dated May 15, 2026.

2.    Submission from Cascade (prior to its withdrawal): Letter dated February 28, 2025.

3.    Submissions from CCB: Letters dated January 22, 2026; April 30, 2026; and May 14, 2026.

4.    Submissions from NRS: Letters dated January 9, 2026;  January 26, 2026; January 30, 2026; and May 14, 2026.

5.    Submissions from OPP: Letters dated February 27, 2025; April 30, 2026; and May 14, 2026.

6.    Joint submission from BSH, CCB, and OPP: Letter dated May 14, 2026.