UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- x

| | |
|---|---|
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES | REPORT AND RECOMMENDATION OF SPECIAL MASTER |
| ------------------------------------------------------- x | 1:24-MC-03415-BMC-JAM |
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT APPEAL OF REGISTRANT ACI WORLDWIDE, CORP. | 1:26-MC-03041-BMC-JAM |

------------------------------------------------------- x

**Parties**: ACI Worldwide, Corp. is the sole registrant that is a party to this dispute.

**Counsel**:

Steig Olson
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Ave., 22nd Floor
New Yor, NY 10010-1601
(212) 849-7000
steigolson@quinnemanuel.com
Counsel for ACI Worldwide, Corp.

I. Background

Between June 20, 2024, and July 2, 2024, ACI[1] registered 3,525 Taxpayer Identification Numbers ("TINs") with the Class Administrator together with a supporting declaration and exhibits. On September 5, 2024, the Class Administrator made an initial determination that ACI

[1] As used here, "ACI" refers collectively to ACI Worldwide, Corp. ("ACI Worldwide"), its subsidiary ACI Payments, Inc. ("ACI Payments"), and the following additional predecessors, subsidiaries, and affiliates of ACI Worldwide: E Commerce Group Products, Inc.; EBPP Agent Services, Inc.; EPOS Corporation; Official Payments Corporation; Official Payments Holdings, Inc.; Online Resources Corporation; Princeton eCom Corporation; S1 Corporation; S1, Inc.; SpeedPay, Inc.; and Tier Technologies, Inc. *See* Letter from Steig Olson to Class Administrator dated Oct. 5, 2024 ("Letter"), at 1 & n.1; Declaration of Ben Mitchell (President of ACI Payments) dated June 20, 2024 ("Mitchell Dec."), ¶¶ 5-6.

was ineligible to file claims in its capacity as a Payment Facilitator. ACI disputed that designation. *See* ACI 10/5/24 at 1-8.[2] ACI later submitted a letter to me challenging the designation. *See* ACI 7/7/26.[3] As explained below, I respectfully recommend that the Court reject ACI's challenge and find that it is not a class member with respect to the transactions of its merchant customers because the payment processing service it provides does not constitute "acceptance" of payment cards for purposes of the Superseding Settlement Agreement. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05-MD-01720-BMC-JAM (E.D.N.Y.) ("*MDL 1720*"), ECF 7257-2 ¶ 4 ("Settlement Agreement").

## II. Analysis

### A. Applicable Case Law

Four prior decisions, all arising from the litigation in *MDL 1720*, provide the legal context for this dispute. First, when the Court gave final approval to the proposed damages class settlement, it endorsed the settling parties' definition of the class as consisting of "[a]ll persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time" during the relevant period, with exceptions not

---

[2] I will use "ACI [submission date]" to cite ACI's submissions. *See* ACI 7/7/26 (letter to Special Master); ACI 10/5/24 (letter to Class Administrator); ACI 7/7/26 (letter to Special Master citing reasoning in ACI 10/5/24).

[3] On May 22, 2025, the CA sent a notice to ACI advising that it would need to submit its contract with each merchant to substantiate its authorization to act on behalf of all of them before the dispute could be considered further. ACI had not yet done so when the Court issued its decision in *In re MDL 1720 Damages Class Settlement Disps.* ("*Settlement Disputes*"), 2026 WL 1729167 (E.D.N.Y. June 16, 2026) ("*Teleflora*") (adopting in part report and recommendation). In *Teleflora*, the Court adopted my recommendation to find that the registrant was not a class member and on that basis declined on mootness grounds to adopt my recommendation to require the company to submit its contracts with each of the thousands of merchants whose TINs it had registered. *See id.* at *3; *Settlement Disputes*, 2026 WL 825503, *9-10 (E.D.N.Y. Mar. 17, 2026) ("*Teleflora R&R*"). In light of that ruling, I suspended the contract-filing requirement and asked ACI to submit argument to me supporting its position on class membership.

pertinent here. *See MDL 1720*, 2019 WL 6875472, at *31 (E.D.N.Y. Dec. 16, 2019) (the "Approval Order") (quoting Settlement Agreement ¶ 4) ), *aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023) ("*Fikes*"). In doing so, the Court overruled an objection from a group of franchisee entities that owned and operated gas stations (the "Branded Operators") that the use of "accepted" might allow their franchisor oil company suppliers to supplant them as class members and that uncertainty about that issue made class membership impossible to determine. *See id*.

