UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES | REPORT AND RECOMMENDATION OF SPECIAL MASTER |
| | 1:24-MC-03415-BMC-JAM |
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT APPEAL OF REGISTRANT NO. 1906642 | 1:26-MC-03085-BMC-JAM |

**Parties**: Financial Recovery Services, Inc. and Financial Recovery Services, LLC, both d/b/a Financial Recovery Strategies (collectively, "FRS") are the only parties to this dispute.

**Representative**:

Jeffrey N. Leibell, Chief Legal & Financial Officer
FRS Recovery Strategies
279 Sylvan Avenue, Suite 2240
Englewood Cliffs, NJ 07632
(201) 853-1246
jleibell@frsco.com
Counsel for FRS

## I. Background

Between November 30, 2023 and January 23, 2026, FRS registered numerous Taxpayer Identification Numbers ("TINs") with the Class Administrator for a share of the proceeds of the damages class settlement fund in *In re Payment Card Interchange Fee Merchant Discount Antitrust Litigation*, Dkt. no. 05-MD-1720 (E.D.N.Y.) ("*MDL 1720*")) arising out of the payment card transactions of thousands of merchants.[1] With respect to 1,336 of those registrations, some

[1] FRS is a third-party filer ("TPF") meaning that it enters into agreements with merchants to register and prosecute their claims of settlement funds in exchange for a portion of the merchants' recovery. *See MDL 1720*, 2014 WL 4966072, at *4 (E.D.N.Y. Oct. 3, 2014) (describing "the business of third-party claims filing companies").

other entity also registered the same TIN – either the merchant (or its successor in interest) acting on its own or a third-party filer acting as the claim-owner's agent – thereby creating a conflict with FRS as to that registration. Each such conflict was associated with the specific TIN assigned to the merchant whose transaction gave rise to the claim.[2]

In each conflict, the Class Administrator notified each registrant that in order to pursue a claim for the registered TIN, it must submit a Merchant Authorization Form ("MAF") executed by an authorized principal or officer of the merchant, designating which of the registrants the merchant chose to proceed on its behalf. The notice specifically informed registrants of the following, in accordance with a decision matrix that I approved:

(1) Where only one filer submits a valid MAF, that filer will be deemed to be the prevailing party in the conflict and the Class Administrator will withdraw the others.

(2) Where multiple filers submit a valid MAF, the conflict will proceed to the Special Master for review. Registrants that do not submit a valid MAF and do not dispute the conflict will be withdrawn.

(3) Where no party submits a valid MAF, the Class Administrator will withdraw all third-party registrations.[3]

(4) A registrant may proceed to the Special Master for review based on either a disagreement with the process or an inability to provide the MAF by providing an explanation and any relevant documentation.

---

[2] Multiple conflicts may be created over time for a given TIN. This occurs when different entities register the same TIN after a conflict already exists. In such cases, the Class Administrator resolves the earlier conflict and notifies all current registrants of the new conflict and provides an opportunity for them to resolve it among themselves. The 1,336 conflicts at issue here involve a total of 1,302 distinct TINs.

[3] Although not called out in the notice, any party can reactivate its registration upon submission of a valid MAF after the deadline has passed if it requests an extension and no other registrant has already fulfilled the requirements. The merchant can also contact the Class Administrator if all TPFs have withdrawn and it chooses to represent itself.

In the conflicts at issue here the results of that notice fell into four categories: (1) only one of the registrants submitted a valid MAF, and that registrant was not FRS (this occurred in 82 conflicts as of the time of this writing); (2) multiple registrants submitted a valid MAF (14 conflicts); (3) no filer submitted a valid MAF (881 conflicts); and (4) the conflict was resolved outside the Special Master process (359 conflicts).In each instance, FRS sought further review from the Special Master in a series of letters submitted from January 17, 2025, through April 28, 2026.[4] The 359 cases described in the fourth category were resolved after FRS submitted the relevant dispute letter and require no further review.

In its submissions seeking review, FRS does not address the merits of any individual conflict or rely on the particulars of any specific merchant representation agreement.[5] Instead, it relies on an overarching argument that all of the instant conflicts should be resolved in its favor for reasons common to all. Likewise, this report and recommendation addresses only FRS's general position with respect to all of the conflicts and does not assess the merits of any individual conflict. In particular, in the  cases where both FRS and at least one other party

---

[4] I will use "[submission date] Ltr." to cite FRS's submissions; where FRS submitted two letters on the same date, I add suffixes to distinguish them. *See* 1/17/25 Ltr., 3/11/25 Ltr., 5/15/25 Ltr., 6/14/25 Ltr., 8/7/25 Ltr., 10/6/25 Ltr. I, 10/6/25 Ltr. II, 1/9/26 Ltr., 4/28/26 Ltr. For the most part, FRS's submissions repeat the same arguments with respect to different groups of notices from the Class Administrator rather than raise new substantive points in successive letters. While I do not cite each letter in which FRS advanced a particular argument, I have considered all of the arguments in all of FRS's submissions to me.

