UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

| | |
|---|---|
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES | REPORT AND RECOMMENDATION <u>OF SPECIAL MASTER</u> |
| ---------------------------------------------------------- x | 1:24-MC-03415-BMC-JAM |
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT APPEALS OF REGISTRANT LOYALE HEALTHCARE LLC. | 1:26-MC-03160-BMC-JAM |

---------------------------------------------------------- x

**Parties**:

Loyale Healthcare, LLC ("Loyale")

Rule 23(b)(3) Class Plaintiffs ("Class")

**Counsel**:

Keith J. Barnett
Troutman Pepper Locke LLP
Bank of America Plaza
600 Peachtree Street NE, Suite 3000
Atlanta, GA 30308
(404) 885-3000
keith.barnett@troutman.com
Counsel for Loyale

Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 Wests Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
xanb@rgrdlaw.com
Class Counsel

## I. Background

Loyale has registered a total of 781 Taxpayer Identification Numbers ("TINs") with the Class Administrator in two groups seeking to recover proceeds from the damages class

settlement in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05-MD-01720-BMC-JAM (E.D.N.Y.) ("*MDL 1720*").[1] The Class Administrator has designated Loyale as a Payment Facilitator with respect to both groups and Loyale seeks review of that designation. In other respects, however, the two groups are distinct, as explained below. Briefly stated, the issue with respect to one group (the "PayFac Group") is whether the Court's reasoning in prior cases involving the Payment Facilitator designation applies to Loyale. For the other group (the "TPF Group"), the issue is whether Loyale may avoid that designation by virtue of the consent it has secured from merchants to have Loyale register their TINS in the capacity of a third-party filer ("TPF") in exchange for a fee of 90 percent of their recovery.[2] For the reasons discussed below, I conclude that Loyale is not a class member and that its claim filing agreements are misleading and unconscionable. I therefore respectfully recommend that the Court direct the Class Administrator to withdraw all of Loyale's registrations in both the PayFac and TPF groups, void all of Loyale's claim filing agreements with members of the TPF Group and direct the Class Administrator to administratively file all of the TINs in both groups on the merchants' behalf.

[1] Before submitting a claim to receive the settlement proceeds corresponding to the payment card transactions of a merchant member of the Rule 23(b)(3) Settlement Class (the "Class"), a party must first register that merchant's TIN with the Class Administrator. The registrant must provide proof that it is the owner (or authorized representative of the owner) of the claim corresponding to that merchant TIN. In the absence of supporting documentation, this requirement can also be satisfied by providing the Claimant ID and Control Number printed on the original prepopulated claim forms that were mailed to known class members. Once the registrant establishes such authority, the Class Administrator updates the registrant's status to "approved." If there is only one approved registrant for a given TIN, the registrant may submit a claim for that TIN. In cases where multiple parties have registered the same TIN, the Class Administrator designates the TIN as being in "conflict" and does not permit any registrant to submit a claim until the conflict is resolved.

[2] A TPF is a business that enters into agreements with merchants to register and prosecute their claims of settlement funds in exchange for a portion of the merchants' recovery. *See MDL 1720*, 2014 WL 4966072, at *4 (E.D.N.Y. Oct. 3, 2014) (describing "the business of third-party claims filing companies").

The record before me includes the following documents:

- Letter dated January 30, 2025, from Loyale's counsel to Class Administrator providing proof of authority to file TINs including four exhibits and 90 one-page form agreements entitled "Consent for Settlement Services" dated January 15-February 4, 2025, between Loyale and various clients;

- Emails dated January 17-31, 2025, between Loyale's counsel and the Class Administrator;

- Letter dated February 4, 2025, from Loyale to Whom It May Concern;

- An additional "Consent for Settlement Services" form received by the Class Administrator on Feb. 4, 2025 (the 91st such form);

- Email dated May 22, 2025 from the Class Administrator to Loyale.

- Letter dated June 10, 2025, from Loyale to Whom It May Concern;

- A collection of 152 contracts and other documentation Loyale submitted for 75 Merchants/TINs in response to the PayFac Dispute Deficiency Notice.

