UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- x

IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES

REPORT AND RECOMMENDATION OF SPECIAL MASTER

------------------------------------------------------- x

1:24-MC-03415-BMC-JAM

IN RE MDL 1720 DAMAGES CLASS SETTLEMENT APPEAL OF CERTIFICATE CLEARING CORPORATION

1:26-MC-03949-BMC-JAM

------------------------------------------------------- x

**Parties and Representatives**:

Certificate Clearing Corporation ("CCC")
Brian Blockovich
404 South Wells Street, Suite 600
Chicago, IL 60607
(312) 204-6970
yapstone@certificateclearing.com
Counsel for CCC

Rule 23(b)(3) Class Plaintiffs (the "Class")
Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
xanb@rgrdlaw.com
Class Counsel

I. Background

Between May 6, 2024, and February 4, 2025, CCC registered the Taxpayer Identification Numbers ("TINs") of approximately 286,960 merchants with the Class Administrator to claim a share of the proceeds of the settlement fund in *In re Payment Card Interchange Fee Merchant Discount Antitrust Litigation*, Dkt. no. 05-MD-1720 (E.D.N.Y.) ("*MDL 1720*") arising out of the

payment card transactions associated with those TINS.[1] CCC purchased those claims from Yapstone, Inc. ("Yapstone"), which in turn had provided a payment processing service to the merchants associated with the relevant TINs.[2] The Class Administrator has classified Yapstone as a payment facilitator and therefore not a class member.[3] CCC disputes that determination. After considering all of CCC's arguments and evidence, for the reasons set forth below, I respectfully recommend that the Court find that Yapstone is not a member of the settlement class

---

[1] Before submitting a claim to receive the settlement proceeds corresponding to the payment card transactions of a merchant member of the Rule 23(b)(3) Settlement Class, a party must first register that merchant's TIN with the Class Administrator. The registrant must provide proof that it is the owner (or authorized representative of the owner) of the claim corresponding to that TIN. In the absence of supporting documentation, this requirement can also be satisfied by providing the Claimant ID and Control Number printed on the original prepopulated claim forms that were mailed to known class members. Once the registrant establishes such authority, the Class Administrator updates the registrant's status to "approved." If there is only one approved registrant for a given TIN, the registrant may submit a claim for that TIN. Where multiple parties have registered the same TIN, the Class Administrator designates the TIN as being in "conflict" and does not permit any registrant to submit a claim until the conflict is resolved.

[2] The documents in the record alternately use "YapStone" and "Yapstone" to refer to the payment processor at issue here. For consistency, I use only the latter below, altering the capitalization as needed to do so.

[3] To be precise, while the Class Administrator has applied the "PayFac" classification to the authorization status of most of the approximately 286,960 TINs at issue here (which are divided between two separate registration accounts), it has applied other classifications to some of them. The merchants associated with 29 TINs have been classified as "Excluded Parties" without objection from CCC; accordingly, regardless of the outcome here, the registrations of those TINs will not be processed. CCC has withdrawn the registration of nine of the TINs previously registered in the Yapstone-related accounts and those registrations will also not be processed regardless of the outcome here. Finally, two of the TINs are classified as being in "Conflict" status because some other registrant has registered the same TINs. Regardless of the outcome here, it appears likely that the Court will not need to resolve those conflicts. If the Court adopts my recommendation, the Class Administrator will move Yapstone's registration of the two TINS to the "PayFac" classification and process the sole conflicting registration in each case. If the Court rejects or modifies the recommendation, it appears likely that no judicial intervention will be required because CCC states that "in the interest of administrative expedience [CCC] will represent that it claims no TINs for which a sub merchant [*i.e.*, a Yapstone merchant client] has filed a claim." Memorandum to Special Master dated Sept. 9, 2026, at 4.

with respect to the merchant TINs at issue and therefore direct the Class Administrator to withdraw CCC's registrations of those TINs.

