UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------- x

IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES

REPORT AND RECOMMENDATION OF SPECIAL MASTER

----------------------------------------------------- x

1:24-MC-03415-BMC-JAM

IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTE CONFLICT ID NUMBER:

201116 (FIRED UP, INC.).

1:26-MC-04163-BMC-JAM

----------------------------------------------------- x

**Parties and Representatives**:

Bluestone Holdings Group, LLC ("Bluestone")
Michael Ferdinand Sitzer
Sitzer Law Group, P.C.
430 32nd Street, Suite 200
Newport Beach, CA 92663
(949) 723-5324
msitzer@sitzerlawgroup.com
Counsel to Bluestone

Class Action Financial Settlements ("CAFS")
Jason Blatt
41 University Drive, Suite 400
Newtown, PA 18940
(917) 583-6840
jblatt@classactionfinance.com
Representative of CAFS

Park Interchange LLC ("Park")
Darren Yulfo
555 Theodore Fremd Ave., Suite C-303
Rye, NY 10580
(646) 846-9105
parkinterchangeoppclaims@haybeach.com
Representative of Park

Rule 23(b)(3) Class Plaintiffs (the "Class")
Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
xanb@rgrdlaw.com
Class Counsel

I. Background

CAFS and Park have both registered with the Class Administrator to claim a share of the proceeds of the settlement fund in *In re Payment Card Interchange Fee Merchant Discount Antitrust Litigation*, Dkt. no. 05-MD-1720 (E.D.N.Y.) ("*MDL 1720*") arising out of the payment card transactions of Fired Up, Inc. ("FUI") which has a Taxpayer Identification Number ("TIN") ending in 0745.[1] Spectrum Settlement Recovery ("Spectrum") also registered the same TIN but has since withdrawn its registration. CAFS is a third party claim filing agent ("TPF") authorized to act on behalf of Bluestone.[2] CAFS has not submitted anything to me concerning the instant conflict; instead its principal Bluestone has submitted arguments and evidence to me directly as the real party in interest.

[1] Before submitting a claim to receive the settlement proceeds corresponding to the payment card transactions of a merchant member of the Rule 23(b)(3) Settlement Class, a party must first register that merchant's TIN with the Class Administrator. The registrant must provide proof that it is the owner (or authorized representative of the owner) of the claim corresponding to that TIN. In the absence of supporting documentation, this requirement can also be satisfied by providing the Claimant ID and Control Number printed on the original prepopulated claim forms that were mailed to known class members. Once the registrant establishes such authority, the Class Administrator updates the registrant's status to "approved." If there is only one approved registrant for a given TIN, the registrant may submit a claim for that TIN. Where multiple parties have registered the same TIN, the Class Administrator designates the TIN as being in "conflict" and does not permit any registrant to submit a claim until the conflict is resolved.

[2] A TPF is a business that enters into agreements with merchants to register and prosecute their claims of settlement funds in exchange for a portion of the merchants' recovery. *See MDL 1720*, 2014 WL 4966072, at *4 (E.D.N.Y. Oct. 3, 2014).

The parties agree that FUI sold the claim at issue here as part of the disposition of its assets following its filing of a bankruptcy petition in 2016. Bluestone contends that it bought the claim in 2016 as part of a court-approved sale of some such assets. Park argues that the claim was not among the assets conveyed in that 2016 sale. Instead, it asserts that the claim was among the "Remnant Assets" that FUI sold to Oak Point Partners, LLC ("OPP") in 2020 and that OPP resold the claim to Park later the same year. As discussed below, I conclude that the claim was not conveyed in the 2016 sale, that it was conveyed in the 2020 sales, and that Park therefore owns it. Accordingly, I respectfully recommend that the Court direct the Class Administrator to process Park's registration and withdraw CAFS's registration on Bluestone's behalf.

