UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------ x

IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES

------------------------------------------------------ x

IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTE CONFLICT ID NUMBER:

196532 (SAMUELS JEWELERS, INC.).

------------------------------------------------------ x

REPORT AND RECOMMENDATION OF SPECIAL MASTER

1:24-MC-03415-BMC-JAM

1:26-MC-04244-BMC-JAM

**Parties and Representatives**:

Driftwood IX Funding LLC ("Driftwood")
Darren Yulfo
555 Theodore Fremd Ave., Suite C-303
Rye, NY 10580
(646) 846-9105
parkinterchangeoppclaims@haybeach.com
Representative of Driftwood

Premium ERC LLC, d/b/a Bnkrpt ("Premium")
Eliana Fields and Robert A. Zadek
Buchalter
655 West Broadway, Suite 1600
San Diego, CA 92101
(619) 219-5335
efields@buchalter.com
rzadek@buchalter.com
Counsel for Premium

Rule 23(b)(3) Class Plaintiffs (the "Class")
Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
xanb@rgrdlaw.com
Class Counsel

I. Background

Driftwood and Premium have both registered with the Class Administrator to claim a share of the proceeds of the settlement fund in *In re Payment Card Interchange Fee Merchant Discount Antitrust Litigation*, Dkt. no. 05-MD-1720 (E.D.N.Y.) ("*MDL 1720*") arising out of the payment card transactions of Samuels Jewelers, Inc. ("Samuels"), which has a Taxpayer Identification Number ("TIN") ending in 6316.[1] Both parties assert ownership of the claim based transactions related to the bankruptcy proceedings in *In re Samuels Jewelers, Inc.*, Case No. 18-11818 (KJC) (Bankr. D. Del.) ("*Samuels*"). Driftwood contends that (1) Samuels sold the claim to Wells Fargo Bank, N.A. ("Wells Fargo") in 2019 as part of a court-approved sale of some of the bankruptcy estate's assets; (2) Wells Fargo resold the claim to Oak Point Partners, LLC ("OPP") in 2022; and (3) OPP then resold the claim to Driftwood in 2023. Premium argues that the claim was not among the assets Samuels sold in 2019 but instead remained a part of the bankruptcy estate's remnant assets that it bought from the estate's trustee in 2024. As discussed below, I conclude that Premium owns the claim and therefore respectfully recommend that the Court direct the Class Administrator to process Premium' registration and withdraw Driftwood's.

The record before me includes the following documents:

[1] Before submitting a claim to receive the settlement proceeds corresponding to the payment card transactions of a merchant member of the Rule 23(b)(3) Settlement Class, a party must first register that merchant's TIN with the Class Administrator. The registrant must provide proof that it is the owner (or authorized representative of the owner) of the claim corresponding to that TIN. In the absence of supporting documentation, this requirement can also be satisfied by providing the Claimant ID and Control Number printed on the original prepopulated claim forms that were mailed to known class members. Once the registrant establishes such authority, the Class Administrator updates the registrant's status to "approved." If there is only one approved registrant for a given TIN, the registrant may submit a claim for that TIN. Where multiple parties have registered the same TIN, the Class Administrator designates the TIN as being in "conflict" and does not permit any registrant to submit a claim until the conflict is resolved.

- Notice of Entry of Interim Order, *Samuels*, Doc. 94 (Bankr. D. Del., Aug. 9, 2018);
- Debtor's Motion For an Order Approving the Sale of the Assets, *Samuels*, Doc. 295 (Bankr. D. Del., Oct. 3, 2018) ("Asset Sale Motion");
- Order Authorizing the Sale of Certain Assets, *Samuels*, Doc. 688 (Bankr. D. Del., Feb. 25, 2019) ("Asset Sale Order");
- Execution Version Purchase Agreement dated February 28, 2022, between Samuels as seller and Wells Fargo as purchaser, *Samuels*, Doc. 697-1 (Bankr. D. Del., Feb. 28, 2019) ("2019 Purchase Agreement");[2]
- Notice of Conversion, *Samuels*, Doc. 799 (Bankr. D. Del., Apr. 8, 2019);
- Emails dated July 8, 2022, between OPP and Wells Fargo;
- Asset Purchase Agreement dated November 29, 2022, between Wells Fargo as seller and OPP as purchaser ("2022 APA");
- Claim Sale Agreement dated January 9, 2023, between OPP as seller and Driftwood as purchaser ("2023 CSA");
- Email dated December 26, 2023, from Cozen O'Connor with no specified addressee soliciting best and final offers for the remnant assets of the Samuels bankruptcy estate;
- Asset Purchase Agreement dated January 9, 2024, between the Chapter 7 Trustee of the Samuels Bankruptcy Estate as seller and Premium as purchaser;
- Undated Class Administrator's Conflict Notice;
- Email dated November 4, 2024, from Premium to Class Administrator;
- Emails dated December 9-11, 2024, among Premium, Driftwood, and OPP;
- Email dated January 24, 2024, from Premium to Class Administrator;

---

[2] Neither side has submitted, and I have not seen, a complete executed copy of the 2019 Purchase Agreement. The copy of the Asset Sale Order in the record before me includes, as Exhibit 1 to the order, an unexecuted draft of the complete agreement dated as of February 25, 2019. *See Samuels*, Doc 688-1 (Bankr. D. Del. Feb. 25, 2019). The executed version cited above is also in the public record of the *Samuels* case, but it is incomplete in that it does not include all of the schedules included in the draft appended to the Asset Sale Order. I have compared both versions and confirmed that with respect to the provisions relevant here – in particular, Sections 2.1 and 2.2 – they are identical. The parties appear to assume that the schedules are also the same in both documents, and for purposes of analysis I make the same assumption.

