UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTES | REPORT AND RECOMMENDATION OF SPECIAL MASTER |
| | 1:24-MC-03415-BMC-JAM |
| IN RE MDL 1720 DAMAGES CLASS SETTLEMENT DISPUTE CONFLICT ID NUMBERS:<br>148146 (CLAREMONT RESTAURANT GROUP, LLC); and<br>148172 (JP STEAKHOUSE, LLC). | 1:26-MC-04349-BMC-JAM |

**Parties and Representatives**:

Optium Capital, LLC ("Optium")
David B. Sloan
2193 Fillmore Street
San Francisco, CA 94115
(415) 805-8137
claim@optiumcapital.com
Representative of Optium

Spectrum Settlement Recovery ("Spectrum")
Joey Hodges
P.O. Box 480
San Francisco, CA 94104
(415) 392-5900
jhodges@spectrumsettlement.com
Representative of Spectrum

Rule 23(b)(3) Class Plaintiffs (the "Class")
Alexandra S. Bernay
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058
xanb@rgrdlaw.com
Class Counsel

I. Background

Optium and Spectrum have both registered with the Class Administrator to claim a share of the proceeds of the settlement fund in *In re Payment Card Interchange Fee Merchant Discount Antitrust Litigation*, Dkt. no. 05-MD-1720 (E.D.N.Y.) ("*MDL 1720*") arising out of the payment card transactions of Claremont Restaurant Group, LLC, which has a Taxpayer Identification Number ("TIN") ending in 1735 ("Claremont"), and its corporate parent JP Steakhouse, LLC, which has a TIN ending in 3677 ("JP").[1] Spectrum contends that its affiliate Cascade Settlement Services, LLC ("Cascade") bought both claims in 2011, citing a purchase agreement that names Claremont as the seller but makes no specific mention of JP. Optium relies on a claim purchase agreement from 2021 that names both Claremont as a seller and JP as an "affiliate seller" and purports to convey the *MDL 1720* claims of both entities. Optium proposes "to (i) clear the JP conflict in Optium's favor and (ii) clear the Claremont conflict by way of splitting the Claremont claim into two distinct timeframes, one pre-bankruptcy and one post-bankruptcy[.]" Letter dated August 28, 2025, from Optium to Special Master at 1. Optium clarifies its proposal by suggesting a temporal dividing line December 8, 2011, the date of Cascade's purchase of Claremont's claim. *Id.* at 2. As explained below, I conclude that Cascade owns both claims. I therefore respectfully recommend that the Court direct the Class Administrator to process Spectrum's registration of both TINs and withdraw Optium's.

[1] Before submitting a claim to receive the settlement proceeds corresponding to the payment card transactions of a merchant member of the Rule 23(b)(3) Settlement Class, a party must first register that merchant's TIN with the Class Administrator. The registrant must provide proof that it is the owner (or authorized representative of the owner) of the claim corresponding to that TIN. Once the registrant establishes such authority, the Class Administrator updates the registrant's status to "approved." If there is only one approved registrant for a given TIN, the registrant may submit a claim for that TIN. Where multiple parties have registered the same TIN, the Class Administrator designates the TIN as being in "conflict" and does not permit any registrant to submit a claim until the conflict is resolved.

The record before me includes the following documents:

- *JP Steakhouse, LLC, et al. v. American Commercial Capital, LLC, et al.*, Case No. 3:02-cv-00393-HM, Doc. 1 (Complaint) (W.D.N.C. Sept. 24, 2002);[2]
- Notice of Assignment dated October 27, 2011, concerning transfer of Claremont's *MDL 1720* claim to Cascade Settlement Services, LLC ("Cascade") ("2011 Cascade NOA");
- *In re Claremont Restaurant Group, LLC*, Case No. 10-50525 ("*Claremont 2010*"), Doc. 1 (Bankr. W.D.N.C. Apr. 16, 2010) ("Petition");
- *Claremont 2010*, Doc. 260 (Order Authorizing the Substantive Consolidation of Non-Debtor Affiliates) (Bankr. W.D.N.C. Aug. 2, 2011) ("Consolidation Order");
- *Claremont 2010*, Doc. 295 (motion for order authorizing Debtor to sell *MDL 1720* claim) (Bankr. W.D.N.C. Nov. 3, 2011) ("Claim Sale Motion");[3]
- *Claremont 2010*, Doc. 298 (order authorizing Debtor to sell *MDL 1720* claim) (Bankr. W.D.N.C. Nov. 23, 2011) ("Claim Sale Order");
- Asset Purchase and Sale Agreement dated December 8, 2011, between Claremont as seller and Cascade as purchaser ("2011 Cascade APA");
- *Claremont 2010*, Doc. 311 (proposed Plan of Reorganization) (Bankr. W.D.N.C. Dec. 30, 2011) ("Reorganization Plan");
- *Claremont 2010*, Doc. 338 (Order Confirming Plan of Reorganization) (Bankr. W.D.N.C. Feb. 10, 2012) ("Confirmation Order");
- *Claremont 2010*, Doc. 344 (Notice of Occurrence of Effective Date) (Bankr. W.D.N.C. Mar. 6, 2012);
- Claim Purchase Agreement dated October 16, 2021, between Claremont and certain affiliates (including JP) as seller and Optium Fund 5, LLC as purchaser ("2021 Optium CSA);

---

[2] This document includes all of the five-page Complaint and an addendum reading: "Note: This is a partially scanned document. Please see the case file for attachments, exhibits, affidavits, or other material which has not been scanned."

[3] Although the Claim Sale Order references the underlying Claim Sale Motion, neither side has submitted a copy of the latter. I have retrieved the motion from the *Claremont 2010* public docket and have considered in my analysis. Similarly, I have retrieved from the public docket and considered the proposed Plan of Reorganization and Notice of Occurrence of Effective Date listed below.

- Notice of Assignment dated October 16, 2021, concerning transfer of Claremont's *MDL 1720* claims of Claremont and certain affiliates (including JP) to Optium Fund 5, LLC ("2021 Optium NOA");
- Document titled "Customer Identification Information – Litigation Claims" dated October 8, 2021, providing information about Claremont and JP;
- *In re Claremont Restaurant Group, LLC*, Case No. 22-60012 ("*Claremont 2022*"), Doc. 1 (Petition) (Bankr. S.D. Tex. Mar. 8, 2022);
- Class Administrator's Conflict Notice dated April 5, 2024;
- Undated document showing Employer Identification Number for JP (reflecting database updated on July 12, 2024);
- Class Administrator's Special Master Review Notice dated July 29, 2025;
- Emails dated May 31, 2024, through November 11, 2025, among the parties and the Class Administrator concerning status of registrations and conflicts;[4]
- Letter dated August 27, 2025, from Spectrum to Special Master ("Spectrum 1");[5]
- Letter dated August 28, 2025, from Optium to Special Master ("Optium 1");
- Letter dated September 12, 2025, from Spectrum to Special Master ("Spectrum 2");
- Letter dated September 12, 2025, from Optium to Special Master ("Optium 2");
- Letter dated September 17, 2025, from Spectrum to Special Master ("Spectrum 3");
- Letter dated September 17, 2025, from Optium to Special Master ("Optium 3");

## II. Analysis

The parties disagree about two issues. First, they disagree about the scope of the 2011 Optium APA: Spectrum contends that it bought the *MDL 1720* claims of both Claremont and JP,

[4] The record also includes an email dated August 26, 2025, from Spectrum to the Class Administrator about the misfiling of a document relevant to a different conflict.

[5] Spectrum explains that its submissions are made "through its affiliate Cascade[.]" *Id.* at 1.

while Optium argues that Spectrum bought only the former. Second, they disagree as to who should recover the portion of the settlement attributable to Claremont's transactions. Spectrum believes that having bought the whole claim it should get all of that recovery. Optium asserts that it should get the portion of the claim that accrued after Spectrum's claim purchase on December 8, 2011. I agree with Spectrum on both matters.