Second, in affirming the Approval Order, the Second Circuit likewise rejected the Branded Operators' arguments. After acknowledging the ambiguity of the word "accepted," *Fikes,* 62 F.4th at 715, the court clarified the core question those arguments raised:

> The dispute is not over which group of class members will get the recovery; the dispute is over which claimants are within the class. Whoever "accepted" the payment cards is by definition in the class, gets compensation, and is bound by the release; an entity that did not accept the payment is by definition excluded from the class and is not bound by the settlement.

*Id*. at 717. Because that dispute did not implicate the requirement that a class must have ascertainable membership to be certified, the court did not need to decide who – as between franchisors and franchisees – had "accepted" payment cards and were therefore class members. *See id*. at 718.

Third, in *MDL 1720*, 735 F. Supp. 3d 249 (E.D.N.Y. 2024), *reconsideration denied*, 2025 WL 2490442 (E.D.N.Y. Aug. 29, 2025) ("*PayFacs I*"), *aff'd*, 2026 WL 1210154 (2d Cir. May 4, 2026) ("*PayFacs II*"), Judge Brodie ruled that two payment facilitators – Block, Inc., f/k/a Square, Inc. ("Square"), and Intuit Inc. and Intuit Payment Solutions, LLC (collectively, "Intuit") – had not "accepted" payment cards used to pay for goods and services sold by their merchant clients and therefore were not members of the class. *See PayFacs I*, 735 F. Supp. 3d at 252. To

reach that conclusion, Judge Brodie considered several factors, as summarized on review by the Second Circuit:

> (1) Square's merchant agreement, which states that Square allows merchants "to *accept* Cards from customers," [*PayFacs I*, 735 F. Supp. 3d at 264]; (2) Square's Complaint, which alleges that Square "helps Sellers (merchants who utilize Square to *accept* payment cards ...) start, run, and grow their businesses, including by enabling Sellers to *accept* card payments," *id.*; (3) Visa's rules, which distinguish between a "Payment Facilitator" and a "Merchant" and provide that an entity cannot simultaneously act as both a payment facilitator and a merchant, *id.* at 265; (4) Mastercard's rules, under which Sellers "accept" payment cards while payment facilitators facilitate the acquiring of transactions, *id.* at 266; (5) the Square Sellers' own declarations, which describe themselves as businesses that *accept* credit and debit cards, *id.*; (6) the "way real-world transactions are conducted" in which the "cardholder hands her card to a Seller, who 'accepts' it for payment at the point of sale," *id.* at 264; and (7) the incongruence of interpreting the word "accepted" to mean that Square " 'accepts' a payment card, but the [Square] Seller 'accepts' cash, for two otherwise identical transactions," *id.* at 265.

*PayFacs II*, 2026 WL 1210154, at *1.[4]

Finally, in *Teleflora*, as in this case, payment facilitator Teleflora, LLC ("Teleflora") challenged the Class Administrator's determination that it was not a class member and therefore ineligible to register a claim. In seeking my review, Teleflora noted a number of ways in which its contracts with merchant clients differed from the contracts between Square and Intuit and their respective clients. I analyzed those arguments in detail and concluded that they either replicated arguments by Square and Intuit that Judge Brodie explicitly rejected in *PayFacs I* or were not meaningfully different for purposes of determining class membership. *See Teleflora*

[4] In affirming Judge Brodie's analysis, the Second Circuit observed that "[f]ew persons are in a better position to understand the meaning of a settlement than the district judge who oversaw and approved it[.]" *Id*. at *2 (quoting *W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29, 33 (2d Cir. 1996) (cleaned up)). At the time Judge Brodie oversaw and approved the *MDL 1720* damages class settlement, I was the magistrate judge assigned to the case. In that role, I sat on the bench with Judge Brodie for oral argument of the objections to the proposed settlement. *See* MDL 1720, Doc. 7774 (minute entry dated Nov. 7, 2019).

*R&R*, 2026 WL 825503, at *4-7. I therefore recommended that this Court find that Teleflora had not accepted payments for its merchant clients' transactions and was not a class member. *Id*. at *10. This Court adopted that recommendation, reasoning as follows:

> Teleflora points to a number of factors that purportedly distinguish its situation from the situation presented in *PayFacs I*. The Court disagrees, and not just because many of these factors were actually considered in *PayFacs I*. Rather, it simply does not matter how many and in what ways Teleflora differs from Square and Intuit because they are the same in the one respect that matters: they don't accept payment cards.