[5] In the interest of efficiency, FRS has submitted some but not all of its merchant agreements to the Class Administrator and offered to provide the rest, along with relevant correspondence in support of its claims, if I agree with its position and direct the Class Administrator to further process its registrations. Having those additional documents in the record before me would not alter my analysis. FRS has reserved the right to submit and rely on its contracts and correspondence in seeking review of this Report and Recommendation or in support of individual claims if allowed to proceed with the Class Administrator's registration process. *See* 1/17/25 Ltr. at 2.

submitted a valid MAF, I have not considered whether one or the other is entitled to deference on the merits. Instead, I address only whether the fact that FRS had a contract with the merchant, standing alone, is dispositive.

For the reasons discussed below, I conclude that where FRS is one of multiple registrants for a given merchant's claim, the fact that FRS had at some prior time entered into an agency contract with the merchant is not dispositive. In such cases, the Class Administrator should be guided by the merchant's choice of agent, if any.[6] As a principal, each merchant has the legal power to select an agent other than FRS, regardless of whether the exercise of that power may subject the merchant to contract-based liability. Further, neither the Court nor I in my role as Special Master should exercise jurisdiction over any such contract claim (let alone all of them) solely by virtue of the fact that the parties' contract involved the appointment of an agent to file a merchant's claim to the proceeds of the *MDL 1720* damages class settlement. Finally, as a matter of protecting the class, the Court should endorse the Class Administrator's requirement that where multiple parties register the same TIN, no party may pursue that claim unless and until it submits a valid MAF demonstrating its authorization to act as the merchant's agent.

As a procedural matter, I have reviewed FRS's arguments without having solicited briefing from any other registrant. In the event the Court disagrees with my analysis, I also include a procedural recommendation for affording each registrant in conflict with FRS an opportunity to be heard before any final determination of that registrant's claim.

---

[6] More precisely, the power to choose an agent to register a TIN belongs to either the merchant or the successor in interest that currently owns the claim for that TIN and therefore has the rights of a member of the settlement class. I will use "merchant" as a convenient shorthand to refer to the owner of a claim associated with a specific TIN.

## II. Analysis

FRS contends that because it has valid and enforceable contracts with all of the merchants involved in the instant conflicts, declining to process its claims on behalf of those merchants will prevent it from fulfilling its contracts. On that basis, FRS writes that it "disagrees with any preliminary determination that permits a TPF's client to breach its contract with the TPF without also providing the TPF with a forum to seek redress for that breach." FRS 1/17/25 at 2; *see also* FRS 8/7/25 at 1.

I respectfully disagree. Taking direction from a merchant as to who should represent it in processing a claim for a share of the settlement fund does not "permit" that merchant to breach a contract with FRS (or any other TPF). Rather, doing so merely acknowledges and respects the merchant's lawful power to appoint an agent to act on its behalf and to revoke any other agent's authority to do so. Acknowledging that power does nothing to alter the legal rights and responsibilities of either the former agent (here, FRS), the merchant's preferred agent, or the merchant itself. Nor does that acknowledgment deprive FRS of a forum in which to assert any claim arising from its contract with the merchant. FRS can of course assert such a claim in a court of competent jurisdiction.

What FRS seeks here, however, is quite different. Adopting FRS's position would effectively create a new multi-district litigation that encompasses hundreds of claims against merchants, claim purchasers, TPFs and others based on disparate contracts[7] executed under

[7] The Class Administrator has provided me with three types of sample merchant agreements that FRS submitted. Those forms use differing terms to define the parties' agency relationship and to describe both the class to which the merchant belongs and the settlement agreement to which the agreement pertains. I do not consider here whether or how those differences would affect the adjudication of potential contract claims by FRS against merchants who have appointed a different agent. For purposes of analysis here, I assume only that FRS has established the existence of a contract with each of the merchants at issue.

disparate circumstances. Such claims would have nothing to do with the merits of the actions that the Judicial Panel on Multidistrict Litigation ("JPML") consolidated in *MDL 1720* and would not require any tribunal to interpret or enforce the damages class Superseding Settlement Agreement (ECF 7257-2, the "Settlement Agreement"). Consolidating all of those claims and resolving them as part of *MDL 1720* could impose needless burdens on thousands of merchants and would likely delay the distribution of settlement proceeds to those merchants pending the outcome of such litigation.[8] Neither the Court's supervisory role nor its appointment of the Special Master compels such a result. And while the proposition that all of FRS's potential claims against merchants and their preferred agents should be consolidated for litigation in *some* forum may have merit, that is properly a question for the JPML to address in the first instance and I do not address it here.