- A collection of 404 contracts and other documents that Loyale submitted for 380 Merchants/TINs in response to the PayFac Dispute Deficiency Notice.

- Letter dated July 10, 2026, from Loyale's counsel to Special Master, with a copy of the Loyale 1/30/25 letter and Exhibits 1-4 thereto attached as Exhibit A (but not including the 90 agreements originally appended to that letter);

- Loyale Healthcare LLC's Response to Report and Recommendation of Special Master dated August 31, 2026 ("Loyale Br."), together with the Declaration of Crista Harwood, General Counsel for RevSpring Inc. ("RevSpring") (which acquired Loyale in 2020) dated Aug. 31, 2026 ("Harwood Dec.") and 6 exhibits thereto (including two additional consent forms, bringing the total to 93);

- Rule 23(b)(3) Class Counsel's Response to Report and Recommendation of Special Master dated August 31, 2026 ("Class Br.");

- Loyale Healthcare LLC's Response to Rule 23(b)(3) Class Counsel's Response to Report and Recommendation of Special Master dated September 18, 2026 ("Loyale Reply"); and

- Rule 23(b)(3) Class Counsel's Reply in Further Support of Report and Recommendation of Special Master dated September 18, 2026 ("Class Reply").

Loyale registered 781 merchant TINS on December 28, 2024, and did not include any proof of authority to acts on the merchants' behalf. On January 2, 2025, the Class Administrator made an initial determination that Loyale was not a class member and therefore ineligible to register those TINS in its capacity as a Payment Facilitator based on Judge Brodie's decision in *MDL 1720*, 735 F. Supp. 3d 249 (E.D.N.Y. 2024), *reconsideration denied*, 2025 WL 2490442 (E.D.N.Y. Aug. 29, 2025) ("*PayFacs I*"), *aff'd*, 2026 WL 1210154 (2d Cir. May 4, 2026) ("*PayFacs II*"). Loyale lodged its objections to that designation, first with the Class Administrator and then with me.[3] *See* Loyale 1/30/25 at 1-4; Loyale 7/10/26 at 1-2.[4]

Over the course of the month following the Class Administrator's notice, RevSpring contacted hundreds of the merchants with whom Loyale had payment facilitation agreements in an effort to reclassify Loyale as a TPF:

> Beginning in January 2025, RevSpring contacted executives at over 400 companies for which Loyale processed payments before March 2020. RevSpring reminded the executives that Loyale had a processing relationship with the company and informed the executives that their companies were likely identified, through their respective tax identification numbers, as companies that were eligible to file a claim for a settlement payment related to the In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation. RevSpring asked the companies to allow Loyale to file the claims for settlement payments on their

---

[3] On May 22, 2025, the Class Administrator sent deficiency notices to Loyale advising that it would need to submit its contract with each merchant to substantiate its authorization to act on behalf of all of them before the dispute could be considered further. Loyale had not yet done so when the Court issued its decision in *In re MDL 1720 Damages Class Settlement Disps.* ("*Settlement Disputes*"), 2026 WL 1729167 (E.D.N.Y. June 16, 2026) ("*Teleflora*") (adopting in part report and recommendation). In *Teleflora*, the Court adopted my recommendation to find that the registrant was not a class member and on that basis declined on mootness grounds to adopt my recommendation to require the company to submit its contracts with each of the thousands of merchants whose TINs it had registered. *See id*. at *3; *Settlement Disputes*, 2026 WL 825503, *9-10 (E.D.N.Y. Mar. 17, 2026) ("*Teleflora R&R*"). In light of that ruling, I suspended the contract-filing requirement with respect to cases involving payment facilitators.

[4] I will use "Loyale [submission date]" to cite Loyale's letters and emails.

> behalf as a Third-Party Filer in exchange for the companies keeping 10% of the settlement payout.

Harwood Dec. ¶ 10.