The record before me includes the following documents:

- Agency Lookup Authorization dated May 6, 2024, between Yapstone Holdings, Inc., and CCC;
- Assignment and Agency Agreement dated June 14, 2024, between Yapstone International, Inc. and CCC
- Memorandum in Support of Claims of Yapstone by CCC dated February 4, 2025 ("Memo I");
- Memorandum to Special Master by CCC dated September 9, 2026 ("Memo II");[4]
- A blank Yapstone Client Service Agreement form ("CSA");
- Yapstone's Client Fee Schedule, referenced in CSA §§ 1.4, 1.12;
- A spreadsheet identifying all of the Yapstone-related TINs registered by CCC;
- Emails dated December 18, 2024 through August 5, 2026, between CCC and Class Administrator; and
- Approximately 43 form responses to the Class Administrator's initial notice of "PayFac" status submitted by CCC on August 4-5, 2026.

---

[4] On May 22, 2025, the CA sent a notice to CCC advising that it would need to submit Yapstone's contract with each merchant to substantiate its authorization to act on behalf of all of them before its arguments could be considered further. CCC had not yet done so when the Court issued its decision in *In re MDL 1720 Damages Class Settlement Disps.* ("*Settlement Disputes*"), 2026 WL 1729167 (E.D.N.Y. June 16, 2026) ("*Teleflora*") (adopting in part report and recommendation). In *Teleflora*, the Court adopted my recommendation to find that the registrant was not a class member and on that basis declined on mootness grounds to adopt my recommendation to require the company to submit its contracts with each of the thousands of merchants whose TINs it had registered. *See id*. at *3; *Settlement Disputes*, 2026 WL 825503, *9-10 (E.D.N.Y. Mar. 17, 2026) ("*Teleflora R&R*"). In light of that ruling, I suspended the contract-filing requirement and permitted CCC to submit further argument supporting its position on class membership. *See* Email dated August 10, 2026, from Class Administrator to CCC.

II. Analysis

Four prior decisions, all arising from the litigation in *MDL 1720*, provide the legal context for this dispute. First, when the Court gave final approval to the proposed damages class settlement, it endorsed the settling parties' definition of the class as consisting of "[a]ll persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time" during the relevant period, with exceptions not pertinent here. *See MDL 1720*, 2019 WL 6875472, at *31 (E.D.N.Y. Dec. 16, 2019) (the "Approval Order") (quoting Superseding Settlement Agreement, ECF 7257-2 ("Settlement Agreement"), ¶ 4) ), *aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023) ("*Fikes*"). In doing so, the Court overruled an objection from a group of franchisee entities that owned and operated gas stations (the "Branded Operators") that the use of "accepted" might allow their franchisor oil company suppliers to supplant them as class members and that uncertainty about that issue made class membership impossible to determine. *See id*.

Second, in affirming the Approval Order, the Second Circuit likewise rejected the Branded Operators' arguments. After acknowledging the ambiguity of the word "accepted," *Fikes,* 62 F.4th at 715, the court clarified the core question those arguments raised:

> The dispute is not over which group of class members will get the recovery; the dispute is over which claimants are within the class. Whoever "accepted" the payment cards is by definition in the class, gets compensation, and is bound by the release; an entity that did not accept the payment is by definition excluded from the class and is not bound by the settlement.

*Id*. at 717. Because that dispute did not implicate the requirement that a class must have ascertainable membership to be certified, the court did not need to decide who – as between franchisors and franchisees – had "accepted" payment cards and were therefore class members. *See id*. at 718.

Third, in *MDL 1720*, 735 F. Supp. 3d 249 (E.D.N.Y. 2024), *reconsideration denied*, 2025 WL 2490442 (E.D.N.Y. Aug. 29, 2025) ("*PayFacs I*"), *aff'd*, 2026 WL 1210154 (2d Cir. May 4, 2026) ("*PayFacs II*"), Judge Brodie ruled that two payment facilitators – Block, Inc., f/k/a Square, Inc. ("Square"), and Intuit Inc. and Intuit Payment Solutions, LLC (collectively, "Intuit") – had not "accepted" payment cards used to pay for goods and services sold by their merchant clients and therefore were not members of the class. *See* 735 F. Supp. 3d at 252. To reach that conclusion, Judge Brodie considered several factors, as summarized on review by the Second Circuit:

> (1) Square's merchant agreement, which states that Square allows merchants "to *accept* Cards from customers," *id.*; (2) Square's Complaint, which alleges that Square "helps Sellers (merchants who utilize Square to *accept* payment cards ...) start, run, and grow their businesses, including by enabling Sellers to *accept* card payments," *id.*; (3) Visa's rules, which distinguish between a "Payment Facilitator" and a "Merchant" and provide that an entity cannot simultaneously act as both a payment facilitator and a merchant, *id.* at 265; (4) Mastercard's rules, under which Sellers "accept" payment cards while payment facilitators facilitate the acquiring of transactions, *id.* at 266; (5) the Square Sellers' own declarations, which describe themselves as businesses that *accept* credit and debit cards, *id.*; (6) the "way real-world transactions are conducted" in which the "cardholder hands her card to a Seller, who 'accepts' it for payment at the point of sale," *id.* at 264; and (7) the incongruence of interpreting the word "accepted" to mean that Square "'accepts' a payment card, but the [Square] Seller 'accepts' cash, for two otherwise identical transactions," *id.* at 265.

*PayFacs II*, 2026 WL 1210154, at *1.[5]

Finally, in *Teleflora*, as in this case, a payment facilitator ("Teleflora") challenged the Class Administrator's determination that it was not a class member and therefore ineligible to

---

[5] In affirming Judge Brodie's analysis, the court observed that "[f]ew persons are in a better position to understand the meaning of a settlement than the district judge who oversaw and approved it[.]" *Id*. at *2 (quoting *W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29, 33 (2d Cir. 1996) (cleaned up)). At the time Judge Brodie oversaw and approved the *MDL 1720* damages class settlement, I was the magistrate judge assigned to the case. In that role, I sat on the bench with Judge Brodie for oral argument of the objections to the proposed settlement. *See MDL 1720*, ECF 7774 (minute entry dated Nov. 7, 2019).

register a claim. In seeking my review, Teleflora noted a number of ways in which its contracts with merchant clients differed from the contracts between Square and Intuit and their respective clients. I analyzed those arguments in detail and concluded that they either replicated arguments by Square and Intuit that Judge Brodie explicitly rejected in *PayFacs I* or were not meaningfully different for purposes of determining class membership. *See In re MDL 1720 Damages Class Settlement Disputes*, 24-MC-03415-BMC-JAM (E.D.N.Y.), ECF 2 at 5-11 (Mar. 17, 2026). I therefore recommended that this Court find that Teleflora had not accepted payments for its merchant clients' transactions and was not a class member. *Id*. at 17. This Court adopted that recommendation, reasoning as follows:

> Teleflora points to a number of factors that purportedly distinguish its situation from the situation presented in *PayFacs I*. The Court disagrees, and not just because many of these factors were actually considered in *PayFacs I*. Rather, it simply does not matter how many and in what ways Teleflora differs from Square and Intuit because they are the same in the one respect that matters: they don't accept payment cards.

*Teleflora* 2026 WL 1729167, at *2.

Applying the reasoning of the cases discussed above, Yapstone plainly did not accept payment cards within the meaning of the Settlement Agreement. CCC acknowledges that Yapstone "may be labeled a 'payment facilitator'" but argues that while Yapstone "facilitates payments[,] that doesn't make it a 'Payment Facilitator' like Square or Intuit." Memo I at 1, 2. I respectfully disagree based on CCC's own description of Yapstone's business:

> Yapstone functions in the world of property rentals. It acts as a manager and outsourced administrator of entities who either own or manage rental properties. For example, suppose I own houses in Los Cabos, Mexico, Las Vegas, Nevada, Park City, Utah and Santa Barbara, California. Suppose I want to receive rental income from these houses. I might start by collecting checks, cash or a service like Venmo, but of course then I have to do the accounting, manage records and figure out a way to run reports so I can know whether they are profitable or not. Another solution would be to hire Yapstone.