The record before me includes the following documents:

- Parent-Subsidiary Certificate of Merger, filed on February 26, 2014, in the Office of the Secretary of State of Texas reflecting merger of FUI and its wholly owned subsidiary Kona Restaurant Group, Inc.;
- *In re Fired Up, Inc.*, Case No. 14-10447-tmd ("*FUI-2014*"), Doc. 543 (W.D. Tex. Oct. 29, 2014) (Debtor and the Unsecured Creditors Committee's Amended Joint Plan of Reorganization) ("2014 Plan");
- *FUI-2014*, Doc. 655 (W.D. Tex. Dec. 19, 2014) (order confirming 2014 Plan);
- *FUI-2014*, Doc. 656 (W.D. Tex. Dec. 19, 2014) (Motion to Amend Exhibit to Confirmation Order);
- *FUI-2014*, Doc. 661 (W.D. Tex. Dec. 22, 2014) (Order Granting Motion to Amend Exhibit to Confirmation Order);
- *In re Fired Up,* Inc., Case No. 16-10816-tmd ("*FUI-2016*"), Doc. 178 (W.D. Tex. Oct. 7, 2016) (Order Authorizing Debtor to Enter Into an Agreement for the Sale of Assets) ("Asset Sale Order");[3]

[3] Neither party has submitted a copy of the underlying motion granted by this order, but that motion is a publicly available court record that I have considered. *See FUI-2016*, Doc. 155 (W.D. Tex. Sept. 21, 2016) (Debtor's Motion for Order Authorizing Debtor to Enter Into an Agreement for the Sale Of Assets) ("Asset Sale Motion"). Similarly, I have considered the publicly filed schedule of assets that FUI submitted shortly after filing its 2016 petition. *See FUI-2016*, Doc. 56 (W.D. Tex. July 29, 2016) (Official Form 206A/B).

- *FUI-2016*, Doc. 311 (W.D. Tex. Dec. 12, 2016) (Order Approving Sale of Debtor's Assets) ("Asset Sale Approval");
- Asset Purchase Agreement dated November 23, 2016, between FUI as seller and Bluestone as buyer ("2016 FUI-Bluestone APA")
- *FUI-2016*, Doc. 494 (W.D. Tex. Sept. 25, 2019) (Debtor's Plan of Reorganization) ("2019 Plan");
- *FUI-2016*, Doc. 532 (W.D. Tex. Dec. 27, 2019) (order confirming 2019 Plan as amended, with the Debtor's Amended Plan of Reorganization Dated December 11, 2019, appended to the order);
- Asset Purchase Agreement dated August 12, 2020, between "Fired Up, Inc. ('Debtor'), as Reorganized Debtor" as seller and OPP as purchaser ("2020 FUI-OPP APA");
- Claim Sale Agreement dated December 23, 2020, between OPP as seller and Park as purchaser ("2020 OPP-Park CSA");
- Third party claim filing agreement dated August 7, 2024, between CAFS as TPF and Bluestone as client ("Bluestone-CAFS TPF Agreement");
- Email dated October 9, 2024, from Spectrum to Class Administrator, CAFS, and Park withdrawing registration;
- Email dated October 24, 2024, from CAFS to Class Administrator concerning conflicts;
- Letter dated August 20, 2025, from Bluestone to Special Master ("Bluestone 1"), with exhibit including emails dated October 3, 2024-April 10, 2025;
- Letter dated August 28, 2025, from Park to Special Master ("Park 1");
- Supplemental letter dated August 28, 2025, from Park to Special Master ("Park 2");
- Letter dated September 12, 2025, from Bluestone to Special Master ("Bluestone 2");
- Letter dated September 12, 2025, from Park to Special Master ("Park 3");
- Letter dated September 17, 2025, from Bluestone to Special Master ("Bluestone 3"); and
- Letter dated September 17, 2025, from Park to Special Master ("Park 4").

II. Analysis

There is no disagreement among the parties that FUI owned the *MDL 1720* claim associated with its TIN when it filed a bankruptcy petition in 2016. There also seems to be no disagreement that if that claim was not conveyed to Bluestone in 2016, it was among the "Remnant Assets" that FUI conveyed to OPP in 2020. Nor is there any disagreement that in 2020, OPP explicitly represented that it had acquired that specific claim from FUI and purported to sell it to Park. Thus, the crux of the dispute here is whether FUI sold the claim to Bluestone as part of the court-approved sale of some of its assets in 2016. If the claim was conveyed in that sale as Bluestone contends,[4] then Bluestone now owns it and has properly authorized CAFS to register FUI's TIN. If the claim was not conveyed in the 2016 transaction, then OPP correctly represented having bought it from FUI in 2020 and the claim now belongs to Park.