- Class Administrator's Special Master Review Notification dated July 29, 2025;
- Letter dated August 28, 2025, from Driftwood to Special Master ("Driftwood-1");
- Letter dated August 28, 2025, from Premium to Special Master ("Premium-1");
- Letter dated September 12, 2025, from Driftwood to Special Master ("Driftwood-2");
- Letter dated September 12, 2025, from Premium to Special Master ("Premium-2");
- Letter dated September 17, 2025, from Driftwood to Special Master ("Driftwood-3"); and
- Letter dated September 17, 2025, from Premium to Special Master ("Premium-3").

II. Analysis

The parties appear to agree that the *MDL 1720* claim at issue here was part of the bankruptcy estate in *Samuels*. The crux of their dispute is whether that claim was among the assets that Wells Fargo bought in the court-approved 2019 Purchase Agreement. If it was, then Driftwood now owns it, having bought it from OPP in 2023, which in turn bought it from Wells Fargo in 2022. If it was not, then Premium now owns that claim by virtue of its purchase of the estate's remnant assets in 2024.

Driftwood relies on "only two relevant aspects" of the 2019 Purchase Agreement. Driftwood 2 at 1. The first is that "Wells Fargo purchased all credit card accounts receivable from Samuels." *Id.* (citing 2019 Purchase Agreement § 2.1(b)(ii)). The second is that Wells Fargo also bought "all rights, claims, causes of action and credits owned by Seller to the extent relating to any Purchased Assets[.]" 2019 Purchase Agreement § 2.1(vi) (quoted in Driftwood 2

at 1).[3] Driftwood therefore argues that "the only question" is whether Samuels' rights under the Superseding Settlement Agreement, *MDL 1720,* ECF 7257-2 ("Settlement Agreement") "relate to Samuels' credit card accounts receivable." Driftwood 2 at 2. In response to its own question, Driftwood answers that "[t]hey do." *Id.*; *see also* Driftwood 1 at 4 ("The Purchased Assets in the [2019 Purchase Agreement] include rights to payment, claims, and causes of action arising from and related to credit card accounts receivable. Consequently, the right to assert a claim in the [*MDL 1720*] Settlement was sold to Wells Fargo.").

I respectfully disagree. The only sense in which Samuels' *MDL 1720* claim relates to its credit card account receivables is the very broadest one in which all of Samuels' assets are related to one another due to their common original ownership. But the contractual text precludes so broad a construction. The provision that Driftwood cites defines "Purchased Assets" to include "all rights, claims, causes of action and credits owned by Seller *to the extent* relating to any Purchased Assets[.]" 2019 Purchase Agreement § 2.1(b)(vi). That language explicitly limits the provision's scope to something narrower than all of Samuels' "rights, claims, causes of action and credits." Adopting Driftwood's construction of the provision would impermissibly nullify the "to the extent" clause. *See*, *e.g.*, *United States v. Sanofi-Aventis U.S. LLC*, 226 A.3d 1117, 1129 (Del. 2020) ("When interpreting contracts, we construe them as a whole and give effect to every provision if it is reasonably possible.") (citing cases).[4]

Driftwood attempts to overcome that interpretive obstacle by making the *ipse dixit* assertion that "Claims in the [*MDL 1720*] Settlement comprise rights to payment, claims, and

---

[3] In what appears to be a typographical error, the letter actually cites Section 2.1(b)(iv). Driftwood's initial letter correctly attributes the provision to Section 2.1(b)(vi). *Compare* Driftwood 2 at 1 *with* Driftwood 1 at 2.

[4] Delaware law governs the contract's interpretation. *See* 2019 Purchase Agreement § 12.6.

causes of action related to accounts receivable." Driftwood 1 at 4. The contention finds no support in the Settlement Agreement. Samuels was entitled to class membership not because of any "credit card account receivables" but because it accepted Visa and Mastercard payment cards during the 2004-2019 class period. *See* Settlement Agreement ¶ 4. Moreover, Samuels' share of the settlement proceeds was not tied in any way to its credit card accounts receivable, but rather to the amount of interchange fees it paid during the class period. *See* Settlement Agreement, Appendix I (Plan of Administration and Distribution) at I-2 (providing that each claimant's recovery will be based on "Interchange Fees Paid, with no reductions based on rebates, marketing support or promotional payments, or other consideration received").