A. The Bankruptcy Court Authorized the Sale of Both Claremont's Claim and JP's

The 2011 Cascade APA contains two provisions that create ambiguity about whether the transaction included JP's *MDL 1720* claim in addition to Claremont's. In one of the contract's recitals, the parties stated their intent "to transfer from Seller to Purchaser any and all of *the Seller's right, title and interest* in and or associated with, or connected in any manner to, any Asset that may arise from the Litigation." 2011 Cascade APA at 2 (Recital H) (emphasis added). Viewed in isolation, that appears to contemplate the sale of no more than the claim that Claremont (the only named "Seller") owned. But Claremont's claim was not necessarily the only "Asset" that was being conveyed under the agreement. That term is defined in an earlier provision: "The Asset is a Litigation Right that *the Seller is authorized by the Plan of Reorganization to sell*." *Id*. at 1 (Recital D) (emphasis added).

Each of those recitals must be read in context to give each one meaning. *See* Cal. Civ. Code. § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 503, 115 P.3d 68, 72 (2005) (the effect of § 1641 "is to disfavor constructions of contractual provisions that would render other provisions surplusage"); 2011 Cascade APA § 6.5 (providing that the agreement is governed by California law). That interpretive rule is satisfied by reading the contract to convey Claremont's *MDL 1720*

claim as well as anything else that the Reorganization Plan authorized Claremont to convey. However, as of the date of the 2011 Cascade APA, the Reorganization Plan had neither been filed nor confirmed.

That does not mean that Recital D has no meaning independent of Recital H. Instead, interpreting the Recitals requires consideration of other parts of the bankruptcy court record because, as Optium correctly observes, that order authorizing the 2011 Cascade APA formally took effect only upon the Reorganization Plan's effective date, which occurred months after the agreement was signed. *See* Optium 2 at 1.

At the time of the 2011 Cascade APA, the bankruptcy court had already entered a Consolidation Order that consolidated Claremont's bankruptcy estate with those of eight affiliates, including JP. *See* Consolidation Order at 2, 4. The court's rationale for that consolidation provides useful context.

> 4. *The Debtor and Affiliated Entities have conducted business as an integrated whole since their inception*. Not only do they share common ownership and management, but they also employ a centralized procurement system for equipment, goods and supplies, a centralized cash management process, and a consolidated accounting system. The Debtor is the central hub for each of these functions, making it an indispensable component in the operation of each and every restaurant location. Certain of the Affiliated Entities hold licenses and contracts necessary for the operation of individual restaurant locations, making the Affiliated Entities [indispensable] to the ongoing operation of the restaurant system.
>
> 5. Substantive consolidation of the Affiliated Entities' estates is warranted in this case because *their affairs are inextricably intertwined* with those of the Debtor. In fact, to date, the estate of each Affiliated Entity has been administered through the Debtor's chapter 11 case.
>
> 6. *Creditors have dealt with the Debtor and the Affiliated Entities, largely, as though they comprised a single economic unit*. For instance, many unsecured creditors have provided goods or services at locations owned by the various Affiliated Entities, but these unsecured creditors dealt with the Debtor on financial matters. Secured creditors, like BB&T have extended credit to the Debtor jointly with certain Affiliated Entities and have required guaranties from

> outside individuals, indicating acknowledgement that business assets are held jointly among the Debtor and Affiliated Entities.
>
> …
>
> 8. *While it may be possible to separate the various assets and liabilities of the Debtor and the Affiliated Entities, the time and expense required for such an undertaking is cost prohibitive. Further, the affairs of the Debtor and Affiliated Entities are so intertwined that such sub-division would serve no distinguishable purpose.*
>
> 9. *The Debtor anticipates filing a Plan of Reorganization which will rely upon the consolidation sought in the Motion*. In order to facilitate reorganization and to resolve objections to the Motion, the Debtor modified the request at the Hearing that Substantive Consolidation should not take effect until the Effective Date of a Plan either proposed or supported by the Debtor occurs as such date is defined in a confirmation Plan.
>
> …
>
> 11. The substantive consolidation of the estates of the Debtor and the Affiliated Entities is in the best interests of the Debtor, the Affiliated Entities, their estates, creditors and all parties in interest.

*Id*. at 2-3 (emphasis added). The consolidation of estates thus recognized the reality that Claremont's assets were inextricably intertwined with JP's and those of its other affiliates and that disentangling them would be cost-prohibitive and serve no useful purpose.[6] In contrast, consolidation would benefit the estate's creditors as well as the affiliated companies themselves. And importantly, the court explicitly noted that the anticipated Reorganization Plan would "rely upon the consolidation[.]" *Id*. at 3.