*Teleflora*, 2026 WL 1729167, at *2.

B. ACI's Card Payment Processing Service

Ben Mitchell ("Mitchell"), President of ACI Payments, Inc., has provided the following description of the service ACI provides in a declaration dated June 20, 2024 ("Mitchell Dec."):

> ACI Payments provides real-time payment software solutions that enable its customers to process and manage digital payments, power omni-commerce payments, present and process bill payments, and manage fraud and risk. ACI Payments customers are often municipal governments, local utility companies, and other small-to-medium sized businesses. These entities contract with ACI Payments (or during the class period, with its predecessors, as described above) for services, whereby, among other things, ACI Payments accepts Visa and Mastercard payment cards on its customers' behalf through an online ACI Payments portal. In other words, in the payment card transactions which ACI Payments facilitates, no payment card is physically handed to ACI Payments' customers. Instead, as a general matter, the clients of ACI Payments' customers are redirected to an ACI Payments-hosted interface and/or website and then ACI Payments accepts the payment card through that online portal interface. ACI Payments then pays the applicable interchange fees, charges its customers a fee for its services, and then remits the balance to its customers.

ACI 10/5/24 Ex. 1 (Mitchell Dec.) ¶ 9.

To illustrate that description, Mitchell includes in his declaration "true and correct screenshots of representative payment interfaces to which ACI Payments' customers are redirected where ACI Payments accepts their payment[.]" *Id*. ¶ 10. Here are two of them, one for NV Energy and the other for Swarthmore College:

https://www.nvenergy.com/account-services/payment-and-billing




Swarthmore College

https://www.swarthmore.edu/student-accounts-office/payment-options




*Id.*

Because the text in those images is difficult to read, I have accessed the internet address displayed in each screenshot. Those websites reveal important information that Mitchell's declaration omits. For example, the page for NV Energy includes more payment options than are shown in Mitchell's truncated screenshot of that page. Those additional options include paying in person at, among other locations found upon clicking a link, an NV Energy kiosk in Reno, Nevada. A further option is for the payor to send a check directly to NV Energy in Reno, Nevada. *See* https://www.nvenergy.com/account-services/payment-and-billing (visited July 24, 2026). The Swarthmore College page likewise includes payment options Mitchell's illustration omits. Among those are sending a check or money order payable to Swarthmore College directly to the college at its address in Swarthmore Pennsylvania. Another is to make a payment in person on the college campus at Swarthmore's Student Accounts Office. *See* https://www.swarthmore.edu/student-accounts-office/payment-options (visited July 24, 2026).

C. ACI's Arguments

ACI makes several arguments as to why the service it provides to its clients is materially distinct from those provided by Square, Intuit, and Teleflora and why, as a result, it claims to be a class member. First, it notes that in contrast to those other services, ACI's clients (which I will call "Sellers" for ease of reference) do not themselves handle payment cards proffered by the Sellers' customers ("Payors"). Instead, ACI has its own platform where Payors use their cards to make payments. *See* ACI 10/5/24 at 3. ACI thus "'takes or receives' the payment card 'offered willingly' by a patron to ACI's online portal." *Id.* (citing *PayFacs I*, 735 F. Supp. 3d at 264) As ACI notes, that conforms to the "plain-English meaning" of "accept" on which the Judge Brodie relied in finding that Square and Intuit did not accept card payments. *Id.* (same).

That argument founders on the portion of *PayFacs I* that immediately follows the text ACI quotes: "Square and Intuit hold themselves out as enabling Sellers to 'accept' payment cards[.]" 735 F. Supp. 3d at 264. ACI does the same. *See* Mitchell Dec. ¶ 9 ("ACI Payments provides real-time payment software solutions that enable its customers to process and manage digital payments[.]"). Further, at the end of the same paragraph in *PayFacs I*, the Court noted another reason for its finding that the payment facilitators there were not class members: "it would strain the meaning of the word 'accepted' to interpret it to mean that Square or Intuit 'accepts' a payment card, but the Seller 'accepts' cash, for two otherwise identical transactions." 735 F. Supp. 3d at 264. The same reasoning applies here, as ACI clients such as NV Energy and Swarthmore accept checks by mail and in-person payments at their respective locations.