A. <u>A Principal Has the Power to Terminate an Agent's Appointment</u>

It is blackletter law that a principal generally has the power to revoke an agent's authority, regardless of the existence of any contract between the two under which that revocation may constitute a breach. *See*, *e.g.*, *United Ins. Co. v. World Wide Web*, 2011 WL 1870599, at *2-3 (E.D.N.Y. Apr. 27, 2011) ("a principal has an inviolate right to revoke its agency at any time[;]" if "in doing so, the principal violates its obligations to the agent under their contract, the agent retains the legal recourse of bringing a breach of contract claim") (citing cases), *report and recommendation adopted* 2011 WL 1843280 (E.D.N.Y. May 16, 2011); Restatement (Third) Of Agency § 3.06 (2006).[9] As a result, in each conflict here, the merchant

---

[8] FRS has stated that it "does not intend to pursue breach of contract remedies with respect to each of the unresolved conflicts at issue" if the Court accepts its position "in whole or in part[.]" FRS 1/17/25 at 2. It has made no such commitment if the Court adopts my recommendation here.

[9] The general rule does not apply when the authority granted to the agent is a "power given as a security." *See*, *e.g.*, *Gov't Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 95 F.3d 291,

has the power to select its preferred agent, and the Class Administrator must act in accord with that selection.

B. FRS Should be Required to Submit a Valid MAF in Cases of Conflict

In each of the conflicts at issue here, FRS is one of multiple filers who have registered the same merchant TIN, thereby creating a question of each filer's authority to act on the merchant's behalf. Where such a conflict exists, it would be unfair to merchants to decide which registration to process without ensuring that the merchant has actually authorized the registrant to act as its agent. For that reason, working in conjunction with the Class Administrator, I have developed procedures for resolving such conflicts that protect against such unfair results. Specifically, where there are multiple registrants for the same TIN, I have directed the Class Administrator to issue a notice requiring each to submit evidence of which one the merchant wants to proceed with – a choice that is clearly the merchant's to make even if it thereby incurs liability under a contract. The Court has explicitly authorized me to institute such dispute-resolution procedures. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMA-JAM, Doc. 3, ¶ 2 ("Subject to the procedures set forth herein, the Special Master shall have discretion to determine the appropriate procedures for resolution of all matters within his or her appointment and shall have the authority to take all appropriate measures to perform the assigned duties.").

I do not suggest that the procedural requirement to submit a valid MAF is shielded from review of any underlying substantive legal analysis. The MAF requirement reflects my view that

---

300 (3d Cir. 1996). However, a third-party filer's agreement to file a claim on behalf of a merchant in exchange for a portion of the merchant's recovery does not create a power given as a security; it creates no more than a revocable agency relationship. *See* Restatement (Third) Of Agency § 3.12, illus. 4 (2006) ("P develops a mechanical invention and engages A to patent the invention…. P authorizes A to file patent documents on P's behalf…. P agrees … to pay A half of P's profits. Even if A's authority is stated to be irrevocable, A does not hold a power given as security.")

where multiple parties register the same TIN, the existence of a prior contract between a merchant and a TPF is not conclusive proof of the TPF's authority to act as the merchant's agent. It further reflects my concern that accepting FRS's position and applying the same rule impartially would be unworkable. There have been many instances in which multiple TPFs have registered the same TIN based on conflicting assertions that they have properly been appointed under an agreement with a merchant to act as its agent. A rule requiring the Class Administrator to process each such registration without securing further evidence of the agent's continuing authority would risk delay, double payment, and an improper diminution of the funds available to other merchants. FRS of course has the right to seek review of that reasoning. But absent a ruling by this Court agreeing with FRS's position on the merits (which would in turn prompt my amendment of the applicable claim dispute resolution procedures), FRS should be required to submit a valid MAF before proceeding with a claim.

C. <u>The Court Should Not Adjudicate FRS's Contractual Rights</u>

FRS seeks a determination that it has a contractual right to act as a merchant's agent notwithstanding that merchant's contrary choice. It further asserts the right to have its assertion of contractual rights adjudicated as part of *MDL 1720* claim dispute resolution process. FRS makes four arguments in support of that position. First, FRS claims that the adjudication of any claims arising from its merchant contracts falls within the scope of the exclusive jurisdiction the Court retained under the Settlement Agreement. Second, it contends that resolving such claims is part of my remit as Special Master. Third, FRS makes a series of policy arguments in support of its position and argues that rejecting that position would amount to tortious interference. Fourth, FRS points to a decision that post-dated some of the determinations at issue here as supporting its position. I address each argument in turn.

1. The Court Does Not Have Exclusive Jurisdiction

a. Exclusive Jurisdiction Under the Settlement Agreement

FRS relies on two authorities for its assertion that this Court has "exclusive continuing jurisdiction over all matters that relate to the administration of the Superseding Settlement and its distribution." FRS 1/17/25 at 2. It first points to two paragraphs from the Court's order granting final approval to the Settlement Agreement. *See* FRS 1/17/25 at 2-4 (citing ECF 7818 (the "Final Judgment")).[10] FRS specifically quotes the following portions of those paragraphs:

> [T]his Court retains continuing jurisdiction in MDL 1720 over … the members of the Rule 23(b)(3) Settlement Class … to implement, administer, consummate, and enforce the Superseding Settlement Agreement and this Rule 23(b)(3) Settlement Order and Final Judgment, ***including any disputes relating to or arising out of, … any claims for payment from the Class Settlement Escrow Account.***"

*Id*. at 2-3 (quoting ECF 7818 at ¶ 18) (brackets, ellipses, and emphasis supplied by FRS).