Loyale has not included in its exhibits any memorialization of the communications Harwood describes. It has, however, submitted the form agreement the merchants were asked to execute. *See id*. ¶ 9. The text of that form agreement is as follows:

**CONSENT FOR SETTLEMENT FUNDS**

> At a point during 2008 to 2019, Loyale Healthcare, LLC ("Loyale") processed payments for [merchant name] ("you" or "your") as its merchant services provider. Your tax identification number is [merchant TIN].
>
> Pursuant to Loyale's General Terms of Service with you for card processing, you agreed to pay Loyale processing fees at a contracted rate which covered all interchange fees assessed by the card brands and paid for by Loyale on your behalf. As such, Loyale intends to make a claim in the Visa and Mastercard class action lawsuit settled in March 2023 on your behalf and requests that Loyale be the payee of the transaction. By signing this Consent for Settlement Funds ("Consent"), you:
>
> - Authorize Loyale to file claims on your behalf; and
> - Authorize Loyale to receive payment on your behalf, and
> - Agree that, if any settlement is received related to you, Loyale will share 10% of any settlement with you within thirty (30) days of Loyale's receipt of funds.
>
> Please note that:
>
> - Class members like you are not required to use a third party like Loyale, a "Third-Party Filer."
> - Free help is available from Class Counsel and the Class Administrator.
> - Additional information can be found on the following court approved settlement website (https://www.paymentcardsettlement.com/en).
>
> You acknowledge and agree that the person signing this Consent has signatory authority for the above-referenced business.

Harwood Dec. Ex 6.

Loyale's effort succeeded in dozens of cases: between January 16 and February 4, 2025, Loyale reregistered 92 merchant TINs – all of which it had previously registered on December 28, 2024 – under a new registration record distinct from the one it used for the original group of 781 TINs.[5] During the same period, Loyale sent emails to the Class Administrator withdrawing the initial registration of dozens of TINs in the second group, so that each of the TINs in the TPF Group was no longer registered in the PayFac Group. *See*, *e.g.*, Loyale 1/17/25 (withdrawing three TINs); Loyale 1/21/25 (withdrawing 16 TINs); Loyale 1/29/25 ("[f]or the merchants that we have proof of authorizations, Loyale is acting in its capacity as a third-party filer rather than it its capacity as a payfac"). Notwithstanding Loyale's claim to be acting as a TPF for some merchants, the Class Administrator continued to designate Loyale as a Payment Facilitator with respect to all of the TINs it had registered and provided the following explanation:

> We'd like the Special Master to review the entire situation, including the individual filings in [the TPF Group] account…. In terms of being a Third-Party Filer, there are a few aspects with this account that are unique to your situation. Generally, a Third-Party Filer is an outside organization that charges a small fee to file on behalf of the merchant. Here, Loyale had a pre-existing relationship with the merchants, which seems to be material based on the language in the Proof of Authority documents you've submitted. Specifically, the agreement references the "General Terms of Service." We'd like to know more about that relationship and review the communications between Loyale and the individual merchants before we make a determination. Also, the agreement states that Loyale will keep 90% of the recovered fees, which is highly unusual for a Third-Party Filer. Please let me know if you have any other questions.

---

[5] The Class Administrator has reported that the TPF Group originally included 92 TINS and that Loyale later withdrew one for which it had no proof of authorization (and therefore remains registered in the PayFac Group), leaving a total of 91. Loyale asserts that there are 93 merchants in the TPF Group. *See* Loyale Br. at 1 n.1. Loyale further notes that 91 merchants in the TPF group agreed to pay the 90 percent service fee Loyale sought and that the remaining two negotiated the fee down to 80 percent and 75 percent, respectively. *Id*. at 6 (citing Harwood Dec. ¶¶ 9-11 & Ex. 6 (redacted copies of two consent forms). The discrepancy between Loyale's count and the Class Administrator's does not affect my analysis as I conclude that all of Loyale's registrations should be withdrawn.

Email dated Jan. 28, 2025 from Class Administrator to Loyale. Loyale objected to being classified as a Payment Facilitator with respect to the TINs in this group on the grounds that it had registered those TINs as a TPF. *See* Loyale 2/4/25; Loyale 6/10/25.

After reviewing the submissions up to that point, I noted "the possibility that the 90 percent fee allocated to Loyale under the consent forms is unconscionable and the possibility that the wording of the consent forms misled the merchants who signed them." Order dated Aug. 3, 2026. I therefore invited Loyale and Class Counsel to submit briefing on the consent forms' validity. *Id*. at 5. The parties submitted their initial briefs on August 31, 2026, and filed replies on September 18, 2026.