> When I hire Yapstone, I outsource all of these functions to them. Yapstone accepts the payments. It accepts many different forms of payment including credit card, debit card, ACH and even check over the phone.

Memo I at 2.

As CCC's description makes clear, a property holding company that had previously been collecting rent from its tenants (and unquestionably "accepting" such payments itself) could "outsource" that function to Yapstone. That is, Yapstone would serve the merchant client as a service vendor. Yapstone would not itself sell goods or services to the property owner's tenants and those tenants would owe rent to the property owner, not to Yapstone.

Yapstone relies on some of the same types of arguments that other providers of payment processing services have previously advanced without success. For example, it points out differences between its payment processing methods and those of other payment facilitators. *See* Memo I at 2; Memo II at 1-2. But in doing so it ignores what this Court wrote when Teleflora did the same: "it simply does not matter how many and in what ways Teleflora differs from Square and Intuit because they are the same in the one respect that matters: they don't accept payment cards." *Teleflora* 2026 WL 1729167, at *2.

Also as in earlier payment facilitator cases, CCC points to specific provisions of its standard Client Service Agreement that, in its view, "establish that Yapstone accepted the cards." Memo II at 2 (capitalization removed). *See* Memo II at 2-3. That Agreement, however, makes quite clear the fact that under each of its merchant contracts, Yapstone received payments as a "processor of Payments on [the merchant] Client's behalf." CSA § 1.11. The CSA goes on to recite that "Client's receipt of Payments are transactions between Client and the relevant Renter and not with Yapstone or any of Yapstone's affiliates" and that "Yapstone is a third-party Payment processor for Client and is not a party to any transaction[.]" CSA § 2.2(i), (ii).

To its credit, CCC acknowledges that contractual language and tries to explain away its import by arguing that "[i]t is a limitation of liability. It had the sole purpose of keeping Yapstone out of disputes among landlords, residents, and. property owners, and to disclaim any status as a depository institution holding funds for the Renter." Memo II at 3. In other words, CCC suggests that Yapstone could rely on that language to its legal advantage but that others, including this Court, may not rely on it to Yapstone's (or its successor CCC's) disadvantage. Such an interpretation is unsupportable. Moreover, CCC does not acknowledge the many other contractual provisions that undermine its position, including the following:

- "Yapstone provides online electronic payment services (the 'Services') that facilitate the payment of [rents] between property owners/managers and renters" (CSA at 1 (Background, first bullet point);
- "Client desires to provide renters … of its properties … the opportunity to pay rent to Client using Yapstone's Services" (CSA at 1 (Background, fourth bullet point);
- "Yapstone will provide Services to enable Renters to make payments of Rent to Client using … credit/debit card … payments" (CSA at § 1.1);
- "If Client chooses to accept only certain types of cards, it is the Client's responsibility to properly indicates which cards are accepted" (CSA at § 1.2);[6]
- "Client shall be liable to Yapstone for the full transaction amount including fees or charges for facilitating the payment of Rent as Yapstone may determine in its sole discretion" (CSA at § 1.4).

As CCC acknowledges, Yapstone's clients paid for Yapstone's service. *See* Memo II at 4. In doing so, however, CCC mischaracterizes those payments as "a resale price[.]" *Id*. But as the title and text of the Yapstone Fee Schedule makes clear, Yapstone's clients paid a "fee" for

---

[6] CCC addresses a different portion of the same section of the CSA but says nothing of this one. *See* Memo II at 3.

Yapstone's "Services" rather than a purchase price for the "resale" of something Yapstone had previously purchased for itself.[7]