The 2016 FUI-Bluestone APA makes no mention of the claim at issue here being among (or excluded from) the conveyed assets. It does not acknowledge the existence of any such claim or of the *MDL 1720* litigation and it does not allude in any way to the proposition that merchants like FUI were entitled to recovery from Visa and Mastercard for allegedly anticompetitive conduct. Bluestone contends that FUI's *MDL 1720* claim was within the scope of the agreement's definition of "Purchased Assets" because, as Bluestone argues:

> **The Asset Purchase Agreement defines Purchase Assets to specifically include " .. all accounts receivable, *rights to payment arising out of the conduct of the Business with the Purchased Assets ... "*.** Refer to Section 1 of the

[4] Park contends that I should entirely disregard Bluestone's submissions because it is not one of the "claimants or conflict parties to the referenced Conflict" and because Bluestone has given Park "no explanation as to their connection to CAFS and the Conflict that is now pending." Park 3 at 1. I disagree. The "connection" is clear: CAFS filed FUI's TIN as Bluestone's agent. *See* Bluestone-CAFS TPF Agreement. Bluestone's right to be heard is equally clear: it did not forfeit the right to speak on its own behalf by appointing CAFS as its claim filing agent.

> Asset Purchase Agreement which was approved by and attached to the Sale Order. Section 1 provides the exhaustive list of Purchased Assets.

Bluestone 1 at 1 (boldface and italics in original); *see* Bluestone 2 at 1 (quoting same). Even read in isolation as Bluestone presents it, that language does not support its position. At the time of the 2016 FUI-Bluestone APA, FUI's status in *MDL 1720* was that of an absent member of a putative class of merchants seeking both damages and equitable relief.[5] As such, its potential claim against Visa and Mastercard for antitrust violations could not reasonably have been characterized as part of FUI's "accounts receivable,"[6] and FUI did not then have any "rights to payment" from the *MDL 1720* defendants (or from the subsequently created settlement fund).

The provision Bluestone quotes is one of twenty items in the agreement's non-exhaustive list of "Purchased Assets." *See* 2016 FUI-Bluestone APA § 1(a)(xviii).[7] But the introductory text preceding that list provides a definition of the term "Purchased Assets" that does not obviously

---

[5] The 2016 FUI-Bluestone APA is dated November 23, 2016. That date was after June 30, 2016, when the Second Circuit vacated the certification of a single class of merchants seeking damages and equitable relief. *See MDL 1720*, 827 F.3d 223, 227 (2d Cir. 2016) (vacating class certification). It was also before November 30, 2016, when I appointed lead counsel for two new putative classes of merchants, one seeking only damages (*i.e.*, the certified settlement class here) and the other seeking only equitable relief. *MDL 1720*, 2016 WL 8138988, at *1 (E.D.N.Y. Nov. 30, 2016). Thus, at the time of FUI's sale of assets to Bluestone, FUI (which was not a named party in *MDL 1720*) was an absent member of the putative class that was later certified and that later entered into the current settlement agreement.

[6] Under Texas law (which governs the agreement, *see* 2016 FUI-Bluestone APA § 11(b)), "[w]here goods are sold or services rendered not for cash but on an open account, an account receivable is created." *Nebraska Beef, Ltd. v. KBK Fin., Inc.*, 2006 WL 538790, at *5 (N.D. Tex. Mar. 3, 2006) (quoting *Mbank El Paso Nat'l Ass'n v. Featherlite Corp.,* 792 S.W.2d 472, 475 (Tex. Civ. App. 1990) (citing *In re Cooper,* 2 B.R. 188, 192 (Bankr .S.D. Tex. 1980)).

[7] The provision also includes additional language that Bluestone omits and that provides useful context. *See id*. ("All accounts receivable, rights to payment arising out of the conduct of the Business with the Purchased Assets, *food rebates, and vendor rebates owed to or owned by the Seller*") (emphasis added). A provision otherwise clearly designed to capture payments that FUI could reasonably expect as compensation for engaging in specific transactions for goods and services seems ill-suited to convey the idea that Bluestone was also buying FUI's potential stake in litigation to which it was not a party.

suggest the inclusion of potential litigation claims. Specifically, the term is defined as "all right, title and interest of Seller in and to the assets, properties and rights of Seller *which are used or held for use in connection with the Business* (exclusive of the Excluded Assets as defined below) (collectively, the 'Purchased Assets')." *Id*. § 1(a) (emphasis added).[8] FUI's *MDL 1720* claim cannot reasonably be described as an asset or right that FUI "used or held for use in connection with" its business; it is instead a claim for damages to remedy the harm it suffered as a result of the *MDL 1720* defendants' allegedly anticompetitive conduct.