A more fundamental problem with Driftwood's position is that it does not explain how the accounts receivable that Wells Fargo bought had anything to do with the interchange fees that Samuels had paid and that were allegedly inflated as a result of the *MDL 1720* defendants' allegedly anticompetitive conduct. Driftwood relies on the following portion of the 2019 Purchase Agreement's description of the Purchased Assets: "Credit card accounts receivable arising from third party credit card processor companies for sales, including Visa, American Express, Diners Club, Discover and Master Card accounts receivable." Driftwood 1 at 2 (quoting 2019 Purchase Agreement Schedule 2.1(b)(ii), ¶ 2).[5] Under the applicable law of Delaware, the delivery of good or services for which payment is outstanding creates an account receivable, and a bankruptcy "debtor has no rights in an accounts receivable until the debt is owed. In other words, a security interest in an accounts receivable cannot be perfected until it has attached by

[5] As noted above, the executed version of the 2019 Purchase Agreement that I have seen does not include Schedule 2.1. Driftwood has accurately quoted the provision as it appears in the draft agreement appended to the Asset Sale Order, and I assume the same provision appears in the executed version as well.

means of the debtor having delivered goods or performed services which caused the account to come into existence." *In re PNC Bank, Delaware v. Berg*, 1997 WL 527978, at *9 (Del. Super. Ct. Jan. 31, 1997) (internal citations and emphasis omitted).

That understanding of accounts receivable jibes with most natural reading of the provision defining the assets Samuels sold to Wells Fargo. Those assets included Samuels' right to receive the amounts it was owed for goods and services that it had previously sold to customers using credit cards that it had not yet collected, minus the associated interchange fees. Samuel's right to such amounts arose by virtue of its sales and was satisfied when they were paid. On the other hand, Samuels' interest in recovering some or all of the allegedly inflated interchange fees it had previously paid was not among its accounts receivable; rather, it was the stake of an absent class member in an unresolved class action.[6] Premium offers an illustration that highlights the defect in Driftwood's tacit definition of accounts receivable:

> Samuels' customer initiated a transaction using a Visa credit card in 2010. The acquirer paid the interchange fee and funded Samuels for the transaction. Because Samuels was paid, there is no receivable. However, the Class Action Claims cover this transaction and the corresponding interchange fee. Visa's misconduct in this transaction does not and cannot "relate to" any credit card account receivable.

Premium 3 at 2. I agree. The owner of Samuels' *MDL 1720* claim is entitled to a pro rata share of the settlement fund corresponding the to interchange fee Samuels paid for that hypothetical 2010 transaction, even though Samuels did not have a receivable corresponding to that transaction at the time of the 2019 Purchase Agreement. Thus, the *MDL 1720* claim arising from that transaction was not related to any account receivable.

---

[6] The 2019 Purchase Agreement occurred after the Court granted preliminary approval of the Settlement Agreement on January 24, 2019, but before final approval on December 16, 2019. Thus, at the time of the sale, the Class's claims against the *MDL 1720* defendants remained unresolved.

Samuels' stake in the *MDL 1720* litigation was neither an account receivable nor a claim related in any meaningful way to its accounts receivable. That conclusion refutes the only explanation Driftwood offers for the proposition that Samuels sold the claim at issue here to Wells Fargo in 2019. That in turn means that Wells Fargo did not own the claim and could not sell it to OPP in 2022 and that OPP did not own and could not sell it to Driftwood in 2023. Further, in the absence of any argument or evidence that Samuels disposed of its *MDL 1720* claim in some other way, the fact that Well Fargo did not buy the claim in 2019 means that the claim was among the remnant assets that Premium bought from Samuels in 2024. I therefore conclude that Premium, not Driftwood, owns the claim and is empowered to register Samuels' TIN.

I do not discount the possibility that Driftwood may have some enforceable right against OPP or Wells Fargo or some other party arising out of the 2022 APA or the 2023 CSA. But Driftwood must assert any such claim against whatever party is liable to it rather than as a direct claim for a portion of the settlement fund. Driftwood has not mentioned the possibility of any such lawsuit, and I do not address its merits here. Further, I would recommend against adjudicating any such claim within the *MDL 1720* litigation. As this Court has already held, such ancillary claims "do not fall under this Court's retained settlement jurisdiction" but must instead be litigated "in independent lawsuits, outside of MDL 1720." *In re MDL 1720 Damages Class Settlement Disputes*, 2026 WL 2389790, at *1 (E.D.N.Y. Aug. 17, 2026).

## III. Recommendation

For the reasons set forth above, I respectfully recommend that the Court direct the Class Administrator to process Premium' registration and withdraw Driftwood's.

IV. Objections

This Report and Recommendation will be served on Driftwood and Premium via the Court's ECF system, and the Class Administrator will also promptly provide a copy to both. Any interested party shall have 21 days from today's date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-04244-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this Report and Recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect confidentiality and the identities of claimants, as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMC-JAM, Doc. 3, ¶ 4.

Dated: October 20, 2026

*/s/ James Orenstein*
Special Master