---

[6] Optium faults Spectrum for "fail[ing] to observe that the [Claim Sale Order] was *pending the Effective Date of the Plan* which was in February 2012, a date and event *subsequent to and not part of their claim purchase*." Optium 2 at 1 (italics in original). In criticizing that omission, Optium itself omits important information. Specifically, the court explained that it postponed the effective date of the order at Claremont's request "[i]n order to facilitate reorganization and to resolve objections to the Motion." Consolidation Order at 3. In doing so, the court did not disavow its observation in the order's preceding paragraph that separating Claremont's assets from those of the affiliated entities would be cost-prohibitive and useless.

The Consolidation Order set the groundwork for everything that followed in the bankruptcy proceedings. Less than four months after issuing the order and explaining its rationale, the court granted Claremont's Asset Sale Motion. Claremont reported that it had not received any offers for its *MDL 1720* claim other than Cascade's and that by selling the claim, Claremont would avoid a variety of risks attendant to holding a stake in the litigation and potential settlement of *MDL 1720*. Claim Sale Motion at 3.[7] It further reported that its aim in selling the *MDL 1720* claim was "to immediately realize additional funds for the benefit of its estate, thereby increasing the pool of assets available for creditor distribution." *Id*. at 5. The court agreed: in granting the motion it found that Cascade's offer was "the highest and best offer for the Asset" and was "in the best interests of the estate and its creditors." Claim Sale Order at 3.

Including the *MDL 1720* claims of all of the consolidated affiliate entities undoubtedly increased the value of the assets Claremont contemplated selling and thereby increased the price it could demand in return. Based on figures provided by the Class Administrator about the amount of Visa and Mastercard interchange fees Claremont and JP each paid during the Class period, I calculate that adding JP's claim alone raised the value of the sale assets by about more than ten percent. *See* Superseding Settlement Agreement, *MDL 1720* Doc. 7257-2 at I-2 (plan of distribution "based on the Claimant's Interchange Fees Paid as compared to the total amount of Interchange Fees Paid attributable to all Claimants").

---

[7] Those risks included:

> (a) the risk that the Plaintiffs fail to certify a class in the Class Action Interchange Litigation; (b) the risk that a Settlement Event does not occur; ( c) the risk that the case is dismissed; ( d) the risk that the Defendants prevail; ( e) the risk that the size of any potential settlement fund is unknowable prior to the Settlement Event; and (f) the risk that the ultimate payment of any awards could occur many years into the future, the Debtor negotiated the Sale Agreement with the Purchaser.

*Id*.

The court also found that "[a] sale of the Asset other than one free and clear of liens, claims and encumbrances would impact the estate materially and adversely and will yield substantially less for the estate." *Id*. That finding bolsters the conclusion that the court anticipated the sale not only of Claremont's *MDL 1720* claim, but also the affiliates' claims. Given the court's earlier finding that Claremont and its affiliates "ha[d] conducted business as an integrated whole since their inception," Consolidation Order at 2, separating ownership of the affiliates' *MDL 1720* claims could spark later litigation over the companies' respective settlement shares. The only practical way to avoid that risk, and thereby to convey Claremont's stake in *MDL 1720* "free and clear of … claims" was to sell all of the affiliates' claims together.

When it granted the Claim Sale Motion, the court had already found the assets of Claremont and JP (and other affiliates) to be essentially inseparable, it had found that the affiliated entities' estates should be consolidated into one estate, and that the proposed asset sale would benefit the estate and its creditors. Against that backdrop, the proposition that the court contemplated a sale only of Claremont's stake in the *MDL 1720* litigation, and not those of affiliated entities like JP, is implausible. The court had already found both that separating the affiliates' assets would be cost-prohibitive and that the proposed asset sale maximized the amount of money available for distribution to the estate's creditors. Those two findings make clear the court's intention to authorize the sale of all of the affiliates' *MDL 1720* claims together so as to secure more money for the creditors and to avoid the cost to the estate of separating those assets.[8]

---

[8] Indeed, if selling only Claremont's claim had provided value to the estate and its creditors, the parties and the court would have had every incentive to pursue additional sales of the affiliated entities' claims. The fact that the record reflects no consideration of any such transaction makes sense only if all concerned understood that Cascade had already bought the affiliates' claims as part of the 2011 Cascade APA.