More fundamentally, ACI's own description of the service it offers makes clear that when it "takes or receives" a payment card "willingly offered" by a Payor, it does so as the Seller's agent. *See* Mitchell Dec. ¶ 9 ("ACI Payments accepts Visa and Mastercard payment cards on [the Sellers'] behalf"); *see also*, *e.g.*, *id*. Ex. R § 14.6 ("[ACI affiliate] Official Payments is the agent of [Seller] for the limited purpose of accepting payments from [Payor] and forwarding such payments to [Seller]"); *id*. Ex T § 2.1(a) "[Seller] appoints and authorizes [ACI affiliate] ORCC as its agent to perform and provide the Services to the [Seller]"). When a Payor who owes tuition to Swarthmore College makes a payment – in an amount and in a form that the college alone deems to be acceptable – it is Swarthmore College that accepts the payment. It is not the Swarthmore employee who physically receives a check or cash in a building of the college campus who accepts the payment, and it is not ACI who accepts an electronic payment via its online platform. In each case, it is Swarthmore College as a Seller, acting through an agent, that accepts the payment. That is because as a matter of law, the agent's acts are attributable to

principal. *See*, *e.g.*, *Tlalmanalco Campos v. LVNV Funding, LLC*, 2026 WL 2098801, at *3 (E.D.N.Y. July 21, 2026) (Cogan, J.).

ACI further argues that its mechanism for receiving payments is comparable to a circumstance I recognized as potentially supporting a finding that Teleflora "accepted" card payments.

> In [*Teleflora R&R*], the Special Master explained that where "the cardholder . . . presented a payment card directly to" the facilitator, not to a merchant's own store or website, the facilitator "would have a stronger argument that . . . it 'accepted' payment cards," and found only that Teleflora's record "rest[ed] on speculation rather than evidence."

ACI 7/7/26 at 3 (quoting *Teleflora R&R* at *7); *see also id*. ("For similar reasons that Judge Cogan preserved Teleflora's Class membership for transactions in which cardholders made purchases on Teleflora.com, [*Teleflora*, 2026 WL 1729167,] at [*]3 n.2, ACI is the Class member for payments made on ACI's portals and websites.").

ACI omits an important qualification in the portion of *Teleflora R&R* it cites. In that report and recommendation, I acknowledged the possibility that –

> with respect to some transactions involving its merchant customers, the cardholder making an online flower purchase presented a payment card directly to Teleflora, *which then arranged for a merchant customer in the recipient's vicinity to deliver the flowers in exchange for a fee payment by Teleflora for that delivery service*. To the extent transactions occurred *in that manner (as distinct from transactions in which the cardholder went to the merchant customer's store or website to purchase flowers, presented a payment card to the merchant, and Teleflora's role was limited to processing the payment)*, Teleflora would have a stronger argument that *in some instances* it "accepted" payment cards for purposes of the Settlement Agreement.

*Teleflora R&R*, 2026 WL 825503, at *7 (emphasis added). In the transactions that I identified as potentially presenting a "stronger argument" for Teleflora, the company was acting as a Seller. That is, Teleflora (rather than a client florist) agreed with a cardholder on the goods to be sold, the price, and the form of payment to be used. *See also Teleflora*, 2026 WL 1729167, at *3 n.2

(adopting same reasoning and describing types of transactions to which it would apply). The client florist in those transactions is not the Seller – it merely acts as Teleflora's supplier and delivery service. Nothing remotely comparable occurs here: ACI does not claim to sell any goods or services to cardholders that its merchant clients supply or deliver. Instead, it only processes the payments for transactions that its client Sellers and their customer Payors negotiate before ACI gets involved.

ACI next tries to distinguish the *PayFacs* and *Teleflora* decisions by pointing to what cardholders see when making payments and how they can seek recourse:

> *PayFac I* and *Teleflora* also each relied on Visa's and Mastercard's network rules distinguishing a "Merchant" from a "Payment Facilitator" based on which entity represents itself to the cardholder, uses its own name to identify the point of sale, and provides recourse in a dispute. 735 F. Supp. 3d at 255, 265-66. Here, ACI's name and branding is presented to the cardholder at the point of payment, and it is an ACI portal through which the transaction is processed. *See* Proof of Authorization ¶ 10. As the named "Merchant" under its bank-card agreements, ACI is financially liable for the transactions it accepts and pays the applicable interchange fees. *See id.* ¶¶ 11-13. ACI is the merchant that accepts the payment cards.