> [M]embers of the Rule 23(b)(3) Settlement Class … ***irrevocably submit to the exclusive jurisdiction of this Court for resolution of any matter covered by the Superseding Settlement Agreement***, this Rule 23(b)(3) Class Settlement Final Order and Judgment, or the applicability of the Superseding Settlement Agreement or this Rule 23(b)(3) Class Settlement Final Order and Judgment. All applications to the Court with respect to any aspect of the Superseding Settlement Agreement or this Rule 23(b)(3) Class Settlement Final Order and Judgment shall be presented to and determined by [a designated Judge of this] Court.

*Id*. at 3 (quoting ECF 7818 at ¶ 19) (brackets, ellipsis, and emphasis supplied by FRS).

Neither provision does what FRS claims. The jurisdiction that the Court "retains" in paragraph 18 is to "implement, administer, consummate, and enforce" the Settlement Agreement and the Final Judgment. FRS relies on the phrase "including any disputes relating to or arising out of, … any claims for payment from the Class Settlement Escrow Account," but elides the

[10] ECF 7818 is entitled "Final Approval Order." However, in the body of the document, the Court refers to it variously as "this Rule 23(b)(3) Class Settlement Order and Final Judgment" and "this Rule 23(b)(3) Class Settlement Final Order and Judgment." ECF 7818 ¶¶ 18, 19. For clarity and ease of reference, I will refer to the document as the "Final Judgment."

significance of the word "including" in that phrase. That "including" tethers the "any disputes" language to the Court's power to "implement, administer, consummate, and enforce" the Settlement Agreement and the Final Judgment. If FRS sues a merchant for contract breach because the merchant appoints a different agent, the claim arguably "relat[es]" to the merchant's claim for payment from the Class Settlement Escrow account. But exercising jurisdiction over such a claim does nothing to "implement, administer, consummate, [or] enforce" any provision in either the Settlement Agreement or the Final Judgment. In particular, deciding which agent may represent a merchant will have no effect on the merchant's right to receive any portion of the settlement fund. Rather, it will effect only how whether the merchant is liable to FRS regardless of how the claim for settlement funds is resolved.[11]

A portion of Paragraph 18 of the Final Judgment that FRS omits provides important context. Immediately before the portion that FRS quotes, the Court wrote "as further provided in Paragraphs 65-68 of the Superseding Settlement Agreement[.]" The cited provisions of the Settlement Agreement, in turn, are plainly focused on disputes that require interpretations of that agreement or of the Final Judgment:

> Without limiting the generality of the foregoing, it is hereby agreed that any suit, action, proceeding, or dispute of a Class Plaintiff or member of the Rule 23(b)(3) Settlement Class, *in which the provisions of this [Settlement Agreement] or the … Final Judgment are asserted as a ground for a defense, in whole or in part, to any claim or cause of action, or are otherwise raised as an objection,* constitutes a suit, action, proceeding, or dispute arising out of or relating to this Superseding and Amended Class Settlement Agreement or the Rule 23(b)(3) Class Settlement Order and Final Judgment.

---

[11] FRS appears to anticipate that its partial performance as an agent can support contract or quasi-contract actions against merchants who select someone other than FRS to submit their claims, regardless of the amount (if any) of the recovery. *See*, *e.g.*, FRS 5/15/25 at 3 (arguing that "FRS has invested substantial amounts of capital and performed under these contracts going back as far as 2012" and has "justifiably relied on [its] clients to honor their own contractual obligations.").

Settlement Agreement ¶ 67 (emphasis, brackets, and ellipsis added). If FRS sues a merchant for breaching a contract between the two, its claim will necessarily rest on the terms of that contract – not anything in the Settlement Agreement or the Final Judgment. *See MDL 1720*, 348 F.R.D. 151, 172 (E.D.N.Y. 2024) (adopting identical reasoning by Judge Marutollo). And while it would be speculative to predict any defense arguments in such an action, I know of no provision in the Settlement Agreement or the Final Judgment that absolves merchants of liability for breach of a contract with a non-party, and FRS has not cited one.[12]

FRS's reliance on Paragraph 19 of the Final Judgment fares no better. The "exclusive" jurisdiction to which class members submit is the Court's jurisdiction to resolve disputes "covered by" the Settlement Agreement or the Final Judgment. A claim against a merchant for breaching a private agreement with FRS is "covered by" neither document.

Simply put, the language of the Final Judgment that FRS cites demonstrates a concern that tribunals other than this Court might purport to interpret the Settlement Agreement or the Final Judgment and addresses that concern by asserting its exclusive jurisdiction over such issues. Nothing in that language suggests a concern about how other courts might resolve disputes that arise between non-parties and class members simply because the amount in dispute is a portion of the money to be paid to the class member party from the settlement fund.