## II. Analysis

### A. Loyale Did Not Accept Payment Cards and Therefore is Not a Class Member

I assume that with respect to the TINs remaining in the PayFac Group, Loyale continues to take the position that it is a class member and entitled to receive 100 percent of the recovery for the TINs in that group. The record on that point is not entirely clear: in its reply brief – which, to be clear, refers to the TINs in the TPF Group – Loyale wrote that it "never" made the argument that it was entitled to 100 percent of the award. Loyale Reply at 2. But that is precisely what it argued in its submission to me about the TINs in the PayFac Group – a group that originally included dozens of the TINs now in the TPF Group. *See* Loyale 7/10/26 at 1 (arguing that Loyale "is a member of the Damages Class for the transactions in which the Class Administrator has deemed Loyale as ineligible to register a claim"); Loyale 1/30/25 ("Loyale is a member of the Damages Class with respect to the [TINs] related to this letter"). If Loyale is a class member entitled to a share of the settlement fund based on its payment processing agreements with merchants, it need not defend the validity of the consent forms because it is

already the owner of the claims associated with the TINs of the merchants who executed those forms. On the other hand, if Loyale's right to receive a portion of its merchant clients' recovery relies on the validity of the consent forms, then it does not own the claims of merchants who did not sign those forms.

To the extent Loyale does continue to assert a right to register the TINs in the PayFac Group, I respectfully disagree with its position. Loyale relies on the same types of arguments that other providers of payment processing services have previously advanced without success: it is labeled as a "merchant" in its agreements with other payment processors and those agreements recite that Loyale "accepts" Visa and Mastercard; cardholders use Loyale's online platform when paying for goods and services sold by Loyale's merchant clients; Loyale maintained merchant accounts with acquirers; and Loyale directly paid interchange fees. *See* Loyale 7/10/26 at 2; Loyale 1/30/25 at 1-3.

This Court has consistently rejected such arguments because "in a payment chain containing a merchant who accepts cards, and a payment facilitator who enables the merchant to accept cards, the merchant is the class member and the payment facilitator is not." *In re MDL 1720 Damages Class Settlement Disps.* ("*MDL 1720 Disputes*"), 2026 WL 1729167, *2 (E.D.N.Y. June 16, 2026) ("*Teleflora*") (adopting in pertinent part report and recommendation finding Teleflora LLC not to be a class member in its capacity as a payment processor); *see also MDL 1720*, 735 F. Supp. 3d 249 (E.D.N.Y. 2024) (holding same with respect to Square and Intuit payment processing services), *reconsideration denied*, 2025 WL 2490442 (E.D.N.Y. Aug. 29, 2025), *aff'd*, 2026 WL 1210154 (2d Cir. May 4, 2026); *MDL 1720 Disputes*, Order dated Sept. 15, 2026 (adopting report and recommendation finding same with respect to FTD, LLC); *id.*, Order dated Sept. 9, 2016 (same with respect to Allpaid, Inc.); *id.*, Order dated Aug. 31, 2016

(same with respect to RoyalPay, Inc.); *id*., Order dated Aug. 18, 2016 (same with respect to ACI Worldwide).

Moreover, Loyale's argument in this regard is undermined by the text of its merchant contracts. As with other payment facilitators, Loyale's standard merchant agreements make clear that it is the merchant rather than Loyale that "accepted" payment cards, and that Loyale only received such payments as the merchant's agent. *See* Harwood Dec. Ex. 3 (General Terms of Service) § 1 (defining "Payment Processing Services" as "the payment processing services offered by Loyale, which provide You [*i.e.*, the merchant client] with the ability to accept credit cards"); *id*. § 5.1 ("You authorize Loyale to act as Your agent for the limited purposes of holding, receiving, and disbursing funds on Your behalf."); *id*. § 8.6(g), (h) (prohibiting merchant from "accepting" payment cards in certain circumstances); *id*. § 8.7(a), (b) (prescribing rules for merchant to set minimum or maximum payment amounts that it will "accept" from cardholders); *id*. Ex. B (allowing merchant to "opt out of accepting American Express cards at any time without directly or indirectly affecting its rights to accept other payment products"). In addition, the "Consent for Settlement Funds" forms that Loyale sent its merchant clients in January 2025 – after the Class Administrator notified Loyale of its Payment Facilitator status – explicitly acknowledged that Loyale's prior payments of interchange fees had been made on the merchants' behalf. *See* Harwood Dec. Ex. 6.[6]