That distinction undermines one of CCC's other arguments. CCC contends that Yapstone, and not its client merchants, suffered a cognizable antitrust injury under federal law and that, as Yapstone's successor, only CCC is entitled to a recovery under the Settlement Agreement. *See* Memo II at 3-4. However, as this Court has consistently recognized, "in a payment chain containing a merchant who accepts cards, and a payment facilitator who enables the merchant to accept cards, the merchant is the class member and the payment facilitator is not." *Teleflora*, 2026 WL 1729167, *2 (E.D.N.Y. June 16, 2026); *see also PayFacs I*; *Settlement Disputes*, Dkt. No. 24-MC-03415-BAM-JAM, Order dated Sept. 15, 2026 (adopting report and recommendation finding same with respect to FTD, LLC); *id*., Order dated Sept. 9, 2016 (same with respect to Allpaid, Inc.); *id*., Order dated Aug. 31, 2016 (same with respect to RoyalPay, Inc.); *id*., Order dated Aug. 18, 2016 (same with respect to ACI Worldwide). Applying that reasoning here compels the conclusion that Yapstone's clients – not Yapstone – suffered the direct antitrust injury cognizable under federal law.

Because Yapstone did not "accept" payment cards in transactions between its clients and the customers who paid rent to those clients as that term is used in the Settlement Agreement, neither it nor CCC (as its successor in interest) is a member of the class with respect to those

---

[7] In the same vein, CCC asserts that "Yapstone deals with the chargebacks and is hit with them." Memo I at 2. That careful formulation obscures a pertinent fact: Yapstone required its merchant clients to authorize Yapstone to debit such chargebacks from the client's account and pay a $25 fee on top of that. *See* CSA § 1.4 & Client Fee Schedule. Yapstone may have been "hit with" chargebacks and may have "deal[t] with" them in terms of interacting with Visa and Mastercard, but it did not bear the costs of those chargebacks.

transactions. I therefore respectfully recommend that the Court direct the Class Administrator to withdraw CCC's registration of all of the TINs at issue here.[8]

I do not discount the possibility that CCC may have some enforceable right against Yapstone or some other party arising out of CCC's purchase of Yapstone's *MDL 1720* claims. But CCC must assert any such claim against whatever party is liable to it rather than as a direct claim for a portion of the settlement fund. CCC has not mentioned the possibility of any such lawsuit, and I do not address its merits here. Further, I would recommend against adjudicating any such claim within the *MDL 1720* litigation. As this Court has already held, such ancillary claims "do not fall under this Court's retained settlement jurisdiction" but must instead be litigated "in independent lawsuits, outside of MDL 1720." *MDL 1720 Disputes*, 2026 WL 2389790, at *1 (E.D.N.Y. Aug. 17, 2026).

III. Recommendation

For the reasons set forth above, I respectfully recommend that the Court find that CCC, as Yapstone's successor in interest, is not a member of the settlement class with respect to the transactions Yapstone facilitated between merchants and their customers, and that the Class Administrator should therefore withdraw CCC's registrations of all of the TINs at issue here.

IV. Objections

This Report and Recommendation will be served on CCC and the Class Administrator will also promptly provide a copy to CCC.[9] Any interested party shall have 21 days from today's

---

[8] To the extent Yapstone may have accepted payment cards as payment for goods and services it sold to others, such transactions are not at issue here. CCC, in its capacity as Yapstone's successor in interest, may well be a member of the class with respect to such transactions. *See Teleflora*, 2026 WL 1729167, at *3 n.2.

[9] In this case, where the issue is a single registrant's status rather than a conflict between two or more registrants, the only party to be served in the first instance is CCC. If the Court adopts the foregoing recommendations, the lack of notice will not prejudice any merchant associated with

date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-03949-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this Report and Recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect confidentiality and the identities of claimants, as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMC-JAM, Doc. 3, ¶ 4.

Dated: October 6, 2026

*<u>/s/ James Orenstein</u>*
Special Master

---

the TINs at issue here. However, in the event the Court rejects or modifies those recommendations, the Class Administrator may at some point authorize CCC to register some of those TINs. In some such cases, CCC registration of a TIN may be in conflict with other filers' registrations of the same TIN (as noted above, two such potential conflicts already exist). I respectfully recommend that where such conflicts arise, the Class Administrator should provide a copy of the Court's decision and this report and recommendation to all parties to the conflict. I further recommend that merchants involved in such conflicts retain the right to contest CCC's class membership on the ground that Yapstone did not accept payment cards within the meaning of the Settlement Agreement.