Even if FUI's absent membership in a putative class could be deemed to constitute a "right of payment" in some circumstances, the phrase as used in the 2016 FUI-Bluestone APA is at most ambiguous. Two objective guides for resolving that ambiguity can be found in the record of the *FUI-2016* bankruptcy proceedings: the Asset Sale Motion and the Asset Sale Order. Neither supports Bluestone's position. The order's only description of the transaction the court authorized was the following: "The Debtor is authorized to accept the Bluestone Holdings Group, LLC's ("Bluestone") Stalking Horse Bid subject to the terms and conditions of the Letter of Intent attached to the Sale Motion as Exhibit A." Asset Sale Order ¶ 2. The Asset Sale Motion, in turn, described the assets FUI owned and then described the subset of those assets that Bluestone had offered to buy:

> 12. As of the Petition Date, Debtor owned thirty-six (36) company-owned stores known as "Johnny Carino's Italian" ("Carino's") and was operating thirty-five (35) of these stores in six states. It also was the franchisor/licensor for forty-eight franchised or licensed locations in fourteen states and four other countries. Since

[8] The list of Excluded Assets does not refer specifically to FUI's *MDL 1720* claim or any other specific litigation but does include "[a]ll claims and causes of action arising under Chapter 5 of the Bankruptcy Code and all claims and causes of action not arising out of or related to any Purchased Asset." While FUI's *MDL 1720* claim might arguably be described as "not arising out of or related to any Purchased Asset[,]" I do not base my recommendation on such a reading. More important, nothing in the agreement suggests (and Bluestone does not appear to argue) that Bluestone bought all of FUI's assets other than those explicitly listed as Excluded Assets.

> the Petition Date, it has closed seven (7) additional locations—Waco, Odessa, Amarillo, Katy, Pearland, Pharr and San Antonio….
>
> **OVERVIEW OF PROPOSED TRANSACTION**
>
> 13. In or about May of 2016, Debtor … began considering different *proposals for the purchase of some or all of its company-owned stores and, in some cases, its franchises operations*….
>
> 14. On or about September 15, 2016, after multiple iterations and discussions with the Debtor, Bluestone … submitted a Letter of Intent ("LOI") for *the purchase twenty-four (24) of the Debtor's company owned locations—along with the buildings, leases, furniture, fixtures and equipment appurtenant, inventory and supplies, licenses and permits, and intangible property appurtenant thereto*. The assets to be purchased also included *the purchase of all of Debtor's intellectual property and franchises*.

Asset Sale Motion ¶¶ 12-14 (emphasis added, footnotes listing store locations omitted). Nothing in FUI's description of the assets it proposed to sell, or that Bluestone offered to buy, suggests that those assets included any of FUI's potential claims for damages in *MDL 1720*.

Bluestone's offer (the "Stalking Horse Bid" mentioned in the Asset Sale Order) likewise included no language that can reasonably be interpreted to include FUI's *MDL 1720* claim among the assets to be conveyed. Bluestone first generally described "the assets to be acquired" as "consist[ing] of Debtor's interests in the following assets used in the operation of the Debtor's restaurants located at the locations listed on Exhibit A (the 'Restaurants') attached hereto[.]" Offer to Purchase Certain Assets of the Estate if Fired Up, Inc. (appended to Asset Sale Order) ("Bluestone Offer"), § 1. It then listed seven categories of assets including physical items (such as buildings, furniture, and inventory), certain legal rights (such as leases, licenses, permits, and franchise rights), and "other intangible assets used in the operation of the Restaurants, such as goodwill." *Id*. §1(a)-(h). But that list of assets included nothing that could reasonably be interpreted as contemplating potential or pending litigation claims. In the interest of

transparency, the Bluestone Offer's entire description of assets to be acquired is set forth below in the margin.[9]

---

[9] **<u>1. Assets to be Acquired</u>**

Subject to the entry of a final, non-appealable order of the Court under Section 363 of the Bankruptcy Code, free and clear of all liens, claims and encumbrances except as set forth below, in a form approved by Buyer, the assets to be acquired by Buyer under the PSA contemplated hereby (the "Court Sale") will consist of Debtor's interests in the following assets used in the operation of the Debtor's restaurants located at the locations listed on Exhibit A (the "Restaurants") attached hereto :

(a) Any and all buildings subject to Ground Leases as listed in Exhibit A;