Viewing the 2011 Cascade APA in that context gives meaning to the reference in Recital D to “a Litigation Right that the Seller is authorized by the Plan of Reorganization to sell” despite the fact that the Plan did not yet exist. At the time of the asset sale, the bankruptcy court had already stated that the anticipated Reorganization Plan would rely on the consolidation of the estates of Claremont, JP, and other affiliates, and it had authorized the sale of Claremont’s *MDL 1720* claim in a manner that would maximize the benefit to debtors and creditors alike. I therefore conclude that the “Asset” Cascade bought in 2011, defined as “a Litigation Right that the Seller is authorized by the Plan of Reorganization to sell,” included the affiliated entities’ *MDL 1720* claims as well as Claremont’s.

Consistent with that interpretation, Confirmation Order that approved the Reorganization Plan ratified the court’s earlier orders and the transactions under those orders. In particular, the Confirmation Order “authorized, directed, and empowered” the “Debtor, Affiliated Entities, Reorganized Debtor and Reorganized Affiliated Entities – a group that included Claremont and JP, *see* Reorganization Plan §§ 1.3, 1.25 – “to take all actions … reasonably necessary or appropriate to effectuate the consummation and implementation of the Plan *and to consummate the transactions contemplated thereby*.” Confirmation Order at 6 (order I, emphasis added). The order further provided that on the effective date, the reorganized entities would “automatically be vested with all property of the Estate … except as otherwise specifically provided in the Plan.” *Id*. (order J). And as an interpretive guide, the court added that “[t]he provisions of the Plan, the Confirmation Evidence, and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each. *Id*. at 8 (order Q).[9]

[9] The order defined “Confirmation Evidence” as “the record and the evidence … presented, and the argument of counsel made, at the February 6, 2012 hearing to consider, *inter alia*, the confirmation of the Plan[.]”

Taken together these provisions authorized Claremont and its affiliates to "consummate the transactions" the Reorganization Plan "contemplated" and vested in the reorganized entities only such property as remained in the consolidated estates upon the effective date. That property did not include the assets sold in the 2011 Cascade APA, which took effect – and thereby conveyed to Cascade the affiliated entities' *MDL 1720* claims – upon the Reorganization Plan's effective date. The 2011 Cascade APA was plainly one of the transactions that the Reorganization Plan contemplated – indeed, the Court had previously stated that the plan would "rely" on the Consolidation Order, and the Asset Sale Order was designed to increase the value to creditors of the consolidated estates. Construing the record in this way best effectuates the purposes of the Reorganization Plan, the Confirmation Evidence (which included the Consolidation Order and the Asset Sale Order as part of the record), and the Confirmation Order.

Accordingly, I conclude that on the effective date of the Confirmation Order the *MDL 1720* claim associated with JP's TIN became the property of Cascade rather than of the reorganized JP. As a result, the claim was not JP's to sell to Optium in 2021. I therefore respectfully recommend that the Court direct the Class Administrator to process Spectrum's registration of JP's TIN and withdraw Optium's.

B. <u>Optium Is Not Entitled To Any Portion of the Claremont Claim</u>

Optium takes the position that it bought the *MDL 1720* claims of both Claremont (defined as the "Parent Seller") and JP (defined as one of several "Affiliated Sellers" and, together with Claremont and the other Affiliated Sellers, as "Sellers") under its agreement with Claremont in 2021. *See* 2021 Optium CSA at 1 (preamble) & Ex. D. The signature block of that contract is reproduced below:

| **Purchaser** | **Parent Seller** |
| --- | --- |
| Optium Fund 5, LLC | Claremont Restaurant Group LLC, on behalf of Itself and the Affiliated Sellers Listed on Exhibit D to the Agreement |
| By: DocuSigned by: Neil Kornswiet 85B3380AEB1040E... | By: Jimmie L Peterson |
| Name: Neil B. Kornswiet | Name: Jimmie L. Peterson |
| Title: Chief Executive Officer | Title: Owner |

*Id*. at 13.