ACI 7/7/26 at 4.[5]

That argument has a number of shortcomings. First, ACI does not hold itself out as a seller of goods or services to cardholders; it is ACI's merchant clients – the Sellers – who do that. Second, the carefully-worded assertion that "it is an ACI portal through which the transaction is processed" is inapposite. As Mitchell's declaration illustrates, the cardholders who make the payments ACI processes typically see the Seller's name prominently displayed on the payment page – and in half of those illustrations much more prominently than the processor's name. Third, ACI's assertion that "under its bank-card agreements, ACI is financially liable for

[5] The "Proof of Authorization" ACI cites appears to be the Mitchell Declaration.

the transactions it accepts and pays the applicable interchange fees" is similarly inapt. It describes the *bank's* recourse, not the cardholder's. As to the latter, ACI makes no assertion that it provides recourse to Payors who use payment cards. To the contrary, the sample client contracts Mitchell appends to his declaration require the Seller to bear the costs of chargebacks and returns. *See*, *e.g.*, Mitchell Dec. Ex. R § 4.1. In that regard, ACI's relationship with banks and merchants is not materially different from the corresponding bank and merchant relationships in the *PayFacs* and *Teleflora* cases. Fourth, the fact that ACI "pays the applicable interchange fees" is likewise one that overlaps with the facts of *PayFacs* and *Teleflora*. *See PayFacs I*, 735 F. Supp. 3d at 260 ("Like Square, Intuit argues that it was the 'direct and only payor' of interchange fees"); *Teleflora R&R*, 2026 WL 825503, at *2 (Teleflora argued that it paid interchange fees).

In seeking to distinguish this case from *Teleflora*, ACI ignores the crux of this Court's reasoning, which applies here with equal force:

> The question before the Court is whether Teleflora gets to be a class member not by virtue of its own sales, but by virtue of its member florists' sales which it facilitates. Logic must prevail here: Teleflora is not the one accepting cards for the member florists' transactions, so Teleflora is not the one that gets to "accept" the settlement proceeds relating to those transactions.

*Id*. at *2. In that critical respect, ACI's position here is no different than Teleflora's: it contends that it "gets to be a class member not by virtue of its own sales, but by virtue of its [client merchants'] sales which it facilitates." *Id*. Because this Court has already rejected that position, I respectfully recommend that it do again with respect to the transactions at issue here.[6]

---

[6] To the extent ACI may have accepted payment cards as payment from clients or others for goods and services that it sold to them, such transactions are not at issue here. ACI may well be a member of the Class with respect to such transactions. *See Teleflora*, 2026 WL 1729167, at *3 n.2;.*Payfacs I*, 735 F. Supp. 3d at 265 n.25.

III. Recommendation

For the reasons set forth above, I respectfully recommend that the Court find that ACI is not a member of the settlement class and that the Class Administrator therefore need not grant it authority to submit claims arising from the transactions of its merchant clients.

IV. Objections

This report and recommendation will be served on ACI via the Court's ECF system and also by the Class Administrator.[7] Any interested party shall have 21 days from today's date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-03041-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this report and recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect confidentiality and the identities of claimants,

[7] In this case, where the issue is a single registrant's status rather than a conflict between two or more registrants, the only party to be served in the first instance is ACI. While the thousands of merchants associated with the TINs ACI has registered (or their successors in interest) may have a potential interest in the outcome here, neither the Class Administrator nor I (nor the Court) has contact information for all of them. If the Court adopts the foregoing recommendations, the lack of notice will not prejudice any such class member. However, in the event the Court rejects or modifies the recommendation and finds that ACI is a class member in its role as a payment processing service provider, the Class Administrator may at some point classify ACI as an authorized registrant as to some TINs. In some such cases, ACI's registration of a TIN may be in conflict with other filers' registrations of the same TINs. I respectfully recommend that where such conflicts arise, the Class Administrator should provide a copy of the Court's decision and this report and recommendation to all parties to the conflict. I further recommend that merchants involved in such conflicts retain the right to contest ACI's class membership on the ground that it did not accept payment cards within the meaning of the Settlement Agreement.

as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMA-JAM, ECF 1, ¶ 4.

Dated: July 24, 2026

*/s/ James Orenstein*
Special Master