---

[12] There are of course cases in which an unscrupulous TPF takes unfair advantage of a merchant in the process of securing a representation agreement. In such circumstances the Court has clear authority to protect class members through appropriate injunctive relief. *MDL 1720*, 2014 WL 4966072, at *1; *see also id*. at *31-32 (explaining the source of the Court's authority to protect class members under Federal Rule of Civil Procedure 23(d) and the All Writs Act, 28 U.S.C. § 1651); *In re Visa Check/MasterMoney Antitrust Litigation*, 2006 WL 1025588, at *4 (E.D.N.Y. Mar. 31, 2006) ("*Visa Check*"). But in the absence of any suggestion in the record that FRS engaged in such misconduct, it would be premature and speculative to exercise jurisdiction over routine contract enforcement actions that FRS may or may not initiate. Should FRS sue a merchant for breach of contract, and should the merchant assert a defense that implicates the Court's protective interest in the matter, the parties can seek removal and transfer as appropriate.

b. The All Writs Act

The second authority upon which FRS relies is the All Writs Act, 28 U.S.C. § 1651, as interpreted in *Visa Check*. In that case, as in this one, the Court had approved a settlement that certified a class of millions of merchants and created a multi-billion-dollar settlement fund and had retained exclusive jurisdiction over the distribution of the settlement funds. Also in that case, as in this, a number of TPFs sought to represent merchants in submitting claims for compensation from the fund to the class administrator. *See id*. at *1. Class counsel accused one such TPF of using false and misleading statements to entice merchants to retain it to submit their claims (or to sell their claims outright to the TPF) and asked the Court for injunctive relief. *See id*. at *2-3. As part of its response, the TPF objected that the Court lacked subject matter jurisdiction. *See id*. at *4. The Court rejected that position and ruled that it was empowered under the All Writs Act to issue an order making the TPF's contracts voidable at the merchant's option. *See id*. at *4-5.

FRS argues that its potential contract claims against merchants are likewise subject to this Court's exclusive jurisdiction. In doing so, it seizes on a portion of the *Visa Check* opinion but ignores both the basis for the Court's invocation of the All Writs Act and an important limitation on the statute's use that did not apply in *Visa Check* but does apply here. Specifically, FRS relies on the following passage in *Visa Check*:

> Because [the TPF's] ***contracts with class members plainly affect the administration of the settlements and the distribution of the settlement funds***, the All Writs Act authorizes the relief sought by Lead Counsel. "The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice."

*Id*. at *5 (quoted in FRS 1/17/25 at 4) (emphasis supplied and footnote omitted by FRS).

Reading the quoted passage in isolation – and without the footnote that FRS has omitted – might support the conclusion that this Court has jurisdiction over *any* dispute arising from a TPF's contract to submit a claim for a merchant's share of the settlement fund. But reading the passage in context makes clear that the Court was empowered to make the contracts voidable as a means of protecting merchant class members from the predations of an unscrupulous TPF.

> The All Writs Act … does not itself create jurisdiction, ... but it authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."
>
> Where, as here, a district court retains exclusive jurisdiction over settlement agreements and distribution of settlement funds pursuant to those agreements, it may issue orders necessary *to protect the settlement from threats by both parties and non-parties*….
>
> … I recognize that [TPFs] can provide a valuable service to class members who seek assistance in filing their claims or wish to liquidate those claims. Such firms are a natural and welcome feature of the settlement landscape. But this is not a run-of-the-mill business environment, subject solely to market forces and the principles of contract and tort law that control behavior in that environment. The fact that the merchant class is huge does not alter the nature of the Court's relationship with its members. The settlement of a long, hard-fought case has given those class members a tangible interest in settlement funds. I have an affirmative obligation to protect *those* interests. If a merchant chooses to sell its claim or pay someone else to process its claim, that is fine with the Court. It is also fine for [TPFs] to solicit merchants to use their claim processing or claim purchasing services. *The nature of the Court's interest is as simple as it is strong: the class members must not be misled*. Where false or misleading statements are used to solicit business from them, I have no intention to sit by and relegate them to a cause of action for breach of contract or fraud. To do otherwise – that is, *to say that I am powerless to take steps, both proactive and reactive, to protect each class member's interest in the settlement funds, even when I know they are being misled – would be an abdication of responsibility*. It would also erode the class members' and the public's respect for the settlements themselves, and for the process that produced them.

2006 WL 1025588, at *4 (citations omitted; ellipses and emphasis supplied).

The footnote that FRS omits likewise highlights the limited scope of the Court's jurisdiction under both the All Writs Act and Rule 23 of the Federal Rules of Civil Procedure. At the end of the first sentence that FRS quoted, the Court added in a footnote:

> The Second Circuit has held that Fed. R. Civ. P. 23(d), like the All Writs Act, does not create independent substantive rights or remedies enforceable in federal court. *See In re Baldwin-United,* 770 F.2d at 335. While Rule 23(d) may preserve jurisdiction in the context of administering a settlement agreement (also like the All Writs Act), I need not decide that question here. *See Georgine v. Amchem Products, Inc.,* 160 F.R.D. 478, 498 (E.D.Pa.1995) (finding that Rule 23 enables courts to enter remedial orders in the conduct of class actions without a [finding] of actual harm: "[a] remedy is appropriate if the communications at issue create a 'likelihood' of abuse, confusion, or an adverse effect on the administration of justice." (citations omitted)).