[6] The same text also belies Loyale's assertion that "Loyale paid the unlawfully inflated [interchange] fees" and that "[t]he companies for whom Loyale processed payments did not." Loyale Br. at 5 (citing Harwood Dec. ¶¶ 5-8); *but see* Harwood Dec. Ex. 6 ("Pursuant to Loyale's General Terms of Service with you for card processing, you agreed to pay Loyale processing fees at a contracted rate which covered all interchange fees assessed by the card brands and paid for by Loyale on your behalf").

Because Loyale did not "accept" payment cards in transactions between its merchant clients and those merchants' customers as that term is used in the Superseding Settlement Agreement, *see MDL 1720*, ECF 7257-2 ¶ 4, it is not a member of the class with respect to those transactions. I therefore respectfully recommend that the Court direct the Class Administrator to withdraw all of Loyale's registrations of TINs in the PayFac Group.[7]

B. Loyale's TPF Agreements Are Misleading and Unconscionable

Once Loyale learned on January 2, 2025, that the Class Administrator deemed it to be a payment facilitator and not a class member, it set out to retcon its relationship with its merchants in a way that would allow it to keep the lion's share of its clients' recovery. It did so through the use of a misleading form agreement that provided for an unconscionably high claim filing service fee. In these circumstances, New York law (which the parties agree applies here), the Federal Rules of Civil Procedure, and the All Writs Act all empower this Court to protect class members by voiding those agreements. I respectfully recommend that the Court do so.

A finding of unconscionability under New York law generally requires a "showing that the contract is both procedurally and substantively unconscionable. The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract." *Aviles v. Wells Fargo Bank, N.A.*, 2026 WL 1256083, at *5 (2d Cir. May 7, 2026) (cleaned up) (quoting *State v. Wolowitz*, 96 A.D.2d 47, 67 (N.Y. App. Div. 1983)); *see In re Lawrence*, 24 N.Y.3d 320, 336-37 (2014). Under Rule 23(d) of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, the Court has authority to protect class members from misleading and abusive practices

[7] To the extent Loyale may have accepted payment cards as payment for goods and services that it sold to others, such transactions are not at issue here. Loyale may well be a member of the class with respect to such transactions. *See Teleflora*, 2026 WL 1729167, at *3 n.2.

through injunctive relief. *See MDL 1720*, 2014 WL 4966072, at *1, *31-32; *In re Visa Check/MasterMoney Antitrust Litigation*, 2006 WL 1025588, at *4 (E.D.N.Y. Mar. 31, 2006). This Court can and should void Loyale's TPF agreements under both state and federal law.

The "Consent for Settlement Funds" form that Loyale sent to its merchant clients was misleading and procedurally unconscionable.[8] As a threshold matter, it does not look like a contract at all – it is titled as a "Consent for Settlement Funds" and does not recite that it is an agreement, it does not clearly identify the consideration Loyale is providing to the merchant in exchange for the merchant's surrender of 90% of its recovery, and it does not address the ancillary matters that written contracts usually address such as the scope of the agreement, the governing law, the term, dispute resolution, and the method for parties to send notices to one another. In this regard the Consent for Settlement Funds differs markedly from the sample payment processing agreement with merchants that Loyale has supplied. *Compare* Harwood Dec. Ex. 6 (Consent for Settlement Funds) *with id*. Ex 4 (sample merchant agreement for payment processing services). A merchant receiving this document could easily believe that it was a matter arising under its earlier payment processing agreement with Loyale rather than a proposal to enter into an entirely new and different business relationship.