(b) Any leases for the spaces in which Debtor operates the Restaurants as said leases may be assumed and/or modified during the pendency of the Case and subject (i) to approval by landlords of an assignment and assumption and (ii) any *ad valorem* taxes owed on the real property being acquired;

(c) Any and all furniture, fixtures, and equipment, including any catering vehicles, used and/or located in each particular Restaurant subject to any ad valorem taxes owed on the personal property being acquired;

(d) To the extent transferable, all licenses and permits, including liquor licenses, necessary for Buyer to conduct the business of the Restaurants to the extent said licenses and permits may be assigned. Debtor and Debtor's affiliate, SIK, will cooperate with Buyer in obtaining any temporary licenses, as may be needed, and to further effectuate the transfer of any transferrable licenses that are held by Debtor, SIK, or any affiliates thereof;

(e) All inventory and supplies of the Restaurants located at the Restaurants existing as of the date of closing (the "Closing") of the Court Sale;

(f) Any other intangible assets used in the operation of the Restaurants, such as goodwill.

In addition to the aforementioned items listed, Buyer will acquire the following assets through the Court Sale:

(g) All intellectual property owned or claimed to be owned by Debtor and/or its affiliates, which includes, but is not limited to: (i) all patents, (ii) trademarks, (iii) domain names, (iv) software developed or in development, (v) all procedures, manuals, and policies, and (vi) all claims past and present against any infringement on the aforementioned intellectual property.

(h) All franchise rights, including all franchise fee income (including royalty and marketing), including any accounts receivable; provided, however, that Buyer will assume the cost and obligation of bringing the franchises into compliance and

Under their 2016 agreement, FUI sold, and Bluestone bought, no more than the bankruptcy court had permitted in the Asset Sale Order. That order permitted the conveyance of no assets other than those FUI sought leave to sell in the Asset Sale Motion. And that motion sought leave to sell no more assets than Bluestone described in its offer. Thus, even if the text of the agreement itself could arguably be read to include the claim at issue here among the assets being conveyed (and I conclude that such a reading is unsupported), the parties lacked legal authority to enter into a transaction that conveyed FUI's stake in the *MDL 1720* litigation. Because there was no language in the Bluestone Offer, the Asset Sale Motion, or the Asset Sale Order that referred to FUI's *MDL 1720* claim, that claim cannot have been among the assets that FUI sold to Bluestone in 2016.

Bluestone's next argument is based on an oblique reference to the *MDL 1720* litigation (but critically, not to FUI's interest in that litigation) in the 2019 Plan. In particular, Bluestone points to the 2019 Plan's Exhibit E and the inclusion in that exhibit of an entry reading as follows (with irrelevant intervening entries omitted for clarity):

| OTHER PARTY | CONTRACT | STATUS? |
|---|---|---|
| Spectrum Settlement Recovery | MC/Visa Class Action Lawsuit | |

2019 Plan, Ex. E at 1, 8. Bluestone construes that entry in conjunction with the following provisions:

> 6.01 **Assumption/Rejection of Executory Contracts and Unexpired Leases.** Debtor shall reject all Unexpired Leases of Non-Residential Real Property and Executory Contracts not specifically assumed or rejected on or before the Effective Date pursuant to 11 U.S.C. § 1123(b)(2). Exhibit E attached hereto sets out the executory contracts in effect as of the Petition Date and indicates which were assumed by Bluestone Holdings as of the date of the closing on its purchase

---

> having the necessary disclosures and other documentation prepared as legally required for an assignment and assumption of same.

Bluestone Offer § 1.

> of assts of the Debtor, which Debtor intends to assume and those in effect as of the Petition Date which it intends to assume but which have been amended, modified, or redrafted by the parties post-petition.
>
> 6.02 **Presumption of Rejection.** To the extent an order approving assumption has not been entered or the contract is specifically enumerated herein, Debtor shall be deemed to have rejected any and all other such executory contracts.
>
> 6.03 **Reservation of Rights.** Pursuant to 11 U.S.C. § 365, Debtor shall have the right to assume or reject on or before the Effective Date any executory contract or unexpired lease of non-residential real property or may change the status of any lease or executory contract listed above (to the extent permitted under the Bankruptcy Code). Any additional or changed assumptions or rejections shall be noted in the Confirmation Order.