I assume that Owner Jimmie L. Peterson ("Peterson") is the same person as Chief Executive Officer Jim L. Peterson who signed the 2011 Cascade APA on Claremont's behalf.[10] In each of the agreements, the Seller represented having the authority to convey the assets being sold. *See* 2011 Cascade APA § 3.2 ("Subject to the entry of the Sale Order, the Seller has the requisite power and authority … to perform the transactions contemplated hereby or thereby"); 2021 Optium CSA § 3.1 ("Each Seller has the requisite power and authority … to perform the transactions contemplated hereby[.]"). Peterson thus signed two agreements that explicitly purported to sell Claremont's *MDL 1720* claim.

In suggesting that it should recover on the portion of the Claremont claim attributable to credit card transactions occurring after the 2011 Cascade APA, Optium relies on two propositions. First, Optium contends that the 2011 Cascade APA conveyed only so much of Claremont's *MDL 1720* claim as had accrued by the date the agreement was executed. *See* Optium 2 at 2. That misreads the agreement itself: what Claremont sold was "any and all of the

[10] Peterson's name is typed on the signature line; there is neither a handwritten signature nor an electronically validated signature of the kind Optium used to execute the agreement. Nevertheless, for purposes of analysis, I assume that Peterson effectively executed the agreement. I also assume that the phrase "on behalf of Itself and the Affiliated Sellers" conveyed that Peterson was authorized to sign on behalf of JP, even though the signature block is designated as that of only the "Parent Seller" (*i.e.*, Claremont alone). The document has no signature block specifically for any of the Affiliated Sellers.

Seller's right, title and interest in and or associated with. or connected in any manner to, any Asset that may arise from the [*MDL 1720*] Litigation." 2011 Cascade APA at 2 (Recital H). Such language cannot be squared with the proposition that Cascade withheld from the sale the portion of the claim that would accrue in the future.[11]

Nor would it make sense for Cascade to have purchased such a limited claim or for the court to have authorized such a sale. At the time of the 2011 Cascade APA, the parties to *MDL 1720* had not yet agreed to any settlement and were awaiting resolution of motions for summary judgment and class certification, among others. Cascade would have had every reason to assume that if the litigation resulted in any recovery for members of the then-putative class, the relevant damages period would extend years beyond the transaction date. In the absence of any limiting language in the 2011 Cascade APA, there is no reason to believe that Cascade anticipated buying only so much of that claim as would accrue before the resolution of Claremont's bankruptcy action. Similarly, there is no reason to believe that the court, in authorizing the sale, contemplated such a restriction, which would necessarily limit the value of the transaction for the estate and the creditors.

Second, Optium asserts that when the Reorganization Plan became effective, a new and legally distinct Claremont came into existence – one that had not sold the *MDL 1720* claim accruing from that day forward. *See* Optium 2 at 2. But in doing so, Optium does not

---

[11] Optium also does not square the date it proposes as the beginning of the period for which it should recover with its position that the 2011 Cascade APA did not take effect until almost four months later. *See Claremont 2010*, Doc. 344 (notice of occurrence of effective date on Mar. 1, 2012). Its proposal to use the date of the 2011 Cascade APA as the dividing line for separating its recovery from Spectrum's mean that Optium is asking to be given the portion of the settlement fund attributable to Claremont's transactions from December 8, 2011, through March 1, 2012. Because the reorganized Claremont did not exist before the latter date, even under Optium's own theory, that portion of the claim clearly belongs to Spectrum.

acknowledge that the only source of the new entity's assets was the sum total of the assets the old entity had owned when the Reorganization Plan took effect. *See* Confirmation Order at 6 (Order K) ("On the Effective Date, the Assets of the Debtor and each Affiliated Entity shall be automatically deemed transferred to the Reorganized Debtor and each respective Reorganized Affiliated Entity."). Thus, the new entity only owned the assets that belonged to the old one when the plan became effective. Since that is when the 2011 Cascade APA took effect, the "old" Claremont did not own any portion of the *MDL 1720* claim arising from its past or future transactions and therefore could not transfer any such claim to the new Claremont. When the new Claremont came into existence, Cascade already owned the *MDL 1720* claim arising from its future payment card sales.