*Id*. at *5 n.3. Here again, the Court focused on its power under the All Writs Act and Rule 23 to protect class members. It did not purport to have, or exercise, free ranging jurisdiction over every dispute somehow related to the settlement.

The issue that FRS seeks to litigate here does not implicate the protective interest that the Court identified in *Visa Check*. More precisely, adopting FRS's argument that its contract disputes with merchants must be litigated in this Court would undermine, rather than advance, that protective interest. Under the regime FRS contemplates, a merchant who selects a TPF other than FRS to act as its agent in the claims process could be haled into court in New York (regardless of where the merchant is located) and would have to await the outcome of that ancillary litigation before receiving its share of the settlement fund. Regardless of the validity of FRS's contract claim, a merchant facing such a choice might be forced as a practical matter to accede to FRS's insistence on acting as the merchant's agent. Worse, in cases where multiple TPFs claimed to have contracts with the same merchant (and the CA has identified many such cases in this Settlement process), a merchant might be unable to avoid litigation in a distant court and the postponement of being paid the settlement funds to which it is entitled. Contrarily, if the

Court declines to exercise jurisdiction over such contract claims, TPFs like FRS can still litigate their claims, but without forcing the merchant to litigate in a faraway court and without postponing payment of the merchant's share of the settlement fund.[13] *See MDL 1720*, 348 F.R.D. at 168-73 (E.D.N.Y. 2024) (adopting identical Judge Marutollo's similar analysis of the All Writs Act's application).

FRS is not a member of the settlement class in the context of the instant disputes. In its capacity as a TPF acting as a merchant's agent, it does not – and cannot – assert a claim for any portion of the settlement fund without the principal's authorization. Nor does it have any claim on the protective role that empowers this Court to exercise jurisdiction over the contract disputes FRS seeks to litigate. It is instead a non-party that seeks either to serve as an agent for some merchants, or, if a merchant revokes that agency, to seek relief from the merchant – not from the settlement fund. Nothing about FRS's status or its interests brings it within the scope of the Court's jurisdiction over the settlement in this case.

2. The Special Master Has No Authority to Resolve FRS's Contract Claims

FRS next argues by analogy in an effort to demonstrate that the contract claims it seeks to assert against various merchants fall within the scope of the order appointing me as Special Master. Specifically, FRS points to the potential franchisor/franchisee disputes that the Court addressed in its opinion approving the settlement. *See MDL 1720*, 2019 WL 6875472, at *21 (E.D.N.Y. Dec. 16, 2019) (cited in FRS 1/17/25 at 4-5). Briefly stated, most of the substantive

[13] FRS complains that the preliminary determination under review "permits a TPF's client to breach its contract with the TPF without also providing the affected TPF with the forum to seek redress for that breach." FRS 1/17/25 at 2. That is incorrect, both because this Court is not "the" forum for FRS to litigate a contract claim against a merchant for the reasons explained above, and because nothing in the preliminary determination prevents FRS from filing such a claim in a court of competent jurisdiction.

objections to the Settlement Agreement came from "entities that own and/or operate gas stations and convenience stores that sell petroleum products that are produced and branded by major oil refiners such as Shell and ConocoPhillips (collectively, the 'Branded Operators')." *Id*. at *5; *see also id*. at *8 (noting that Branded Operators filed the majority of objections received). Those Branded Operators expressed the concern that that the Court would later find that their suppliers – rather than the Branded Operators themselves – would be entitled to portions of the settlement fund attributable to transactions at the Branded Operators' gas stations and stores. *See id*. In overruling those objections, the Court wrote that such disputes between Branded Operators and their suppliers could be resolved during the claims administration process, potentially by a Special Master. Specifically, the Court wrote the following, upon which FRS now relies:

> [T]he Court acknowledges that a process needs to be in place to determine claim ownership in franchisor/franchisee disputes such as those that the Branded Operators have raised, *i.e.*, as to disputes over who has the right to claim settlement funds and will appoint a special master to resolve such disputes. (*See* Hr'g Tr. 21:24–22:3 (the Court stating to counsel for certain Branded Operators that "if there's a dispute as to [a] claim, if the [major oil supplier] also submits a claim [in addition to the Branded Operator] for that same location, … then the dispute gets resolved pursuant to the [P]lan [of Allocation] or if need be, the Court or a special master").) ***These issues will likely implicate who in a given situation or within a certain contractual or processing relationship or corporate structure might have standing under federal antitrust laws.***

*Id*. at *21 (quoted in FRS 1/17/25 at 4; footnote omitted and emphasis supplied by FRS). FRS then posits that "[t]he resolution of contract disputes between TPFs and their clients requires the same type of contract evaluation as does the resolution of franchisor/franchisee disputes." FRS 1/17/24 at 4.