Further, the consent form begins by reminding the merchant that Loyale had been the merchant's payment processor and that "Pursuant to Loyale's General Terms of Service with you for card processing, you agreed to pay Loyale processing fees…." *Id*. Ex 6. That reminder is

[8] "Procedural unconscionability usually results from the use of fine print or complicated, incomplete, or misleading language that fails to inform a reasonable person of the contractual language's consequences." *Parallax Health Scis., Inc. v. EMA Fin., LLC*, 2022 WL 1446521, at *11 (S.D.N.Y. Feb. 24, 2022) (quoting *Guerra v. Hertz Corp.*, 504 F. Supp. 1014, 1021 (D. Nev. 2007)), *report and recommendation adopted as modified*, 2022 WL 2531344 (S.D.N.Y. Apr. 7, 2022).

wholly irrelevant to Loyale's offer of claim filing services and serves only to engender the false assumption that the merchant has already agreed to use the latter service because it is within the scope of the earlier payment processing agreement. That misimpression is bolstered by the wording of the next sentence: "As such, Loyale intends to make a claim in [*MDL 1720*] on your behalf and requests that Loyale be the payee of the transaction." The phrase "As such" clearly – but falsely – conveys that there is some logical link between the merchant's past use of Loyale's payment processing service and Loyale's filing of the merchant's claim. The phrase "Loyale intends to make a claim" clearly – and again falsely – conveys that it has already been decided that Loyale will file the merchant's claim and that there is nothing for the merchant to decide in that regard. Moreover by placing the "Loyale intends" phrase immediately after "As such," the form falsely conveys that it was the merchant's prior agreement to use Loyale's processing service that gives Loyale the right to file the merchant's claim.

The next phrase builds on that misimpression: in contrast to the already determined fact that Loyale "intends" to file the merchant's claim, Loyale "requests" to "be the payee of the transaction." In context, that phrasing suggests that the merchant's only choice in the matter is to decide who receives settlement funds in the first instance rather than who will own those funds upon payment, and not whether Loyale will serve as the merchant's claim filing agent.

To be sure, the consent form follows the misleading text described above with a statement of the effect of signing the document – namely, that it authorizes Loyale to file the merchant's claim and receive payment. But that statement cannot be read in isolation. Viewed in context, and particularly in light of the misleading text that precedes it, the form falsely conveys the impression that the merchant had already granted Loyale such authority as part of its claim

processing agreement, and that the new form merely authorized a particular method for receiving payment.

The consent form exacerbates the risk of confusion in the next provision concerning Loyale's compensation for filing the merchant's claim. The form recites that by signing it, the merchant agrees that "if any settlement is received related to you, Loyale will share 10% of any settlement with you within thirty (30) days of Loyale's receipt of funds." This language does not clearly convey that Loyale will receive settlement funds belonging to the merchant and then retain 90 percent of that recovery as its service fee. Instead, it fosters the false impression that Loyale will receive settlement funds to which *it* is entitled and, to the extent Loyale's recovery is "related to" the merchant, Loyale will "share" a small portion of it with the merchant.

Loyale repeatedly notes that its consent forms included court-mandated disclosures that class members need not use a TPF, that free help is available, and that direct class members to a website with additional information. *See* Loyale Br. at 4, 7, 12, 14, 16, 17, 18-19. That inclusion does little if anything to dispel the confusion that Loyale's form likely engendered. Those disclosures were developed to combat a different method of misleading merchants into signing TPF agreements, such as a TPF's false representation "that signing up with [it] was a prerequisite to recovery and that class members must sign up with [it] right away to receive their refund." *MDL 1720*, 2014 WL 4966072, at *10. Informing a merchant that it need not sign up with a TPF and that free help is available dispels the latter misinformation but it does nothing to help a merchant presented with a document that does not appear to be a TPF agreement at all.[9]

[9] Loyale also repeatedly insists, without explanation or evidence, that the merchants who signed its consent forms were "sophisticated." *See* Loyale Br. at 1, 2, 8-9, 14-15; Loyale Reply at 2. That assertion is at odds with the Court's description of "the small and relatively unsophisticated merchants who constitute the overwhelming majority of the class." *MDL 1720*, 2014 WL 4966072, at *1. As the Court has previously noted, it has a "strong interest in protecting