*Id*. §§ 6.01-6.03 (boldface in original). Taking the provisions and the exhibit entry together, Bluestone argues: "Exhibit E to the Reorganization Plan indicates the presumption that the 'Spectrum Settlement Recovery MC/Visa Class Action Lawsuit' is rejected. Therefore, this is further substantiation that Bluestone has all rights, title, and interest to the subject MC/Visa claim as a Purchased Asset." Bluestone 1 at 1.

Bluestone's argument appears to be that FUI "rejected" any executory contract described in the entry quoted above, and that by doing so it acknowledged that it had already sold its *MDL 1720* claim to Bluestone. The argument finds no support either in the text of the Plan or in logic. First, Bluestone does not explain the "Status?" column in Exhibit E or the fact that it is blank in the entry for the contract with Spectrum. It also does not mention the interpretive key at the end of Exhibit E that explains the meaning of various codes used in the "Status?" column:

> **KEY:**
>
> **A = Assumed**
>
> **AA = Assumed & Assigned**
>
> **E = Expired**
>
> **M = Month to Month**
>
> **R = Rejected**

2019 Plan, Ex. E at 10. The fact that none of those codes appears in the "Status?" column for the Spectrum entry casts doubt on the proposition that FUI "rejected" that contract. Several other contracts listed in the same table were affirmatively coded as "Rejected" while still others are coded as "Assumed" or "Assumed and Assigned." Bluestone makes no attempt to square those facts with the "Presumption of Rejection" provision it cites. Under these circumstances, I cannot agree with Bluestone that it has established that FUI rejected the Spectrum contract.

More fundamentally, the entry for FUI's contract with Spectrum – regardless of whether it shows that FUI rejected it – provides no information about who owned FUI's *MDL 1720* claim at the time of the 2019 Plan. The entry conveys no more than that at some point FUI and Spectrum entered into a contract that had something to do with the *MDL 1720* litigation and that the contract remained executory at the time of the 2019 Plan. There is no logical inference about the ownership of FUI's *MDL 1720* claim that can be drawn from the existence of such a contract. FUI's membership in the Class, and its resulting right to participate in the settlement, did not depend on the existence or status of any contractual relationship with Spectrum (or with the network defendants or any payment processing service). Its membership and its claim arose solely from the fact that it "accepted" Visa's and Mastercard's payment cards during the class period. *MDL 1720*, ECF 7257-2, ¶ 4 (Superseding Settlement Agreement).

Bluestone's next attempt to show that FUI sold its *MDL 1720* claim to Bluestone in 2016 again reads more into a document than its text and context reasonably support. Bluestone suggests that the 2020 FUI-OPP APA "referenced the assets and rights supposedly being acquired by Oak Point from the estate with a healthy dose of skepticism *as to what was even left in the Estate to convey*[.]" Bluestone 2 at 2 (emphasis in original). It predicates that argument on the agreement's unremarkable description of the "Remnant Assets" being conveyed as property

that "may be … remaining [in the bankruptcy estate], consisting of known or unknown assets or claims which have not been previously sold, assigned, or transferred[.]" 2020 FUI-OPP APA at 1 (third "Whereas" provision) (quoted in Bluestone 2 at 2). The implicit proposition that OPP had no idea what it was buying and took the risk that it was paying for nothing at all is wholly implausible. It is also inconsistent with the language of the Bluestone Offer, the Asset Sale Motion, the Asset Sale Order, and the 2016 FUI-Bluestone APA, all of which explicitly acknowledge the existence of assets that Bluestone did not buy from the bankruptcy estate in 2016. Given the fact that FUI sold *some* existing Remnant Assets to OPP in 2020, the language Bluestone cites provides no affirmative support for the proposition that those Remnant Assets did not include the claim at issue here.

Finally, Bluestone points to the 2019 Plan's description of FUI's assets and potential sources of revenue and the fact that they did not contain language that could refer to the *MDL 1720* claim associated with FUI's TIN. *See* Bluestone 2 at 3 (citing 2019 Plan §§ 2.01, 5.03.06 and Art. XIX). Bluestone contends that the absence of such language means that FUI had previously sold its claim. That argument is in significant tension with its reading of the 2016 FUI-Bluestone APA, which likewise has no such language – and which Bluestone interprets as having conveyed FUI's *MDL 1720* claim. The absence of language about the claim cannot mean one thing in the former context and the opposite in the latter.