Optium cites no authority to the contrary. The only judicial opinion it cites is *In re Dow Corning Corp*., 280 F.3d 648 (6th Cir. 2002). *See* Optium 2 at 2 n.2. Without a page citation for what it purports to quote, Optium writes that the Sixth Circuit's opinion in that case "affirms bifurcation of claims in bankruptcy based on 'distinct ownership and operational changes.'" *Id*. But nothing in *Dow Corning* – an opinion that does not include the words Optium has placed between quotation marks – supports the proposition that where a debtor sells an unresolved legal claim, the reorganized debtor may sell it again after reorganization.

Optium goes on to compare this case to *Dow Corning* to forestall awarding all of the Claremont claim to Spectrum which, in Optium's view, "would unjustly enrich Cascade/Spectrum at Optium's expense, violating settlement equity." *Id*. at 2. As Optium frames the matter, "Claremont's closure of restaurants, rejection of contracts, and emergence with only 25 locations mirror Dow Corning's 'leaner' post-petition entity, justifying a temporal split in Interchange Settlement rights. The court noted that such bifurcation ensures equitable treatment

in class-like contexts, preventing overreach by prior owners." *Id.* at 2 n.2. But while the Sixth Circuit in *Dow Corning* did allude to a bankruptcy court's role as a court of equity with "broad authority to modify creditor-debtor relationships[,]" 280 F.3d at 656 (quoting *United States v. Energy Resources Co.,* 495 U.S. 545, 549 (1990)), it did not suggest that a court could reach back to change the terms of an executed agreement between a debtor and a non-party."[12]

Nothing in the 2021 Optium CSA refers to Claremont's prior bankruptcy or gives any clue that, prior to reorganization, Claremont had sold its *MDL 1720* claim. To the contrary, the agreement's Representations and Warranties of Seller include an apparently exhaustive disavowal of any earlier disposition of that claim. *See* 2021 Optium CSA § 3.3. The record does not disclose whether Optium was nevertheless aware, based on due diligence, that Claremont had sold its claim in 2011. But regardless of whether it had made such an inquiry, that sale was a matter of public record in the docket of the Seller's bankruptcy proceedings that was available to Optium for review. If, at the time of the 2021 Optium CSA, Optium had wanted to include language in the agreement clarifying its position that it was buying assets that the pre-reorganization Claremont could not have included in that earlier sale, it was in a position to do so. For the foregoing reasons, I conclude that in 2021, Claremont did not own and therefore could not sell to Optium the *MDL 1720* claim associated with the TIN that Claremont had throughout the Class period. Accordingly, I respectfully recommend that the Court direct the Class Administrator to process Spectrum's registration of Claremont's TIN and withdraw Optium's.

---

[12] In any event, the *Claremont 2010* bankruptcy court, having explicitly authorized the 2011 Cascade APA, had no apparent reason to retroactively change its terms.

I do not discount the possibility that Optium may have some enforceable right against Claremont or some other party arising out of the 2021 Optium CSA. But Optium must assert any such claim against whatever party is liable to it rather than as a direct claim for a portion of the settlement fund. Optium has not mentioned the possibility of any such lawsuit, and I do not address its merits here. Further, I would recommend against adjudicating any such claim within the *MDL 1720* litigation. As this Court has already held, such ancillary claims "do not fall under this Court's retained settlement jurisdiction" but must instead be litigated "in independent lawsuits, outside of MDL 1720." *In re MDL 1720 Damages Class Settlement Disputes*, 2026 WL 2389790, at *1 (E.D.N.Y. Aug. 17, 2026).

## III. Recommendation

For the reasons set forth above, I respectfully recommend that the Court direct the Class Administrator to process Spectrum's registration of both of the TINs at issue and to withdraw Optium's.

## IV. Objections

This Report and Recommendation will be served on Optium and Spectrum via the Court's ECF system, and the Class Administrator will also promptly provide a copy to both. Any interested party shall have 21 days from today's date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-04349-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this Report and Recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect

confidentiality and the identities of claimants, as appropriate. The Court shall review the Special Master's reports and recommendations *de novo*. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMC-JAM, Doc. 3, ¶ 4.

Dated: October 27, 2026

*/s/ James Orenstein*
Special Master