FRS's argument by analogy overlooks a critical distinction between the Branded Operators' potential disputes with their suppliers and FRS's own disputes with merchants. In the case of the Branded Operators, the issue was who owned the claim for a portion of the settlement fund and thus, as the Court noted, "who … within a certain contractual … relationship … might

have standing under federal antitrust laws." 2019 WL 6875472, at *21. Such cases directly implicate the Settlement Agreement's class definition – a matter that this Court is uniquely positioned to resolve. But the disputes between FRS and the various merchants with which it may have contracted are entirely different. In those disputes, there is no disagreement about who has antitrust standing, who accepted payment cards for transactions, and who owns the claim to a portion of the settlement funds. In each case it is unquestionably the merchant and not FRS. Resolution of the contract claims FRS may seek to litigate – unlike the Branded Operators' potential disputes with their suppliers – thus requires no particular familiarity with, or interpretation of, the Settlement Agreement. And because that is the case, FRS is incorrect in arguing that such disputes fall within the scope of the Special Master's remit "to resolve ***any disputes or matters*** arising out of or relating to the Plan of Administration, including … the resolution of claims made to the Net Cash Settlement Fund …." *Id.* at 4-5 (quoting Revised Order Appointing Special Master, ECF 9403, ¶ 1 (E.D.N.Y. Sept. 3, 2024; ellipsis and emphasis supplied by FRS).

3. Policy Arguments and Tortious Interference

FRS next argues that "[a]llowing [merchants who signed a contract with FRS] to select a competing TPF prevents further performance by FRS." *Id.* at 5. From that premise, FRS makes a series of policy arguments in support of its position and then contends that "preventing a TPF from performing under a valid and enforceable contract is so legally unsupportable that it meets the elements of tortious interference." *Id.* None of those arguments compel the result FRS seeks.

A merchant's choice to appoint an agent other than FRS only prevents FRS from acting as its agent. It does not prevent FRS from performing its contractual obligations under a contract that required it to serve as an agent because the revocation presumably ends any such obligation. In any event, I disagree with FRS's framing of the issue. In each of the conflicts addressed here,

the merchant was asked to state whether FRS or a different TPF was its authorized agent for submitting a claim for settlement proceeds and, in those cases in which the merchant did so, it named a different TPF as its preferred agent.[14] If doing so materially breached a contract with FRS, then that breach presumably relieves FRS of its obligation to perform further under that contract. *See*, *e.g.*, *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006); *Daytree at Cortland Square, Inc. v. Walsh*, 2021 WL 3190384, at *5 (E.D.N.Y. July 28, 2021), *aff'd*, 2022 WL 2345820 (2d Cir. June 29, 2022). Conversely, if the merchant was legally entitled to select the other TPF to act as its agent, then FRS has no obligation of its own to do anything further to advance the merchant's claim. Either way, directing the Class Administrator to process the claim submitted by the other TPF on the merchant's behalf does not prevent FRS from doing anything it is legally required (or permitted) to do – just as it does not prevent FRS from seeking redress for any claimed breach of contract.

Second, FRS's policy arguments are unpersuasive. To the extent FRS worries about creating perverse incentives for merchants, it disregards the fact that, in its view, merchants who act on those incentives expose themselves to litigation and liability for breach of contract. Regardless of the outcome here, FRS will be able to prosecute such claims. If those claims have merit, the risk of litigation costs and liability would serve to deter merchants from switching agents. But if FRS's claims are not valid, then a merchant who revokes FRS's agency has no incentive to do so that could fairly be labeled perverse. And FRS's concern that its "ability to pursue remedies against its clients [*i.e.,* merchants] (and, potentially, competing TPFs)" (*id.*) is baseless. If FRS does indeed have a valid claim for breach of contract or tortious interference, its

[14] The Class Administrator also reports that there are many instances in which a merchant has asked to be released from a contract with a TPF so that it can proceed without an agent and that most TPFs release merchants on request.

ability to seek and secure appropriate remedies is neither undermined nor eliminated by having to do so in a court other than this one.

Third, FRS's argument about potential liability for tortious interference is unclear to the extent it does not identify the potential tortfeasor. It cannot mean the merchant because a "party cannot tortiously interfere with its own contract." *N. Shore Window & Door, Inc. v. Andersen Corp.*, 2021 WL 4205196, at *10 n.9 (E.D.N.Y. Aug. 3, 2021) (quoting *Multi-Juice, S.A. v. Snapple Beverage Corp.*, 2003 WL 1961636, at *5 (S.D.N.Y. Apr. 25, 2003)) (cleaned up). A competing TPF may or may not commit such a tort in a given case, but the mere fact that a merchant chose another TPF at some point does not, standing alone, in any way suggest tortious interference by that TPF. The only other potential tort liability theory that FRS appears to contemplate is its assertion that my "preliminary determination makes it impossible for FRS to fulfill its contractual duties." FRS 1/17/25 at 6. To the extent that FRS believes that my conduct as Special Master (or the Class Administrator's conduct in conveying that determination or this Court's potential conduct in adopting my recommendation) constitutes tortious interference with its contracts, I plainly would have a conflict of interest in analyzing the argument and therefore make no recommendation to the Court in that regard.