In my experience over more than two decades – now as the Special Master and previously as the magistrate judge assigned to *MDL 1720* – Loyale's "Consent for Settlement Funds" form stands in stark contrast to the form service agreements that TPFs typically offer to prospective clients. The latter are titled as agreements, contain no language referring to prior payment processing relationships, and clearly state that the TPF will provide specific claim filing services in exchange for a percentage of the recovery clearly described as the TPF's fee. Whether or not Loyale's marked departure from such norms was intended to be misleading, it plainly laid the groundwork for significant confusion among the merchants receiving Loyale's form. As such, it was both procedurally unconscionable for purposes of New York law and sufficiently misleading to warrant this Court's exercise of injunctive authority under the All Writs Act.

Loyale briefing appears to reflect an understanding of the misleading nature of the consent forms. In characterizing RevSpring's solicitation campaign, Loyale provides a description of communications with merchants that it has not documented – a description that differs in small but significant ways from the actual text of the consent forms the merchants signed. For example, Harwood asserts that RevSpring "*asked* the companies to allow Loyale" to file their claims. Harwood Dec. ¶ 10 (emphasis added). What the forms actually said was that "Loyale *intends*" to do so. *Id*. Ex 6. In addition, while Harwood asserts that RevSpring told the merchants that their end of the proposed arrangement would be "*keeping* 10% of the settlement payout," *id*. ¶ 10 (emphasis added), the consent forms noted that "Loyale will *share* 10% of any settlement with you[.]" *Id*. Ex. 6 (emphasis added). The former phrasing suggests the recovery belongs in to the merchant, who will be "keeping" all of it except for Loyale's fee; the latter

merchants*, especially unsophisticated merchants*, from false or misleading solicitations that could result in the merchants needlessly signing away up to a third or more of their damages claims." *Id*. at *18 (emphasis added).

falsely suggests that the recovery belongs to Loyale, which will graciously "share" a small part of it with the merchant.

Loyale's claim filing agreements were also substantively unconscionable. Class Counsel's research confirms my own experience that the fee Loyale seeks here for its claim filing service – 90 percent of the merchants' recovery – is far in excess of what other TPFs charge their clients. As Loyale notes, the question of substantive unconscionability "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." Loyale Br. at 12 (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 12 (1988)). In a market where the price for claim filing service is normally 10-40 percent of a merchant's recovery, there can be no question that Loyale's demand for 90 percent is unreasonably favorable to Loyale.

Moreover, a finding of substantive unconscionability does not improperly "readjust the agreed allocation of risks in the light of some perceived imbalance in the parties' bargaining power." *Id*. (quoting *Gillman*, 73 N.Y.2d at 14. There is no reason to believe that the relative bargaining power of Loyale and the merchants who signed the consent forms differs from the relative bargaining power of other TPFs and merchants. And yet Loyale was somehow able to extract far higher compensation for its services than other TPFs can for theirs. Loyale does not offer any plausible explanation as to why anyone – let alone the ostensibly sophisticated businesses Loyale describes – would choose to pay multiples of the normal market price for its claim filing service. The explanation cannot be found in the parties' relative bargaining power. Rather, based on the record before me, the only plausible explanation for Loyale's ability to extract significantly higher fees for its claim filing service is that the consent forms misled the merchants who signed them or took advantage of their lack of sophistication.

In arguing that its TPF agreements are not unconscionable, Loyale makes two arguments that are entirely unpersuasive. First, it repeatedly cites the fact that most of the merchants it approached did not sign the consent forms, and that two of them negotiated the service fee down from 90 percent (one to 80 percent and the other to 75 percent). *See* Loyale Br. at 3, 6, 11, 12-13, 19. The fact that Loyale failed to mislead many of its payment processing clients does not excuse the fact that it did mislead many others. Moreover, as Class Counsel correctly observes, in the two instances in which merchants negotiated the service fee to a level slightly below 90 percent, it remained far above typical price for claim filing services. *See* Class Reply at 3.[10]