Another more basic problem with the argument is the fact that – as far as the parties have pointed out or that I have found – nothing in the record of the 2016 bankruptcy proceedings mentioned, or acknowledged the existence of, the fact that FUI was a putative member of the *MDL 1720* class. Soon after filing its petition (and before it sold any assets to Bluestone), FUI completed and filed Official Form 206A/B, which required it to respond to a detailed

questionnaire about its assets. In particular, Part 11 of that form required FUI to list "All other assets" in addition to the ten preceding categories of assets (none of which related to litigation claims or causes of action). As shown below, in its responses in Part 11, FUI asserted that it had such other assets and described them in detail – but did not report that it had any "[c]auses of action against third parties (whether or not a lawsuit has been filed)." *FUI-2016* , Doc. 56 at 8 (question 74). It likewise provided no information in response to a question about "[o]ther contingent and unliquidated claims or causes of action of every nature[.]" *Id.* (question 75).

**Part 11:** All other assets

**70. Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

**Current value of debtor's interest**

**71. Notes receivable**

Description (include name of obligor)

Official Form 206A/B **Schedule A/B: Assets – Real and Personal Property** page 7

16-10816-tmd Doc#56 Filed 07/29/16 Entered 07/29/16 19:26:20 Main Document Pg 8 of 283

07/29/2016 07:01:53pm

Debtor Fired Up, Inc. Case number (if known) 16-10816
Name

**72. Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

Tax Attributes Tax year ______ Unknown

**73. Interests in insurance policies or annuities**

See attached Certificate of Insurance marked as Exhibit N. Unknown

**74. Causes of action against third parties (whether or not a lawsuit has been filed)**

**75. Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

**76. Trusts, equitable or future interests in property**

**77. Other property of any kind not already listed** *Examples:* Season tickets, country club membership

Refer to the detailed report of FF&E attached as Exhibit E and referenced in question 39. Unknown

Storage Units
See attached "Detailed Report" of Storage Units and their contents marked as Exhibit O. $34,688.00

**78. Total of Part 11.**
Add lines 71 through 77. Copy the total to line 90. $34,688.00

In short, it appears that none of the bankruptcy case documents on which Bluestone relies referred in any way to FUI's *MDL 1720* claim because nothing in the record of that case gave anyone any reason to believe such a claim existed. As a result, there is no basis to conclude that Bluestone offered to buy that claim, or that FUI agreed to sell it, or that the court authorized such a transaction.

But while the parties to the bankruptcy proceeding paid no attention to that claim, it did exist and FUI owned it when it filed its bankruptcy petition. Bluestone did not buy the claim from FUI in 2016. As a result, the claim continued to belong to FUI in 2020 when it sold its "Remnant Assets" – meaning everything it had not already disposed of – to OPP. Accordingly, I conclude that OPP bought the claim in 2020 and was thus empowered to sell the claim to Park later that year. Park was therefore entitled to register FUI's TIN with the Class Administrator. Bluestone was not.

I do not discount the possibility that Bluestone may have some enforceable right against FUI or some other party arising out of the 2016 FUI-Bluestone APA that relates to the disposition of FUI's *MDL 1720* claim. But Bluestone must assert any such claim against whatever party is liable to it rather than as a direct claim for a portion of the settlement fund. Bluestone has not mentioned the possibility of any such lawsuit, and I do not address its merits here. Further, I would recommend against adjudicating any such claim within the *MDL 1720* litigation. As this Court has already held, such ancillary claims "do not fall under this Court's retained settlement jurisdiction" but must instead be litigated "in independent lawsuits, outside of MDL 1720." *In re MDL 1720 Damages Class Settlement Disputes*, 2026 WL 2389790, at *1 (E.D.N.Y. Aug. 17, 2026).

## III. Recommendation

For the reasons set forth above, I respectfully recommend that the Court direct the Class Administrator to process Park's registration of FUI's TIN ending in 0745 and withdraw CAFS's registration of that TIN on Bluestone's behalf.

## IV. Objections

This Report and Recommendation will be served on Bluestone, CAFS, and Park via the Court's ECF system, and the Class Administrator will also promptly provide a copy to the parties that registered FUI's TIN (CAFS, as Bluestone's agent, and Park). Any interested party shall have 21 days from today's date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-04163-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this Report and Recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect confidentiality and the identities of claimants, as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMC-JAM, Doc. 3, ¶ 4.

Dated: October 15, 2026

*/s/ James Orenstein*
Special Master