4. *Cascade Settlement Services* Does Not Compel a Different Result

In one of its later submissions, FRS cites the decision in *Cascade Settlement Servs. LLC v. ADT LLC*, 2025 WL 2173959 (N.D. Cal. July 31, 2025), as support for the proposition that its contract claims against merchants must be litigating in this Court. FRS 8/7/25 at 1. In that case, "Cascade Settlement Services LLC ('Cascade') and ADT – a class member [in *MDL 1720*] – entered into an Asset Purchase and Sale Agreement ('APSA'), in which Cascade alleges that it purchased ADT's right to recovery from the settlement fund in [*MDL 1720*]." 2025 WL 2173959, at *2. Later, ADT "merged with a company called Protection One Alarm Monitoring,

Inc. ('Protection One'), which was separately a class member in [*MDL 1720*]." *Id*. at *2. The parties then "filed identical – and thus conflicting – claims with the Class Administrator regarding Protection One's settlement claim." *Id*. The Class Administrator preliminarily resolved the conflict in Cascade's favor. *Id*. "ADT disputed that determination and indicated that it planned to appeal at least part of that decision to the Special Master and District Court for the Eastern District of New York." *Id*. Cascade then filed suit in state court in California. ADT removed the case to the Northern District of California and then moved to transfer the case to this Court pursuant to the provision of the Final Approval Order in this case retaining exclusive jurisdiction over "any disputes relating to, or arising out of … any claim for payment from the Class Settlement Escrow Account[.]" *Id*. at *1; *see also* Final Approval Order, ECF 7818, ¶ 18.

The court granted the transfer over Cascade's objection, finding that the parties' dispute was within the scope of the exclusive jurisdiction provision of the Final Approval Order. *See* 2025 WL 2173959, at *5. In reaching that conclusion, the court "found that 'the contract dispute … [did] affect the distribution of conflicting claims from the Class Settlement fund such that it is 'relating to' the administration of that fund under the jurisdiction retention clause[.]" FRS 8/7/25 at 2 (quoting 2025 WL 2173959, at *5). Following that decision, the case was transferred to this Court on January 7, 2026. Once transferred, this Court ordered that the decision "is the law of the case, and the Court does not see cogent and compelling reasons to revisit it." Docket 1:26-MC-00073, electronic order dated Jan. 27, 2026. I therefore assume the opinion is binding authority for purposes of this report and recommendation.

FRS's reliance on *Cascade Settlement Services* is misplaced. That case – like the disputes involving Branded Operators discussed above – presented a dispute about which party owned the claim to a portion of the settlement fund. That is the kind of dispute over which the Court has

clearly retained exclusive jurisdiction and referred to the Special Master.[15] But FRS does not purport to own a claim to any settlement funds. Instead, it contends that it has a right to act as the agent for certain merchants who do own such claims and to be compensated for its work in doing so. Nothing in *Cascade Settlement Services* supports the proposition that such claims are within the scope of the jurisdiction retention provision in this case.

III. Recommendation

For the reasons set forth above, I respectfully recommend that the Court (1) enforce the determinations withdrawing FRS's registrations in the conflicts for which a different TPF submitted a valid MAF, (2) enforce the determinations withdrawing all TPF registrations in the conflicts for which no party submitted a valid MAF, (3) approve the issuance of an appeal notice to the registrants in the conflicts involving competing valid MAFs for the same TIN (which I can then consider individually on the merits and issue a separate report and recommendation), and (4) decline to exercise jurisdiction over breach of contract claims that FRS might assert against merchants who select another TPF as their agents for submitting claims for settlement fund proceeds.

IV. Objections

This Report and Recommendation will be served on FRS via the Court's ECF system, and the Class Administrator will also promptly provide a copy to FRS.[16] Any interested party

---

[15] Many such disputes about who owns the settlement claims of merchants whose assets have been sold are currently pending before the Class Administrator or Special Master.

[16] Because this report and recommendation addresses only FRS's submissions, only FRS will be served in the first instance. If the Court adopts the foregoing recommendations, the lack of notice will not prejudice any other party currently in conflict with FRS. However, in the event the Court rejects or modifies those recommendations, I respectfully recommend that the Class Administrator should be directed to provide a copy of the Court's decision and this report and recommendation to all parties to each affected conflict. I further recommend that merchants

shall have 21 days from today's date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-03085-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this report and recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect confidentiality and the identities of claimants, as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMA-JAM, Doc. 3, ¶ 4.

Dated: July 28, 2026

*/s/ James Orenstein*
Special Master

---

involved in such conflicts (or their successors in interest) should be deemed to retain the right to contest FRS's position on the merits.