Second, Loyale emphasizes that as part of its role as a payment processor it "was listed as the merchant of record and, in that capacity, Loyale paid 100% of the interchange fees that are the subject of the underlying class action lawsuit that led to the settlement." Loyale Br. at 3; *see also id*. at 5 ("The interchange fees were Loyale's separate obligation, Loyale's expense, and Loyale's financial risk."), 13 ("Loyale paid 100% of the interchange fees that are the subject of the underlying lawsuit and settlement agreement") 14 (Loyale "incurred 100% of the out-of-pocket loss"). There are two problems with that argument: it is irrelevant and it is misleading. The argument is irrelevant because Loyale's nominal listing as a "merchant" in some of its contracts and the fact that it conveyed the payment of interchange fees to acquiring banks – which it did only as the agent for its merchant clients – is a function solely of its payment processing agreements. It has nothing to do with the TPF agreements that a subset of its payment processing clients later executed. The argument is misleading because it ignores the fact that – as

[10] I also agree with Class Counsel's assessment that Loyale's willingness to accept a service fee of 75 or 80 percent upon request "shows that the percentage did not reflect the value of the service, the work performed, or any risk assumed. It shows instead that 90% was simply Loyale's opening demand, reduced only where a merchant happened to negotiate." *Id*.

Loyale reminded merchants who received the consent forms – Loyale's merchant clients "agreed to pay Loyale processing fees at a contracted rate which covered all interchange fees assessed by the card brands and paid for by Loyale on [their] behalf." Harwood Dec. Ex. 6.

Because Loyale's consent forms were misleading and unconscionable, I respectfully recommend that the Court deem them void. To avoid prejudicing the merchants who signed those forms, I further respectfully recommend that the Court adopt Class Counsel's suggested relief of having Class Administrator administratively file the relevant TINs, with the merchant class members receiving 100 percent of the settlement benefits to which they are entitled.[11] Because the Class Administrator may not have the contact information for all of the relevant merchants, I also respectfully recommend that the Court direct Loyale to provide that information to the Class Administrator.

## III. Recommendation

For the reasons set forth above, I respectfully recommend that the Court direct the Class Administrator to withdraw all of Loyale's registrations in both the PayFac and TPF groups, void all of Loyale's claim filing agreements with members of the TPF Group, direct the Class Administrator to administratively file all of the TINs in both groups on the merchants' behalf, and direct Loyale to provide the Class Administrator any contact information it has for the merchant associated with each TIN it has registered.

[11] Class Counsel's suggestion was made only with respect to the TPF Group, but the reasoning applies with equal force to all of the merchants in both groups. The Class Administrator reports that at least one merchant in the PayFac group has already registered its TIN with the assistance of a different TPF. I respectfully recommend that where a merchant at issue here registers its own TIN (directly or with the assistance of a different TPF), the Class Administrator need not administratively file that TIN.

IV. Objections

This Report and Recommendation will be served on Loyale via the Court's ECF system, and the Class Administrator will also promptly provide a copy to Loyale.[12] Any interested party shall have 21 days from today's date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-03160-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this Report and Recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect confidentiality and the identities of claimants, as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMC-JAM, Doc. 3, ¶ 4.

Dated: September 25, 2026

*<u>/s/ James Orenstein</u>*
Special Master

---

[12] In this case, where the issue is a single registrant's status rather than a conflict between two or more registrants, the only party to be served in the first instance is Loyale. While the merchants associated with the TINs Loyale has registered (or their successors in interest) may have a potential interest in the outcome here, neither the Class Administrator nor I (nor the Court) has contact information for all of them. If the Court adopts the foregoing recommendations, the lack of notice will not prejudice any such merchant. However, in the event the Court rejects or modifies those recommendations, the Class Administrator may at some point authorize Loyale to register some of those TINs. In some such cases, Loyale's registration of a TIN may be in conflict with other filers' registrations of the same TIN. I respectfully recommend that where such conflicts arise, the Class Administrator should provide a copy of the Court's decision and this report and recommendation to all parties to the conflict. I further recommend that merchants involved in such conflicts retain the right to contest Loyale's class membership on the ground that it did not accept payment cards within the meaning of the Superseding Settlement Agreement.